Case Nos. 25-60055, 25-60149, 25-60329, 25-60453

IN THE

# United States Court of Appeals for the Fifth Circuit

VISTRA CORPORATION, ET AL.,
*Petitioners*,
v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

(*caption continued on inside cover*)

On Petitions for Review of Orders of the Federal Energy Regulatory Commission

**OPENING BRIEF OF PETITIONERS LEEWARD RENEWABLE ENERGY, LLC, RWE CLEAN ENERGY, LLC, DESRI HOLDINGS, L.P., INVENERGY WIND DEVELOPMENT NORTH AMERICA LLC, INVENERGY SOLAR DEVELOPMENT NORTH AMERICA LLC, INVENERGY NELSON LLC, LIGHTSOURCE RENEWABLE ENERGY OPERATIONS, LLC, AND NEXTERA ENERGY RESOURCES, LLC**

STEVEN P. HOLLMAN
ABRAHAM J. SHANEDLING
BRUCE A. GRABOW
JENNIFER BROUGH
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1941

*Counsel for Leeward Renewable Energy, LLC, RWE Clean Energy, LLC, DESRI Holdings, L.P., Invenergy Wind Development North America LLC, Invenergy Solar Development North America LLC, Invenergy Nelson LLC, Lightsource Renewable Energy Operations, LLC, and NextEra Energy Resources, LLC*

No. 25-60055

VISTRA CORPORATION; DYNEGY MARKETING AND TRADE, L.L.C.; LS POWER DEVELOPMENT, L.L.C.; ALPHA GENERATION, L.L.C.; ELECTRIC POWER SUPPLY ASSOCIATION; NEW ENGLAND POWER GENERATORS ASSOCIATION, INCORPORATED; NATIONAL GRID RENEWABLES DEVELOPMENT, L.L.C.; INDEPENDENT POWER PRODUCERS OF NEW YORK, INCORPORATED; THE PJM POWER PROVIDERS GROUP; LEEWARD RENEWABLE ENERGY, LLC; RWE CLEAN ENERGY, LLC; DESRI HOLDINGS, L.P.; INVENERGY WIND DEVELOPMENT NORTH AMERICA, LLC; INVENERGY SOLAR DEVELOPMENT NORTH AMERICA, LLC; LIGHTSOURCE RENEWABLE ENERGY OPERATIONS, LLC; NEXTERA ENERGY RESOURCES, LLC,

*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

consolidated with

No. 25-60149

INVENERGY NELSON LLC

*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

consolidated with

No. 25-60329

LEEWARD RENEWABLE ENERGY, LLC; RWE CLEAN ENERGY, LLC; DESRI HOLDINGS, L.P.; INVENERGY WIND DEVELOPMENT NORTH AMERICA, LLC; INVENERGY SOLAR DEVELOPMENT NORTH AMERICA, LLC; LIGHTSOURCE RENEWABLE ENERGY OPERATIONS, LLC; NEXTERA ENERGY RESOURCES, LLC; VISTRA CORPORATION; DYNEGY MARKETING AND TRADE, L.L.C.; LS POWER DEVELOPMENT, L.L.C.; ALPHA GENERATION, L.L.C.; ELECTRIC POWER SUPPLY ASSOCIATION; NEW ENGLAND POWER GENERATORS ASSOCIATION, INCORPORATED; GERONIMO POWER, L.L.C.; INDEPENDENT POWER PRODUCERS OF NEW YORK, INCORPORATED; THE PJM POWER PROVIDERS GROUP,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

consolidated with

No. 25-60453

PUBLIC SERVICE ELECTRIC & GAS COMPANY; PSEG POWER, L.L.C.; PSEG ENERGY RESOURCES & TRADE, L.L.C.,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

**CERTIFICATE OF INTERESTED PERSONS**

Number and Style of Case: Nos. 25-60055; 25-60149; 25-60329; 25-60453, *Vistra Corporation, et al.*, *v. Federal Energy Regulatory Commission*.

The undersigned counsel of record certifies the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

| **Petitioners** | **Counsel** |
| --- | --- |
| Leeward Renewable Energy, LLC; RWE Clean Energy, LLC; DESRI Holdings, L.P.; Invenergy Wind Development North America LLC; Invenergy Solar Development North America LLC; Invenergy Nelson LLC; Lightsource Renewable Energy Operations, LLC; and NextEra Energy Resources, LLC | Steven P. Hollman<br>Abraham J. Shanedling<br>Bruce A. Grabow<br>Jennifer Brough<br>SHEPPARD, MULLIN, RICHTER & HAMPTON LLP |
| Vistra Corporation; Dynegy Marketing and Trade, LLC; LS Power Development LLC; Electric Power Supply Association; New England Power Generators Association, Inc.; Geronimo Power, LLC (formerly known as National Grid Renewables Development, LLC); Independent Power Producers of New York; and The PJM Power Providers Group | James E. Tysse<br>Stephen J. Hug<br>Kristen E. Loveland<br>Matthew S. Noxsel<br>Margaret O'Brien Rusconi<br>AKIN, GUMP, STRAUSS, HAUER & FELD LLP |
| Alpha Generation, LLC | Christopher M. Odell<br>ARNOLD & PORTER KAYE SCHOLER LLP |

Public Service Electric & Gas Company; PSEG Power, LLC; and PSEG Energy Resources & Trade, LLC.

Masha G. Hansford
Kannon K. Shanmugam
James Durling
Nathan W. Raab
Jacob R. Schulz
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

| **Respondent** | **Counsel** |
| --- | --- |
| Federal Energy Regulatory Commission | Robert Harris Solomon<br>Beth Guralnick Pacella<br>Susanna Y. Chu |

| **Intervenor-Respondents** | **Counsel** |
| --- | --- |
| Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois, and Ameren Transmission Company of Illinois; Arkansas Electric Cooperative Corporation; City Water, Light & Power (Springfield, IL); Cooperative Energy; Dairyland Power Cooperative; East Texas Electric Cooperative; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy Texas, Inc.; Great River Energy; Indianapolis Power & Light Company; Lafayette Utilities System; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Missouri River Energy Services; Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power Company, a Minnesota corporation, and Northern States Power | Wendy N. Reed<br>Wendy B. Warren<br>WRIGHT & TALISMAN, P.C. |

| | |
|---|---|
| Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); and Southern Minnesota Municipal Power Agency | |
| Illinois Office of the Attorney General | Sarah A. Hunger<br>OFFICE OF THE ILLINOIS ATTORNEY GENERAL |
| Maryland Office of People's Counsel and the New Jersey Division of Rate Counsel | Stephen C. Pearson<br>SPIEGEL & MCDIARMID LLP |
| New Jersey Division of Rate Counsel | Stephen C. Pearson<br>SPIEGEL & MCDIARMID LLP |
| Monitoring Analytics, LLC | Jeffrey W. Mayes<br>MONITORING ANALYTICS, LLC |
| Northern Virginia Electric Cooperative, Inc. | Debra D. Roby<br>Alan I. Robbins<br>WASHINGTON ENERGY LAW LLP |
| Old Dominion Electric Cooperative | Matthew R. Rudolphi<br>THOMPSON COBURN LLP |
| PJM Interconnection, LLC | Ryan J. Collins<br>WRIGHT & TALISMAN, P.C. |
| Virginia Electric and Power Company d/b/a Dominion Energy Virginia | Cheri Yochelson<br>DOMINION ENERGY, SERVICES, INC.<br><br>Stephen John Snyder<br>WOMBLE BOND DICKINSON, LLP |

**Other Interested Parties**

All parties on the service list for FERC Docket No. RM22-2-000. *See* Dkt. 5-2 at 10-35.

OMERS Administrative Corporation

RWE AG

D.E. Shaw Renewable Investments, LLC

Invenergy Renewables LLC

Invenergy Renewables Holdings LLC

Invenergy IRH Holdings LLC

IIC Renewables Holdings LLC

Invenergy Investment Company LLC

Invenergy Investment Holdings LLC

Polsky Energy Investments LLC

Polsky Energy Holdings LLC

CDPQ Renewable Holdings Inc.

CDPQ Investments (U.S.) Inc.

Green Renewables Holdings LLC

BP p.l.c.

Vanguard Group Inc.

Invenergy Thermal LLC

Invenergy Thermal Operating I LLC

Invenergy Thermal Operating I Holdings LLC

Invenergy AMPCI Thermal Power LLC

InfraBridge North America Thermal Power Acquisition LLC

Invenergy Clean Power LLC

InfraBridge North America Thermal Power Holdings LP

InfraBridge North America Thermal Power Intermediate LP

InfraBridge North America Thermal Power Midco LP

GIF II US Aggregator LP

InfraBridge Global Infrastructure Fund II A LP (Luxemburg)

InfraBridge  Global Infrastructure Fund II B LP (Luxemburg)

InfraBridge Global Infrastructure Fund II C LP ( Luxemburg)

InfraBridge Global Infrastructure Fund II E LP ( Luxemburg)

InfraBridge Investors (GIF II GP) S.à.r.l

InfraBridge North America Thermal Power GP LLC

GIF II US Aggregator GP LLC

DB Puma GIF II GP Holdco LLC

DB Puma GP Holding LLC

DB Puma Master Holdco LLC

DigitalBridge Operating Company LLC

DigitalBridge Group Inc. (NYSE: DBRG)

*/s/ Steven P. Hollman*
Steven P. Hollman

*Attorney of Record for Leeward Renewable Energy, LLC, RWE Clean Energy, LLC, DESRI Holdings, L.P., Invenergy Wind Development North America LLC, Invenergy Solar Development North America LLC, Invenergy Nelson LLC, Lightsource Renewable Energy Operations, LLC, and NextEra Energy Resources, LLC*

**Corporate Disclosure Statement of Reactive Service Provider Petitioners**

Pursuant to Federal Rule of Appellate Procedure 26.1, unless otherwise stated below, there are no corporations that are either parents of any petitioner or that own stock in the petitioners.

1. Leeward Renewable Energy, LLC ("LRE"). LRE is an indirect, wholly-owned subsidiary of OMERS Administration Corporation, a Canadian statutory corporation without share capital.

2. RWE Clean Energy, LLC ("RWECE"). RWECE is a subsidiary of RWE AG, its parent company, which is a publicly-traded corporation that owns 10% or more of RWECE.

3. DESRI Holdings, L.P. ("DESRI"). DESRI previously participated in the FERC proceedings underlying this appeal through its subsidiary, D.E. Shaw Renewable Investments, LLC. However, as a result of a reorganization and sale subsequent to the FERC Orders at issue in this appeal, DESRI is now the party aggrieved by FERC's Orders.

4. Invenergy Wind Development North America LLC ("Invenergy Wind"). Invenergy Wind is a privately held, limited liability company and subsidiary of Invenergy Renewables LLC; Invenergy Renewables Holdings LLC; Invenergy IRH Holdings LLC; IIC Renewables

Holdings LLC; Invenergy Investment Company LLC; Invenergy Investment Holdings LLC; Polsky Energy Investments LLC; and Polsky Energy Holdings LLC. In addition, the following entities own financial interests in Invenergy Renewables Holdings LLC: CDPQ Renewable Holdings Inc.; CDPQ Investments (U.S.) Inc.; and Green Renewables Holdings LLC.

5. Invenergy Solar Development North America LLC ("Invenergy Solar"). Invenergy Solar is a privately held, limited liability company and subsidiary of Invenergy Renewables LLC; Invenergy Renewables Holdings LLC; Invenergy IRH Holdings LLC; IIC Renewables Holdings LLC; Invenergy Investment Company LLC; Invenergy Investment Holdings LLC; Polsky Energy Investments LLC; and Polsky Energy Holdings LLC. In addition, the following entities own financial interests in Invenergy Renewables Holdings LLC: CDPQ Renewable Holdings Inc.; CDPQ Investments (U.S.) Inc.; and Green Renewables Holdings LLC.

6. Lightsource Renewable Energy Operations, LLC ("Lightsource"). Lightsource is a subsidiary of BP p.l.c., its parent company, which is a publicly-traded corporation that owns 10% or more of Lightsource.

7. NextEra Energy Resources, LLC ("NextEra"). NextEra certifies that Vanguard Group, Inc., owns 10% percent or more of NextEra.

8. Invenergy Nelson LLC ("Invenergy Nelson"). Invenergy Nelson is a privately held limited liability company with parent entities Invenergy Thermal LLC, Invenergy Thermal Operating I LLC, Invenergy Thermal Operating I Holdings LLC, Invenergy AMPCI Thermal Power LLC ("Invenergy AMPCI"), InfraBridge North America Thermal Power Acquisition LLC ("InfraBridge NA"), Invenergy Clean Power LLC ("Invenergy Clean Power"), Invenergy Investment Company LLC, Invenergy Investment Holdings LLC, Polsky Energy Investments LLC, and Polsky Energy Holdings LLC. InfraBridge NA and Invenergy Clean Power each hold a 50% interest in Invenergy AMPCI. InfraBridge NA has parent entities InfraBridge North America Thermal Power Holdings LP, InfraBridge North America Thermal Power Intermediate LP, InfraBridge North America Thermal Power Midco LP, GIF II US Aggregator LP, InfraBridge Global Infrastructure Fund II A LP (Luxemburg), InfraBridge Global

Infrastructure Fund II B LP (Luxemburg), InfraBridge Global Infrastructure Fund II C LP (Luxemburg), InfraBridge Global Infrastructure Fund II E LP (Luxemburg), and, via the general partners (InfraBridge Investors (GIF II GP) S.à.r.l., InfraBridge North America Thermal Power GP LLC, and GIF II US Aggregator GP LLC), DB Puma GIF II GP Holdco, LLC, DB Puma GP Holding, LLC, DB Puma Master Holdco, LLC, DigitalBridge Operating Company, LLC, and DigitalBridge Group, Inc. (NYSE: DBRG). Although DigitalBridge Group, Inc. may constitute a "parent" entity by virtue of its control over the relevant general partner entities, the general partners do not hold a direct or indirect equity interest in InfraBridge North America Thermal Power Holdings LP. No publicly held company owns 10% or more of Invenergy Nelson LLC.

9. Others who are not participants in this specific appeal but may be financially interested in its outcome include those individuals and parties that participated in the underlying FERC proceedings (FERC Docket No. RM22-2-000).

*/s/ Steven P. Hollman*
Steven P. Hollman

*Attorney of Record for Leeward Renewable Energy, LLC, RWE Clean Energy, LLC, DESRI Holdings, L.P., Invenergy Wind Development North America LLC, Invenergy Solar Development North America LLC, Invenergy Nelson LLC, Lightsource Renewable Energy Operations, LLC, and NextEra Energy Resources, LLC*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners Reactive Service Providers respectfully request oral argument. This petition concerns the Federal Energy Regulatory Commission's unexplained reversal of decades of its own precedent and raises complex issues of statutory, administrative, and constitutional law concerning a technical ratemaking matter. Oral argument will aid the Court in resolving these issues and understanding the administrative record.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ix

TABLE OF AUTHORIITIES ............................................................................ xii

GLOSSARY..........................................................................................................xix

JURISDICTIONAL STATEMENT ......................................................................1

INTRODUCTION ..................................................................................................2

STATEMENT OF THE ISSUES...........................................................................6

STATEMENT OF THE CASE...............................................................................7

A. The Nation's Power Grid Would Collapse Without Reactive Power Service Provided By Generators. ......................7

B. FERC Permitted Reactive Power Compensation For Decades. ..........................................................................10

C. Generators Incur Significant Costs To Produce Reactive Power...........................................................................15

D. FERC Suddenly And Arbitrarily Eliminated Reactive Power Compensation. ...............................................17

E. FERC Denied Rehearing, And The Reactive Service Providers Timely Sought Petitions For Review. ......................21

F. The D.C. Circuit Recently Vacated A Similar FERC Order That Had Eliminated Reactive Power Compensation.......................................................21

SUMMARY OF ARGUMENT ............................................................................24

STANDING ...........................................................................................................27

STANDARD OF REVIEW ...................................................................................27

ARGUMENT ....................................................................................................28

I. FERC Failed To Demonstrate That Existing Rates Providing Compensation For Reactive Power Are Unjust, Unreasonable, Or Unlawful....................................................................................29

A. FERC's Finding That Generators Incur No Or *De Minimis* Costs To Provide Reactive Power Within The Deadband Is Arbitrary And Capricious. ....................................29

B. FERC's Claim That Generators Already Are "Obligated" To Provide Deadband-Level Reactive Power As "Good Utility Practice" Is Arbitrary And Capricious. ..........................34

C. FERC's Finding Of Administrative Burden To Displace Current Rates Is Arbitrary And Capricious. ..............................41

II. FERC Failed To Demonstrate That Eliminating Compensation For Reactive Power Within The Deadband Is Just And Reasonable.........................................................................................42

A. FERC's Zero Dollar Replacement Rate Is Arbitrary And Capricious And Denies Certain Generators The Ability To Recover Their Costs. ..........................................................42

1. FERC provided no viable revenue or cost recovery substitutes. ...................................................................44

2. FERC improperly disregarded the financial harm of eliminating reactive power compensation..................47

3. FERC's findings violate cost causation principles.........50

B. A Zero Dollar Replacement Rate Is Discriminatory And Preferential And Effects An Unconstitutional Taking.............53

1. FERC's orders allow undue discrimination and preference. ....................................................................53

2. FERC's orders result in unconstitutional takings...........58

III. Vacatur Is Appropriate. ...................................................................60

CONCLUSION ..............................................................................................61

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Acadian Gas Pipeline Sys. v. FERC*,
878 F.2d 865 (5th Cir. 1989) ....................33, 38

*Ala. Elec. Co-op., Inc. v. FERC*,
684 F.2d 20 (D.C. Cir. 1982)....................53

*Am. Clean Power Ass'n v. FERC*,
54 F.4th 722 (D.C. Cir. 2022)....................28, 54, 56, 57

*Ameren Servs. Co. v. FERC*,
880 F.3d 571 (2018)....................*passim*

*Atl. City Elec. Co. v. FERC*,
295 F.3d 1 (D.C. Cir. 2002)....................42

*Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n*,
262 U.S. 679 (1923)....................58

*BNP Paribas Energy Trading GP v. FERC*,
743 F.3d 264 (D.C. Cir. 2014)....................51

*Capital Power Corp. v. FERC*,
156 F.4th 644 (D.C. Cir. 2025)....................*passim*

*Chamber of Commerce of United States v. SEC*,
85 F.4th 760 (5th Cir. 2023)....................28, 38

*Consol. Edison Co. of N.Y., Inc. v. FERC*,
45 F.4th 265 (D.C. Cir. 2022)....................37

*Duquesne Light Co. v. Barasch*,
488 U.S. 299 (1989)....................58

*Dynegy Midwest Generation, Inc. v. FERC*,
633 F.3d 1122 (D.C. Cir. 2011)....................7, 9, 57

*El Paso Elec. Co. v. FERC*,
832 F.3d 495 (5th Cir. 2016)....................27, 31, 39, 41

*El Paso Electric Co. v. FERC*,
76 F.4th 352 (5th Cir. 2023) ....................37, 50, 51, 53

*Elec. Consumers Res. Council v. FERC*,
747 F.2d 1511 (D.C. Cir. 1984)....................54

*Emera Maine v. FERC*,
854 F.3d 9 (D.C. Cir. 2017)....................28, 29, 45, 60

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....................48, 49

*Env't Def. Fund v. FERC*,
2 F.4th 953 (D.C. Cir. 2021)....................47

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................38

*Fla. Gas Transmission Co. v. FERC*,
876 F.2d 42 (5th Cir. 1989) ....................60

*FPC v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944)....................48

*FPC v. United Gas Pipe Line Co.*,
386 U.S. 237 (1967)....................43

*Gulf S. Pipeline Co. v. FERC*,
955 F.3d 1001 (D.C. Cir. 2020)....................40, 50, 57

*Gulf States Util. Co. v. FERC*,
411 U.S. 747 (1973)....................54

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015)....................59

*Ill. Commerce Comm'n v. FERC*,
576 F.3d 470 (7th Cir. 2009) ....................50

*Jersey Cent. Power & Light Co. v. FERC*,
810 F.2d 1168 (D.C. Cir. 1987)....................43, 47

*Jupiter Energy Corp. v. FERC*,
407 F.3d 346 (5th Cir. 2005) ....................................................................38

*Midwest ISO Transmission Owners v. FERC*,
373 F.3d 1361 (D.C. Cir. 2004)...........................................................10, 11

*Midwestern Gas Transmission Co. v. FPC*,
292 F.2d 119 (5th Cir. 1961) ...........................................................42, 43

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*,
*Wash.*, 554 U.S. 527 (2008)........................................................................54

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................44

*Nat'l Ass'n of Regul. Util. Com'rs v. FERC*,
475 F.3d 1277 (D.C. Cir. 2007).....................................................................13

*NRG Power Mktg., LLC v. FERC*,
862 F.3d 108 (D.C. Cir. 2017).......................................................................29

*Placid Oil Co. v. FERC*,
875 F.2d 487 (5th Cir. 1989) .........................................................................28

*PSEG Energy Res. & Trade LLC v. FERC*,
665 F.3d 203 (D.C. Cir. 2011).......................................................................31

*S. Co. Servs., Inc. v. FERC*,
416 F.3d 39 (D.C. Cir. 2005).........................................................................39

*Smyth v. Ames*,
169 U.S. 466 (1898).................................................................................43, 59

*Sw. Airlines Co. v. FERC*,
926 F.3d 851 (D.C. Cir. 2019).......................................................................38

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) .........................................................................32

*Tarpon Transmission Co. v. FERC*,
860 F.2d 439 (D.C. Cir. 1998).......................................................................34

*Texas v. EPA*,
132 F.4th 808 (5th Cir. 2025) ....................................................................60, 61

*Texas v. United States*,
126 F.4th 392 (5th Cir. 2025) ..........................................................................61

*TransCanada Power Mktg., Ltd. v. FERC*,
811 F.3d 1 (D.C. Cir. 2015)...............................................................................46

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...........................................................................................27

*Village of Morrisville v. FERC*,
136 F.4th 1117 (D.C. Cir. 2025).......................................................................28

*Wisconsin v. FERC*,
104 F.3d 462 (D.C. Cir. 1997)...........................................................................45

*Xcel Energy Servs. v. FERC*,
41 F.4th 548 (D.C. Cir. 2022)......................................................................54, 55

**Administrative Decisions**

*Am. Elec. Power Serv. Corp.*,
Opinion No. 440, 88 FERC ¶ 61,141 (1999).....................................................12

*Black Hills Colo. Elec., LLC*,
182 FERC ¶ 61,162 (2023) ...............................................................................31

*Bluegrass Generation Co., LLC*,
118 FERC ¶ 61,214 (2007), *order on reh'g*, 121 FERC ¶ 61,018 (2007) .........33

*Compensation for Reactive Power Within the Standard Power Factor Range*,
Order No. 904, 189 FERC ¶ 61,034 (2024)...............................................*passim*

*Compensation for Reactive Power Within the Standard Power Factor Range*,
189 FERC ¶ 62,127 (2024) ..........................................................................1, 21

*Compensation for Reactive Power Within the Standard Power Factor Range*,
Order Addressing Arguments Raised on Rehearing, 191 FERC ¶ 61,188 (2025) ........ *passim*

*Dynegy Midwest Generation, Inc.*,
125 FERC ¶ 61,280 (2008) ........ 12, 33

*Dynegy Midwest Generation, Inc.*,
Opinion No. 498, 121 FERC ¶ 61,025 (2007) ........ 9, 13

*Entergy Servs. Inc.*,
143 FERC ¶ 61,120 (2013) ........ 32

*Fern Solar, LLC*,
Opinion No. 591, 189 FERC ¶ 61,035 (2024), *modifying on denial of reh'g*, 190 FERC ¶ 61,133 (2025) ........ 34

*Interconnection for Wind Energy*,
Order 661, 111 FERC ¶ 61,353 (2005) ........ 36, 51

*Kern River Gas Transmission Co.*,
117 FERC ¶ 61,077 (2006), *on reh'g*, 123 FERC ¶ 61,056 (2008), *on reh'g*, 126 FERC ¶ 61,034 (2009) ........ 32

*Midcontinent Indep. Sys. Operator, Inc.*,
182 FERC ¶ 61,033 (2023) ........ 22

*Midcontinent Indep. Sys. Operator, Inc.*,
187 FERC ¶ 61,170 (2024) ........ 56

*Promoting Wholesale Competition Through Open-Access Non-Discriminatory Transmission Services by Public Utilities*,
Order 888, 61 Fed. Reg. 21,540 (May 10, 1996) ........ *passim*

*Pub. Serv. Co. of N.H.*,
61 FERC ¶ 61,256 (1992) ........ 32

*Reactive Power Requirements for Non-Synchronous Generation*,
Order 827, 155 FERC ¶ 61,277 (2016), *order clarified*, 155 FERC ¶ 61,003 (2016) ........ *passim*

*Reliability Standards to Address Inverter-Based Resources*,
Order 901, 185 FERC ¶ 61,042 (2023) .......... 17

*Rules Concerning Certification of the Electric Reliability Organization; and Procedures for the Establishment, Approval, and Enforcement of Electric Reliability Standards*,
Order 672, 114 FERC ¶ 61,104 (2006) .......... 40

*Standardization of Generation Interconnection Agreements and Procedures*,
Order 2003, 104 FERC ¶ 61,103 (2003) .......... *passim*

*Standardization of Generation Interconnection Agreements and Procedures*,
Order 2003-A, 106 FERC ¶ 61,220 (2004) .......... 12, 13

*Standardization of Generation Interconnection Agreements and Procedures*,
Order on Rehearing, Order 2003-C, 111 FERC ¶ 61,401 (2005) .......... 13

*Va. Elec. & Power Co.*,
114 FERC ¶ 61,318 (2006) .......... 33

**Statutes**

5 U.S.C.
§ 706(2)(A) .......... 28, 60

16 U.S.C.
§ 824d .......... 42
§ 824d(b) .......... 53
§ 824e(a) .......... 53, 54
§ 825*l*(a) .......... 1
§ 825*l*(b) .......... 1

**Other Authorities**

Brad Plumer, *Grids Are Surviving the Storm. But the Next 5 Years Could Be Rough*, N.Y. Times (Jan. 30, 2026), https://www.nytimes.com/2026/01/30/climate/winter-storm-power-grid-us-canada.html .......... 2

Katherine Blunt & Jennifer Hiller, *America's Biggest Power Grid Operator Has an AI Problem—Too Many Data Centers*, THE WALL STREET J. (Jan. 12, 2026), https://www.wsj.com/business/energy-oil/power-grid-ai-data-centers-1235f296?st=YqSMmD&reflink=desktopwebshare_permalink .......... 2

NERC, *1999 System Disturbances: Review of Selected Electric System Disturbances in North America* (Mar. 2001)........................................................8

NERC, *Essential Reliability Services Task Force Measures Framework Report* (2015), https://www.nerc.com/globalassets/programs/rapa/ra/erstf-framework-report---final.pdf. ..........................................................................................8

NERC, *Long-Term Reliability Assessment* (2026), https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf ......................................................................6

NERC Steering Group, *Technical Analysis of the August 14, 2003, Blackout: What Happened, Why, and What Did We Learn? Report to the NERC Board of Trustees* (July 13, 2004) ....................................................................8

*Third-Party Provision of Reactive Supply and Voltage Control and Regulation and Frequency Response Services*, Docket No. AD14-7-000, FERC Staff Report: Payment for Reactive Power (Apr. 22, 2014), https://www.ferc.gov/sites/default/files/2020-05/04-11-14-reactive-power.pdf ..........................................................................................................16

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Co-Petitioners | Vistra Corporation; Dynegy Marketing and Trade, LLC; LS Power Development LLC; Electric Power Supply Association; New England Power Generators Association, Inc.; Geronimo Power, LLC (formerly known as National Grid Renewables Development, LLC); Independent Power Producers of New York; The PJM Power Providers Group; Alpha Generation, LLC; Public Service Electric & Gas Company; PSEG Power, LLC; and PSEG Energy Resources & Trade, LLC |
| FERC or Commission | Federal Energy Regulatory Commission |
| FPA | Federal Power Act, 16 U.S.C. § 791, *et seq*. |
| MISO | Midcontinent Independent System Operator, Inc. |
| NERC | North American Electric Reliability Corporation |
| OATT | Open Access Transmission Tariff |
| Order 904 | Order 904, *Compensation for Reactive Power Within the Standard Power Factor Range*, 189 FERC ¶ 61,034 (2024), R.126 |
| PPA | Power Purchase Agreement |
| Reactive Service Providers | Petitioners Leeward Renewable Energy, LLC; RWE Clean Energy, LLC; DESRI Holdings, L.P.; Invenergy Wind Development North America LLC; Invenergy Solar Development North America LLC; Invenergy Nelson LLC; Lightsource Renewable Energy Operations, LLC; and NextEra Energy Resources, LLC |
| Rehearing Order | Order Addressing Arguments Raised on Rehearing, *Compensation for Reactive Power Within the Standard Power Factor Range*, 191 FERC ¶ 61,188 (2025), R.141 |

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 16 U.S.C. § 825*l*(b) because the consolidated petitions for review challenge final orders issued by FERC. R.126 (*Compensation for Reactive Power Within the Standard Power Factor Range*, 189 FERC ¶ 61,034 (2024) ("*Order 904*")); R.133 (Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Compensation for Reactive Power Within the Standard Power Factor Range*, 189 FERC ¶ 62,127 (2024) ("*Rehearing Notice*")); and R.141 (Order Addressing Arguments Raised on Rehearing, *Compensation for Reactive Power Within the Standard Power Factor Range*, 191 FERC ¶ 61,188 (2025) ("*Rehearing Order*")).[1] Each Petitioner, including the Reactive Service Providers, sought rehearing of *Order 904*, timely petitioned for review of *Order 904* and the *Rehearing Notice*, and timely filed supplemental petitions for review of FERC's *Rehearing Order* (Case Nos. 25-60055, 25-60149, 25-60329, and 25-60453). *See* 16 U.S.C. § 825*l*(a).

[1] FERC's *Order 904* and *Rehearing Order* are cited as "*Order 904* at P [Paragraph Number]" and "*Rehearing Order* at P [Paragraph Number]," respectively. All other original-record documents are cited as "R.[Record Item Number in FERC's Certified Index]:[Page Number of the Document]." These documents are cited by their overall PDF number, even when the document has internal pagination. Citations to "Dkt." refer to the docket entry for the lead case in this Court, Case No. 25-60055.

# INTRODUCTION

This petition for review concerns whether FERC met its statutory burden under the Federal Power Act ("FPA") and the Administrative Procedure Act ("APA") when it abruptly decided to eliminate the ability of independent power generators to collect hundreds of millions of dollars in annual compensation for fulfilling the FERC mandate to provide reactive power—a service that is indispensable to the moment-by-moment operation of the nation's electric grid.

Unlike "real power" that supports our homes and businesses, reactive power serves a different, equally vital purpose. Reactive power allows transmission grid operators to meet their FERC-imposed responsibility to maintain adequate voltages and keep the grid stable under changing conditions. Without enough reactive power, voltage on the transmission grid collapses and blackouts can occur, endangering the reliability of the entire electric system and the ability to service customers. And grid reliability concerns are only becoming more pronounced with surging demand for electricity tied to data centers and extreme weather events.[2]

[2] *See* Brad Plumer, *Grids Are Surviving the Storm. But the Next 5 Years Could Be Rough*, N.Y. Times (Jan. 30, 2026), https://www.nytimes.com/2026/01/30/climate/winter-storm-power-grid-us-canada.html; Katherine Blunt & Jennifer Hiller, *America's Biggest Power Grid Operator Has an AI Problem—Too Many Data Centers*, THE WALL STREET J. (Jan. 12, 2026), https://www.wsj.com/business/energy-oil/power-grid-ai-data-centers-1235f296?st=YqSMmD&reflink=desktopwebshare_permalink.

Reactive power service is so essential to grid reliability that for decades, FERC has required generators to supply it within a preset range – called the "deadband" – as a condition to connect to the transmission grid. And for just as long, FERC has permitted generators to be paid for that mandated service by filing and collecting a cost-of-service rate for reactive power.

This rate framework for compensating reactive power generators was rooted in economic rationality and FERC's foundational cost causation principle that those who benefit from a service—transmission providers and their customers—should shoulder its costs. In turn, independent generators relied on reactive power rates – approved hundreds of times by FERC – to invest in necessary equipment, structure long-term contracts, and secure financing. In recent years, annual compensation for reactive power has totaled approximately $700 million.

But then, despite decades of recognizing reactive power as a critical, mandated, and compensable service, FERC abruptly and arbitrarily reversed course. In 2024, FERC proposed a new rate regime where generators still would be required to provide deadband-level reactive power to connect to the grid, but, although numerous other FERC-jurisdictional reliability products receive compensation, generators no longer would be compensated for doing so. The Reactive Service Providers and numerous other parties strenuously urged FERC to reject that proposal, explaining why it was factually flawed and would lead to an

unjust, unreasonable, unduly discriminatory, and preferential outcome in violation of the FPA.

But over these objections and without any abiding reason to do so, FERC approved its own proposal, dismissing decades of FERC precedent and principles and the financial commitments and regulatory expectations of independent generators, while leaving transmission providers free to continue to recover the cost for their own reactive power assets in generation and located on the transmission grid. The resulting *Order 904* did not rest on careful study, evidence-based substantiation, or any new technical revelation about reactive power. FERC supplied no reasonable basis for its about-face and therefore failed to meet its dual burden under the FPA: it neither proved existing reactive power rates were unjust and unreasonable nor lawfully demonstrated that ending compensation would be just and reasonable.

Instead, FERC claimed that the costs to generators to comply with reactive power requirements do not warrant compensation because FERC characterized those costs as at most *de minimis* and pronounced that providing reactive power within the deadband was merely the "good utility practice" obligation of generators. But those findings were unmoored from substantial record evidence to the contrary, demonstrating that generators incur real and significant costs to provide reactive power and that they do so at the direct behest of *transmission*

*providers* who have the FERC and North American Electric Reliability Corporation ("NERC") mandates to maintain grid reliability. Indeed, generators are not in the transmission business; transmission providers are in the transmission business. That is why transmission providers, not generators, can be subject to civil penalties and even criminal charges under the FPA for failing to maintain grid reliability.

By categorically stripping independent generators of their ability to recoup their costs of providing reactive power, FERC arbitrarily and capriciously dismissed their legitimate financial reliance interests and legal protections as public utilities under the FPA against forced service without just and reasonable compensation.

Left intact, FERC's mistaken orders also would rubberstamp a distorted and discriminatory marketplace where independent generators (who only produce and supply electricity to transmission providers (utilities) so they can serve their retail customers) cannot get paid for providing reactive power, but similarly situated transmission providers who own or have affiliated generation or transmission with reactive asset capabilities and also move the electricity to the local market still can. FERC gave little thought to this obvious outcome—a classic example of arbitrary-and-capricious decision making.

At a time when transmission providers need to take major action to address "worsening" grid reliability, avoid widespread blackouts, and enhance the use of the transmission grid to support data centers, eliminating compensation to those entities that provide a key reliability resource – reactive power – makes FERC's orders even more arbitrary.[3]

Because FERC's actions were unlawful, arbitrary, and capricious, the Court should vacate the challenged FERC orders.

## STATEMENT OF THE ISSUES

**1.** Whether FERC acted arbitrarily, capriciously, and contrary to law by finding that electric generators are obligated to provide critical reactive power to the nation's electric grid but no longer are entitled to receive annual compensation for the associated costs of providing that mandated service, thereby depriving those electric generators annually of hundreds of millions of dollars in earned compensation.

**2.** Whether FERC violated the FPA and the APA by eliminating existing rates for reactive power compensation with the deadband without demonstrating, based on record evidence, that those rates were unjust, unreasonable, or unduly discriminatory or preferential.

---

[3] *See* NERC, *Long-Term Reliability Assessment*, at 6 (2026), https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf.

**3.** Whether FERC violated the FPA and APA by eliminating compensation for reactive power within the deadband without adequately responding to evidence and specific concerns that doing so is not just and reasonable and would allow for undue discrimination and violation of generators' constitutional rights.

## STATEMENT OF THE CASE

### A. The Nation's Power Grid Would Collapse Without Reactive Power Service Provided By Generators.

The Reactive Service Providers develop, own, and operate electric generating facilities across the country and sell electric power products and services to transmission service providers, including independent system operators ("ISOs"), regional transmission organizations ("RTOs"), utilities, and businesses such as data centers. R.130:3. Electric generators supply two different types of alternating current ("AC") electricity: active or "real" power, and reactive power. *Capital Power Corp. v. FERC*, 156 F.4th 644, 648 (D.C. Cir. 2025). Whereas, real power is the typical type used for running things like motors or lighting a home, reactive power "serves a different purpose. It helps maintain a stable voltage across the electric grid, which ensures that real power may be reliably transmitted." *Id*. Reactive power is required to maintain the proper functioning of the electric grid, as "inadequacies in reactive power can cause voltage collapse and blackouts." *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1124 (D.C. Cir. 2011)

(citing FERC Staff Report, AD05-1-1000, *Principles for Efficient and Reliable Reactive Power Supply and Consumption* 17-20 (2005)[4]); *see also* R.91:101-05 [Bethel.Affidavit.¶¶54-63]. For example, inadequate reactive resources were identified as a contributing cause of the widespread blackouts that occurred in the late 1990s and early 2000s. NERC, *1999 System Disturbances: Review of Selected Electric System Disturbances in North America* at 9, 11-12, 20 (Mar. 2001); NERC Steering Group, *Technical Analysis of the August 14, 2003, Blackout: What Happened, Why, and What Did We Learn? Report to the NERC Board of Trustees* at 1, 25, 94, 107 (July 13, 2004).

There are three primary entities involved in the provision of electric power: (1) generators who produce electricity; (2) transmission providers who own or operate transmission assets that move the electricity to the local market; and (3) distributors who deliver the electricity to the end user. *Capital Power*, 156 F.4th at 647. Often the transmission provider and distributor are the same entity as a franchised utility. Owners of generation, like the Reactive Service Providers, sell reactive power service to transmission providers, including RTOs and ISOs.

---

[4] *Available at* https://www.ferc.gov/sites/default/files/2020-04/20050310144430-02-04-05-reactive-power.pdf; *see also* NERC, *Essential Reliability Services Task Force Measures Framework Report* at 16 (Dec. 2015), https://www.nerc.com/globalassets/programs/rapa/ra/erstf-framework-report---final.pdf ("The ability to control the production and absorption of reactive power for the purposes of maintaining desired voltages is critical to the reliable and efficient operation of the power system.").

R.130:3. RTOs and ISOs manage electricity markets. RTOs and ISOs do not own transmission lines, but have authority to operate the transmission lines owned by their members that are utilities. Both RTOs and ISOs, as well as transmission service providers (utilities) that are not part of an RTO or ISO, recoup their costs of purchasing reactive power service from their transmission customers. *Dynegy*, 633 F.3d at 1124-25. Transmission providers require sufficient levels of reactive power to meet their good utility practice and NERC obligations to maintain the safe and reliable operation of the transmission grid. *See Promoting Wholesale Competition Through Open-Access Non-Discriminatory Transmission Services by Public Utilities*, Order 888, 61 Fed. Reg. 21,540, 21,580-83 (1996) ("*Order 888*"); R.91:8-11.

Transmission providers obtain reactive power in two ways: one is by installing their own facilities, usually capacitors, as part of their transmission system (the cost of which is part of the basic transmission service); the second is by relying on generating facilities to supply reactive power and voltage control. *Order 904* at P 4; *see also* R.91:42; R.91:101-02 [Bethel.Affidavit.¶¶54-57]. While many transmission providers obtain reactive power from independent generators, many transmission providers are "vertically integrated utilities" and have their own or affiliated generation facilities, which compete with independent

generators and are also sources of reactive supply. *See Capital Power*, 156 F.4th at 648; *Dynegy*, 663 F.3d at 1125; R.91:63; R.91:141-42 [Bethel.Affidavit.¶¶150-51].

Because FERC has recognized that reactive power is an essential service "required for grid reliability," it long has required that electric generators generally maintain a continuous rate of reactive power output within a standard range or "deadband" as a condition to receiving FERC-jurisdictional interconnection service. *Capital Power*, 156 F.4th at 648; *Order 904* at P 6.

**B. FERC Permitted Reactive Power Compensation For Decades.**

"In the bad old days," power grids were run by "vertically integrated, monopolies" that owned generation, transmission, and distribution facilities, and "[c]ompetition among utilities was not prevalent." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004) (citation omitted). But in 1996, FERC issued *Order 888*, which required transmission-owning utilities (transmission providers) to provide independent electric generators with open, non-discriminatory access to interstate transmission facilities. *Id.* at 1363-64 (citing *Order 888*). To do so, FERC required all utilities to unbundle their generation and transmission services and to file an open-access, non-discriminatory tariff ("OATT"). *Id.* The transmission provider investment in transmission assets, including reactive devices, would be collected from transmission customers per rolled-in cost-of-service rates. *Id.* Transmission provider-owned generation and

independent generation would have access to the grid on the same terms and conditions and thus compete on a level playing-field to sell power at market-based rates. *Id.*

Based on recommendations of NERC, FERC also determined that six "ancillary services" – including "Reactive Supply and Voltage Control From Generation Sources Service" – were "needed to accomplish transmission service while maintaining reliability within and among control areas affected by the transmission service." *Order 888* at 21,581-82. FERC therefore required transmission providers to offer such ancillary services (including reactive power) and required their transmission customers, in turn, to purchase those services as a condition and part of the cost to obtain transmission service. *Id.* Five of the ancillary services would be priced at market-based rates. However, because reactive power does not travel and is provided locally, FERC determined that a lack of market power (as basis for market-based rate) was not achievable and thus ordered that transmission providers' rates for reactive power be "cost-based" and set forth in a standard "Schedule 2" to the OATT. *Id*. at 21,580-82, 21,590; *see Capital Power*, 156 F.4th at 648.

Before *Order 888*, transmission providers had no need to isolate the cost to provide reactive power because the all-in generator cost was simply charged to retail customers or purchasers of the power output, and transmission providers

would utilize generation as needed to maintain grid reliability. Post-*Order 888*, however, transmission providers needed to treat generation differently. Transmission provider-generation and independent generation would now compete to sell real power usually at market-based rates. That same generation would also provide ancillary service products, including reactive power. Thus, the cost to develop, own, and operate electric generation that supports the reactive function needed to be isolated. FERC thus spent years assessing means to isolate the cost of generation that provides reactive power service. R.91:90-92 [Bethel.Affidavit.¶¶27-34]. In 1999, FERC adopted the cost-based "AEP Methodology" to allocate the fixed costs of generating facilities between real and reactive power. *Am. Elec. Power Serv. Corp.*, Opinion No. 440, 88 FERC ¶ 61,141 (1999); *see also Dynegy Midwest Generation, Inc.*, 125 FERC ¶ 61,280 at P 11 (2008) ("The *AEP* methodology calculates just and reasonable capability-based reactive power rates that recover the fixed costs associated with providing reactive power service."); R.91:91-92,129-41 [Bethel.Affidavit.¶¶30-33, 123-149].

A few years later, with *Order 2003*, FERC required that, as a condition to connect to the transmission grid, generators *must* provide reactive power within the deadband to support the transmission grid. *Standardization of Generation Interconnection Agreements and Procedures*, Order 2003, 104 FERC ¶ 61,103 at PP 34-38, 541-42 (2003) ("*Order 2003*"), *on reh'g*, Order 2003-A, 106 FERC

¶ 61,220 (2004) ("*Order 2003-A*"). Although FERC also concluded – with little explanation – that generators should not be compensated for providing reactive power within the deadband, it still allowed reactive power compensation *outside* of the deadband and permitted RTOs or ISOs to deviate from these principles. *Order 2003* at P 548. However, on reconsideration in *Order 2003-A*, FERC concluded that if a transmission provider "pa[id] its own or its affiliated generators for reactive power within the established range," then the transmission provider must also compensate independent generators for their reactive power. *Order 2003-A* at P 416.

On further rehearing, FERC found that because providing reactive power within the deadband is "an important service," payments to independent generators for such service do not constitute "windfall" to them, and FERC therefore confirmed they are entitled to payment. *Standardization of Generation Interconnection Agreements and Procedures*, Order on Rehearing, Order 2003-C, 111 FERC ¶ 61,401 at P 42 (2005)*, aff'd sub nom. Nat'l Ass'n of Regul. Util. Com'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007); *see also Dynegy Midwest Generation, Inc.*, Opinion No. 498, 121 FERC ¶ 61,025 at P 82 (2007) (finding there is "a cost to the generator of providing reactive power to the transmission system for the benefit of transmission customers . . . . [who] [w]ithout such extra reactive power . . . would not be able to use the transmission system" and "the cost

associated with this extra reactive power is properly collected from transmission customers").

In 2016, FERC examined reactive power provided by "non-synchronous" generators, such as wind and solar facilities, confirming again "the benefits to the transmission system" of reactive power and finding that "[t]ransmission providers require reactive power to control system voltage for efficient and reliable operation of an alternating current transmission system." *Reactive Power Requirements for Non-Synchronous Generation*, Order 827, 155 FERC ¶ 61,277 at PP 6, 35 (2016) ("*Order 827*"), *order clarified*, 157 FERC ¶ 61,003 (2016); R.91:110-12 [Bethel.Affidavit.¶¶77-80]. Recognizing advancements in wind and solar plant generation to be able to follow and respond to transmission provider voltage directives, FERC required all newly-connected, non-synchronous generating facilities to provide reactive power within the deadband as a condition to interconnect to the grid. *Order 827* at PP 4-5. Importantly, FERC also found that such non-synchronous generators should be eligible for the same reactive power compensation as other generators and made clear that FERC would "not change [its] existing policies on compensation for reactive power." *Id.* at PP 50-52. FERC reached that decision based on its "balancing the *costs* to newly-interconnecting non-synchronous generators of providing reactive power with the

benefits to the transmission system of having another source of reactive power." *Id*. at P 35 (emphasis added).

### C. Generators Incur Significant Costs To Produce Reactive Power.

Underlying FERC's compensation policy for reactive power generation was the foundational fact that producing deadband-level reactive power required by interconnection agreements demands considerable investment and incremental costs by generators, well beyond their costs of producing real power. For example, since the mid-2000s, the Midcontinent Independent System Operator, Inc. ("MISO") – an RTO – has compensated hundreds of independent generators for providing mandatory reactive power service, and in just 2022, generators' collective, cost-based, annual reactive power revenue requirement – approved by FERC – was $220 million for that region alone. *Capital Power*, 156 F.4th at 651 (citing *Midcontinent Indep. Sys. Operator, Inc.*, 182 FERC ¶ 61,033 (2023) (Danly, Comm'r, dissenting at P 3)). When added to the reactive power revenue requirements of other transmission providers, that industry figure is approximately ***$700 million annually***. R.129:4.

The reasons for these costs are straightforward. To satisfy requirements to provide reactive power within the deadband to the transmission grid, generation companies must install larger and more capable generators, transformers, and other equipment. R.85:40 [Knight.Affidavit.¶11]; R.91:37-40; R.91:104-05,117-21

[Bethel.Affidavit.¶¶62-65,94-103]; R.130:35-37. Non-synchronous wind or solar-powered plants, in particular, can only meet deadband levels of reactive power by installing larger inverter capacity or adding capacitor banks, as FERC recognized in *Order 827*. R.85:40 [Knight.Affidavit.¶11]; R.91:37-38; R.93:48-50 [Dumais.Testimony]; R.130:35-36; *see Order 827* at P 35. Those costs, as a FERC staff report found, can be up to 20% of a generator's entire project capital costs. R:84:14-15.[5] Plus, as all of this reactive power equipment ages, supplying reactive power can accelerate equipment degradation, requiring generators to invest in replacement equipment and maintenance. R.93:49-50.

Producing reactive power to meet deadband requirements comes with variable and opportunity costs too, given that when a generator produces reactive power within the deadband, that directly results in a loss of real power production that otherwise would be sold to entities under a power purchase agreement ("PPA") or in the marketplace. R.85:40-42 [Knight.Affidavit.¶¶12-13]; R.91:117-18 [Bethel.Affidavit.¶95]; R.93:48. Because independent generation facilities can cost hundreds of millions of dollars, compensation for reactive power therefore is a

[5] *Third-Party Provision of Reactive Supply and Voltage Control and Regulation and Frequency Response Services*, Docket No. AD14-7-000, FERC Staff Report: Payment for Reactive Power at App. 2 at 2-3 (Apr. 22, 2014), https://www.ferc.gov/sites/default/files/2020-05/04-11-14-reactive-power.pdf.

key input into the financial models that companies and other sources of funding use to make investment decisions. R.91:161-62 [Loehr.Affidavit.¶¶5,8-9].

Transmission providers that own or have affiliated generation can recover the reactive power production costs through retail distribution rates and recover their costs of reactive power assets located on the transmission grid through transmission rates. R.91:45-46,65-66; R.91:106,113,141-42 [Bethel.Affidavit.¶¶67,83,151]. But independent generators cannot do so and instead have relied on compensation under Schedule 2 of the OATT to collect FERC-approved rates. Indeed, FERC recently increased the cost to inverter-based (non-synchronous) generation by imposing additional design and compliance requirements. *Reliability Standards to Address Inverter-Based Resources*, Order 901, 185 FERC ¶ 61,042 (2023); *see also* R.91:39.

### D. FERC Suddenly And Arbitrarily Eliminated Reactive Power Compensation.

In 2021, FERC issued a Notice of Inquiry seeking comments on "reactive power capability compensation and market design." R.1:3. FERC did not discuss removing reactive power compensation altogether, but sought to "examine whether the current regime for reactive power capability compensation require[d] revisions to *ensure that payments* for reactive power capability accurately reflect the costs associated with reactive power capability." R.1:16 (emphasis added). And FERC proposed questions "designed to identify potential *modifications* to the AEP

methodology," including alternative approaches such as a "flat rate methodology" or "replacement cost ratemaking"—both of which still would allow compensation for reactive power service from generation. R.1:24,34-35 (emphasis added).

Several parties, including the Reactive Service Providers, submitted comments reflecting widespread support for ensuring that generators receive just and reasonable, cost-based compensation for providing reactive power capability, given its critical role in maintaining electric grid reliability. *E.g.*, R.36; R.40; R.51; R.54; R.62; R.64. As the Reactive Service Providers explained, if FERC was "going to continue its policy of mandating that generation provide reactive support to the grid, the Commission must allow for compensation that enables the generator to recover its full invested cost." R.36:9-10.

But then, despite decades of having recognized the necessity of reactive power to the electric grid, having required it to be provided as a separate ancillary service charged to transmission customers, and having allowed generators to collect a cost-of-service rate as compensation for providing that mandated service, FERC dramatically reversed course. On March 21, 2024, FERC issued a Notice of Proposed Rulemaking under Section 206 of the FPA (16 U.S.C. § 824e) to completely eliminate all compensation to electric generating facilities for providing reactive power within the deadband. R.71:4,42. Specifically, FERC proposed to revise Schedule 2 of an OATT to "prohibit transmission providers from including

in their transmission rates any charges associated with the supply of reactive power within the standard power factor range," thereby stripping electric generators of their ability to be compensated for providing reactive power within the deadband. R.71:4,11. But despite eliminating compensation for reactive power within the deadband, under the proposed order, "existing generating facilities w[ould] still be required to provide reactive power within the standard power factor range as a condition of obtaining and maintaining interconnection." R.71:45.

The Reactive Service Providers and many others submitted comments urging FERC not to implement the proposed rule and detailing, with evidence, the flaws and unjust, unreasonable, and unduly discriminatory impact of FERC's preliminary determination to eliminate reactive power compensation. *E.g.*, *Order 904* at P 19 n.52. The Reactive Service Providers, for example, submitted an affidavit of Dennis W. Bethel – a life member of the Institute of Electrical and Electronics Engineers and an architect of FERC's AEP Methodology – who explained the operational realities of reactive power, how generators incur significant fixed and variable costs to provide reactive power within the deadband, and therefore why allowing rates to be recovered for that essential service is necessary. R.91:8,80.

Two RTOs even commented that refusing to compensate generators for reactive power could "introduce reliability issues onto the electric system" and put

their systems "at risk of exposure to a number of reliability risks." R.101:7; R.110:6.

Notwithstanding this unrebutted evidence, and without holding a hearing, on October 17, 2024, FERC adopted its proposed rule that categorically eliminated compensation for reactive power within the deadband. *Order 904* at P 20. Not only did FERC find that providing reactive power within the deadband is an "obligation" of *generators* to ensure the transmission grid does not collapse, but FERC also concluded that those generators are not entitled to any compensation (*i.e.*, they cannot charge or collect a rate) for the associated costs of providing that mandated service because, according to FERC, it is merely a matter of a generator's "good utility practice." *Id.* at P 89. FERC's theory was primarily premised on its assertion – despite ample record evidence otherwise – that there are no costs – or only *de minimis* – costs associated with providing deadband-level reactive power above the costs of providing real power. *Id.* at PP 51, 55, 89.

FERC conceded that *Order 904* "represent[ed] a change in policy from prior Commission findings on compensation for the provision of reactive power within the standard power factor range." *Id.* at P 147; *see also id.* at P 24. And yet, FERC still refused to grandfather or provide legacy treatment to generators that reasonably had relied on hundreds of millions of dollars in annual reactive power compensation prior to *Order 904*. *Id.* at P 227.

### E. FERC Denied Rehearing, And The Reactive Service Providers Timely Sought Petitions For Review.

Several parties, including the Reactive Service Providers, timely sought rehearing of FERC's *Order 904*. R.130; R.131; *Rehearing Order* at 2, 4. Those petitions were denied by operation of law on December 19, 2024. R.133.

The Reactive Service Providers as well as the Co-Petitioners timely sought judicial review of *Order 904* and the *Rehearing Notice* in this Court. Dkt. 1, 5 (Case No. 25-60055). Some of these parties petitioned for review of the same orders in the Seventh Circuit, Second Circuit, and D.C. Circuit.

On June 6, 2025, FERC issued an "Order Addressing Arguments Raised on Rehearing," which ultimately "reach[ed] the same result" as in *Order 904* and confirmed the January 27, 2025 effective date of *Order 904* (which remains in effect today). *Rehearing Order* at PP 3, 177. Thereafter, the Reactive Service Providers and Co-Petitioners timely sought judicial review of FERC's *Rehearing Order*. *See* Case No. 25-60329.

Eventually all cases were transferred to this Court and consolidated in this appeal. Dkt. 86, 117, 133.

### F. The D.C. Circuit Recently Vacated A Similar FERC Order That Had Eliminated Reactive Power Compensation.

Around the same time as the FERC proceeding underlying *Order 904*, MISO, on behalf of certain transmission providers (utilities), sought FERC's

approval to revise Schedule 2 of its OATT to eliminate reactive power charges from its transmission rates and to terminate payments to generators for reactive power. *Midcontinent Indep. System Operator, Inc.*, 182 FERC ¶ 61,033 (2023), *modified on reh'g*, 184 FERC ¶ 61,022 (2023).

Many independent generators and industry groups, including the same petitioners here, vigorously protested MISO's proposal for similar reasons. But despite those objections, FERC issued an order approving MISO's proposal on January 27, 2023. *Id*. FERC's then-Commissioner Danly dissented, finding MISO had not met its burden to show that eliminating all reactive power rates within the deadband in MISO was just and reasonable "given the record's substantial unrebutted evidence of the negative rate impacts that this will have on generators not affiliated with the MISO [transmission providers]." *Id*. at P 1 (Danly, Comm'r, dissenting). Specifically, Commissioner Danly found that there was no evidence "of the effects of eliminating the $220 million annual reactive power revenue requirement from the MISO tariff" and that "the only evidence in the record on this critical point [was] from unaffiliated generators . . . that the impact of the reactive power rate elimination will be severe." *Id*. at P 4 (Danly, Comm'r, dissenting).

Various parties petitioned for review of FERC's decision to the D.C. Circuit, which on September 26, 2025, granted the petitions and vacated FERC's MISO order. *Capital Power*, 156 F.4th at 647. Observing that generators "had incurred

significant debt and contractual obligations relying on MISO's longstanding practice of allowing generators to recover cost-based compensation for reactive power," the D.C. Circuit held that "FERC acted arbitrarily" by "inadequately consider[ing] the generators' reliance interests," including "long-term power obligations and accompanying investments," and that FERC "failed to explain why [generators'] concerns were unjustified, entitled to no weight, or outweighed by other considerations." *Id*. at 650, 653-54. Notably, the D.C. Circuit also rejected FERC's argument "that the generators' reliance interests are insignificant because the marginal costs of producing deadband-level reactive power are small," holding that "the harm to the generators stems from the loss of all reactive-power *revenue*" and that "there is reason to think that such revenues have been significant." *Id*. at 653 (emphasis in original). The court therefore vacated FERC's order and remanded for further proceedings. *Id*. at 654. The D.C. Circuit recognized FERC's separate *Order 904* eliminated reactive power compensation nationwide, but the court, observing that that order was "not before us," concluded that its "opinion has no bearing on its procedural or substantive validity." *Capital Power*, 156 F.4th at 654.

* * *

The Reactive Service Providers fully agree with and join the arguments presented in the initial brief of the Co-Petitioners. The Reactive Service Providers

submit this brief to elaborate on errors FERC made in its orders, necessitating vacatur.

## SUMMARY OF ARGUMENT

FERC bears a dual burden under Section 206 of the FPA when changing rate structures to first demonstrate that existing rates are unjust, unreasonable, or unduly discriminatory and to then demonstrate that the proposed *replacement* rates are just and reasonable. FERC flunked both requirements when it eliminated reactive power compensation in the deadband, and its orders were arbitrary, capricious, and contrary to law.

**I.** FERC failed to satisfy its initial statutory burden to establish that compensating generators for reactive power within the deadband was unjust and unreasonable. *First*, FERC did not rationally support its assertion that generators incur no cost, or at most *de minimis* cost, to produce reactive power. The Reactive Service Providers presented significant evidence of their costs, including incremental and opportunity cost in providing reactive power, cost caused by degradation and replacement of equipment, and "upsizing" costs to retrofit facilities to provide reactive power. Additionally, the Reactive Service Providers presented arguments that fixed equipment costs could reasonably be allocated between reactive and real power generation (and indeed have been so allocated for years under FERC precedent). However, FERC failed adequately to address these

costs and instead summarily dismissed them as *de minimis*, rendering its decision arbitrary and capricious and contrary to the FPA.

*Second*, FERC's determination that providing reactive power within the deadband is merely a generator's "obligation of good utility practice" is belied by decades of its prior precedent finding as a matter of fact that transmission providers – not generators – have the obligation to acquire reactive power to meet *their* obligation to support the electric grid. That reality has not changed—and it has been the case pre- and post-*Order 888*. Thus, there is no valid basis under the FPA or the APA for FERC's about-face adoption of a rule that now compels public utilities under the FPA, which includes independent generators, to provide a service without compensation for their costs, especially when that service is required (*i.e.*, caused by and imposed for the benefit) of transmission providers. FERC's failure to properly address its departure from past policy renders its determinations arbitrary, capricious, and contrary to law.

*Third*, FERC asserted that adjudicating cost-of-service reactive power rates is administratively burdensome. But any administrative burden is self-inflicted by FERC, which for years has refused to provide guidance on how to apply the rate methodology to new types of generation such as wind and solar. Moreover, FERC failed reasonably to explain why any administrative burden makes compensating generators for providing necessary reactive power unjust and unreasonable.

**II.** FERC also failed to show that eliminating deadband-level reactive power compensation was just and reasonable, and its reasoning in eliminating such compensation was divorced from substantial record evidence. FERC's orders were arbitrary and unlawful because they prevent generators from recovering their costs for providing a necessary service, and FERC's assertion that generators have alternative ways to recoup their costs is at best speculative and unrealistic. By disregarding the practical and financial realities facing generators without providing a viable revenue substitute, FERC's orders impose significant financial harm, undermine investment-backed expectations, and ignore generators' longstanding reliance interests.

FERC further flouted core cost causation principles that require costs to be borne by those who benefit from the service—here, transmission providers and their customers. In doing so, FERC has given transmission providers and their customers a free ride contrary to precedent. This result distorts competition and unduly discriminates against independent generators compared to similarly situated transmission providers and their affiliated counterparts. It also results in an unconstitutional taking by depriving generators of a fair return on their investments while still requiring them to provide the service.

**III.** Vacatur is the proper remedy because errors in analysis and lack of evidentiary support are substantive failings that cannot be corrected on remand. Vacatur would not be disruptive, as it would re-establish the *status quo ante*.

## STANDING

The FERC orders under review adversely affect the Reactive Service Providers, who own and operate electric generating facilities and sell electric power products including reactive power across the country. R.91; R.130. As a result of FERC's orders removing compensation for reactive power, the Reactive Service Providers and other independent generators have been and will be deprived of hundreds of millions of dollars in annual compensation on which they have relied to finance their projects and investments. *E.g.*, R.91:160-61 [Loehr.Affidavit.¶¶5-9]; R.129:4; R.130:30-42; *Capital Power*, 156 F.4th at 651. This monetary harm is redressable by a favorable ruling from this Court vacating those orders. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

## STANDARD OF REVIEW

The Court reviews FERC orders "under the 'arbitrary and capricious' standard of the Administrative Procedure Act." *El Paso Elec. Co. v. FERC*, 832 F.3d 495, 503 (5th Cir. 2016) (citing *La. Pub. Serv. Comm'n v. FERC*, 771 F.3d 903, 909 (5th Cir. 2014)). The Court will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A). Errors of law are reviewed *de novo*. *See, e.g.*, *Village of Morrisville v. FERC*, 136 F.4th 1117, 1125 (D.C. Cir. 2025). FERC's explanations fail arbitrary-and-capricious review if they do not meaningfully respond to objections or they depart, without explanation, from prior FERC precedent. *Chamber of Commerce of United States v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023); *Placid Oil Co. v. FERC*, 875 F.2d 487, 489 (5th Cir. 1989).

## ARGUMENT

Section 206 of the FPA, under which FERC issued the orders presented here for review, "imposes a 'dual burden' on FERC" (1) to prove that an existing rate it seeks to change is "unjust, unreasonable, unduly discriminatory or preferential," and then (2) to prove that its proposed replacement rate is "just and reasonable." *Emera Maine v. FERC*, 854 F.3d 9, 21, 25 (D.C. Cir. 2017) (quoting 16 U.S.C. § 824e(a)); *see also Am. Clean Power Ass'n v. FERC*, 54 F.4th 722, 724 (D.C. Cir. 2022). "In other words, a finding that an existing rate is unjust and unreasonable is the 'condition precedent' to FERC's exercise of its section 206 authority to change that rate." *Emera*, 854 F.3d at 25 (quoting *FPC v. Sierra Pac. Power*, 350 U.S. 348, 353 (1956)). Unless FERC meets this two-step burden, it "has no authority to impose a new rate." *Id*.

FERC failed both steps in eliminating rates for reactive power within the deadband, rendering its orders arbitrary, capricious, and contrary to law.

## I. FERC Failed To Demonstrate That Existing Rates Providing Compensation For Reactive Power Are Unjust, Unreasonable, Or Unlawful.

FERC's initial burden under Section 206 of the FPA requires it to "make an explicit finding that the existing rate is unlawful before setting a new rate." *Emera*, 854 F.3d at 24. FERC cannot do so by assuming that "all [rates] other than the one FERC identifies as the utility's just and reasonable [rate] are *per se* unlawful." *Id.* at 26. FERC must "demonstrate that the existing rates are 'entirely outside the zone of reasonableness'" before depriving utilities of statutory protections contained in Section 206 of the FPA. *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 114 n.2 (D.C. Cir. 2017) (quoting *City of Winnfeld v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984)). FERC made no such finding with its orders under review here.

### A. FERC's Finding That Generators Incur No Or *De Minimis* Costs To Provide Reactive Power Within The Deadband Is Arbitrary And Capricious.

Central to FERC's determination that compensation for deadband-level reactive power was unjust and unreasonable was FERC's conclusion that "in satisfying such obligations generating facilities incur no incremental investment, or fixed costs, and at most *de minimis* variable costs over and above those needed to provide real power." *Order 904* at P 51; *see also Rehearing Order* at P 95. But the Reactive Service Providers and several other parties submitted detailed

evidence demonstrating that in fact they incur *significant* fixed and incremental costs to provide reactive power and have received approximately $700 million in annual revenue to compensate for those costs. *E.g.*, R.91:37-40; R.91:104-05,117-21 [Bethel.Affidavit.¶¶62-65,94-103]; R.91:161 [Loehr.Affidavit.¶¶5,8-9]; R.130:36-37; *see also Capital Power*, 156 F.4th at 653 ("[T]here is reason to think that such revenues have been significant."). Those costs come from having to install larger and more capable generation equipment to produce reactive power; conducting maintenance on equipment which degrades quicker when producing deadband-level power; as well as opportunity costs from foregone real power revenue. R.18:4-5; R.84:13-15; R.85:10-11; R.85:40-43 [Knight.Affidavit.¶¶12–14]; R.91:37-40; R.91:161 [Loehr.Affidavit.¶¶ 5-6]; R.91:104-05,117-21 [Bethel.Affidavit.¶¶ 62-65,94-103]; R.130:37-40. For some generators, the costs of adding additional reactive power equipment can be up to 20% of a project's total costs. R:84:14-15.

But FERC failed meaningfully to respond to – or at most summarily dismissed – this indisputable evidence, asserting that such costs do not justify charging a reactive power rate because "the same equipment that is needed to produce, and is used to produce, real power also provides reactive power functions, at no additional capital cost" and that it "*could be viewed* as inherently arbitrary" to allocate between their fixed costs. *Order 904* at PP 51, 90 (emphasis added); *see*

*also Rehearing Order* at P 97. Putting aside that "could be" essentially means FERC is guessing, the fact that the same equipment at a generating facility may provide different electric products is not a "reasoned explanation" why it *could be* arbitrary to identify and allocate between different costs. *See El Paso*, 832 F.3d at 503; *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) ("[A]n agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious." (quotations & citations omitted)). The fact that allocation may be difficult does not erase the reality that providing both types of service manifestly burdens the equipment and consumes some portion of its useful life.

Indeed, FERC has recognized many electric products that are sourced from the same generating equipment, including capacity; energy; "[r]eactive [s]upply and [v]oltage [c]ontrol [s]ervice," regulation and frequency response service; energy imbalance service; and "[o]perating [r]eserve" from "[s]pinning [r]eserve [s]ervice" or "[s]upplemental [r]eserve [s]ervice," with some sold at market-based rates and others at cost-based rates. *Order 888* at 21,583, 21,587-89; *see also* R.130:31-32. And, where cost is involved, FERC regularly has approved processes to allocate jointly incurred costs to the proper classes of customers that benefit from them. R.129:27-28; R.130:31-32; *see, e.g.*, *Black Hills Colo. Elec., LLC*, 182 FERC ¶ 61,162 at P 31 (2023) ("Commission precedent already requires

the use of general allocators such as labor ratios or plant ratios to functionalize and allocate costs that cannot be directly assigned to a particular function."); *Entergy Servs., Inc.*, 143 FERC ¶ 61,120 at P 14 (2013) (same). That is so because FERC's longstanding "policy is that direct costs should always be directly assigned and that indirect costs should be allocated by formula," and that "[t]his policy is consistent with the concept that costs should follow cost causation." *Kern River Gas Transmission Co.*, 117 FERC ¶ 61,077 at P 290 (2006), *order on reh'g*, 123 FERC ¶ 61,056 (2008), *order on reh'g*, 126 FERC ¶ 61,034 (2009); *see also Pub. Serv. Co. of N.H.*, 61 FERC ¶ 61,256 at *4 (1992) (allocating costs between joint products even where doing so "is a difficult and inexact science"). In sum, there is nothing unique about allocating costs between real and reactive power production. *See Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1030 (5th Cir. 2019) ("An '[u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be . . . arbitrary and capricious . . . ."). Rejecting allocation under these circumstances is irrational.

That is underscored by the fact that the AEP Methodology has been used by FERC for decades to allocate fixed costs of a generating facility between real power and reactive power. R.91:91-92,118 [Bethel.Affidavit.¶¶32-33,96]; R.129:27; R.130:33. Specifically, the AEP Methodology "calculates just and reasonable capability-based reactive power rates that recover the fixed costs

associated with providing reactive power service" from generation. *Dynegy*, 125 FERC ¶ 61,280 at P 11; *see also Va. Elec. & Power Co.*, 114 FERC ¶ 61,318 at P 3 (2006) (stating that the AEP Methodology computes "the portion of plant investment attributable to reactive power production"). The record is replete with the years of painstaking effort FERC undertook to develop the AEP Methodology and thereafter declare it as the means that all generators should use to identify the cost of providing reactive power service. R.91:91-92 [Bethel.Affidavit.¶¶30-34].

But with *Order 904*, FERC provided no rational reason why the AEP Methodology suddenly *could* allocate costs in an "inherently arbitrary" fashion, despite FERC having applied the methodology to hundreds of cases as a "just and reasonable manner of calculating a reactive power revenue requirement." *Order 904* at P 82 n. 239; *see Bluegrass Generation Co., LLC*, 118 FERC ¶ 61,214 (2007), *order on reh'g*, 121 FERC ¶ 61,018 at P 12 (2007); *Dynegy*, 125 FERC ¶ 61,280 at P 11; *see also Acadian Gas Pipeline Sys. v. FERC*, 878 F.2d 865, 870 (5th Cir. 1989) (holding FERC's decision was arbitrary and capricious because it could not "supply a reasoned analysis" as to why it is changing from the agency's past "policies and standards.").

At best, FERC observed that "[n]ew technologies have developed" for providing reactive power and that "the *AEP* Methodology that predates these technologies does not squarely apply." *Order 904* at P 23. But FERC did not

explain why those technologies rendered the AEP Methodology "inherently arbitrary," *id.* at P 90, especially for generators who have relied on it for decades to recover just and reasonable compensation for their costs through FERC-approved rates. Incredibly, on the same day FERC issued *Order 904*, it issued another order applying the AEP Methodology to new reactive power technologies at a solar generating facility. *Fern Solar LLC*, Opinion No. 591, 189 FERC ¶ 61,035 at PP 303, 394-96 (2024) (establishing the rate based on costs of the generator, which case included the testimony of Mr. Bethel), *modifying on denial of reh'g*, 190 FERC ¶ 61,133 (2025).

FERC's decision-making in *Order 904* therefore was arbitrary and capricious. *See Tarpon Transmission Co. v. FERC*, 860 F.2d 439, 444 (D.C. Cir. 1998) (by responding in "purely conclusory terms," FERC failed to engage in reasoned decision-making).

### B. FERC's Claim That Generators Already Are "Obligated" To Provide Deadband-Level Reactive Power As "Good Utility Practice" Is Arbitrary And Capricious.

FERC's further justification for eliminating compensation for deadband-level reactive power was its assertion that providing reactive power is merely "an obligation of good utility practice." *Order 904* at PP 20, 22, 64, 89; *Rehearing Order* at P 68. But that argument is factually and legally infirm. R.91:7-29; R.130:14-30. In fact, FERC's prior orders show that the term "good utility

practice" applies to *transmission providers* and *their* obligation to provide transmission and interconnection service—not to independent generators. For example, in *Order 888*, FERC used "good utility practice" only in reference to practices that *transmission providers* must follow and to *transmission providers'* obligation to provide transmission service. *Order 888* at 21,619, 21,707-08, 21,712, 21,713. Likewise, in *Order 2003*, FERC used "good utility practice" within the *pro forma* large generator interconnection agreement primarily with regard to *transmission providers'* responsibility to ensure the safety and reliability of the transmission system. *Order 2003, Standard Large Generator Interconnection Agreement, arts.* 9.7.2, 13.5.2. Under *Order 2003*, "good utility practice" applies to interconnection customers (generators) only when *transmission providers* impose an obligation on the interconnection customer related to maintaining the safety or reliability of the transmission system. *E.g.*, *id.* arts. 5.10.2, 9.6.2.

Additionally, beginning with *Order 888*, FERC consistently recognized that reactive supply and voltage control from generation sources is an ancillary service that *transmission providers* – not generators – "need[ ] to provide basic *transmission* service to a customer" and to meet *transmission providers*' obligations "to maintain the integrity of the transmission system during a transaction." *Order 888* at 21,579-82 (emphasis added); *see also* R.91:11-18;

*Interconnection for Wind Energy*, Order 661, 111 FERC ¶ 61,353 at P 28 (2005) ("*Order 661*") (recognizing "Transmission Providers have responsibility for ensuring the reliable operation of their systems" and that transmission providers "are in the best position" to determine specific reactive power needs); *Order 827* at P 6 (confirming "*transmission providers* need generators to either supply or consume reactive power" because "*[t]ransmission providers* require reactive power to control system voltage for efficient and reliable operation of an alternating current transmission system" (emphasis added)).

Simply put, generators do not supply reactive power as some "good utility practice" obligation they must fulfill. They do so because transmission providers require – and pay for – that service in order to fulfill transmission providers' sole "obligation" to maintain the nation's transmission system. R.91:8-9; R.91:95 [Bethel.Affidavit.¶40]; R.130:52. And unlike transmission providers, independent generators do not own transmission assets and are not in the transmission business. R.91:12; R.91:98 [Bethel.Affidavit.¶49]. NERC requires transmission providers, as transmission *owners and operators*, to maintain the transmission system. R.91:12; R.91:97 [Bethel.Affidavit.¶46]. NERC has placed no such obligation on generators. R.91:12; R.91:97 [Bethel.Affidavit.¶46]. NERC merely requires generators to respond to transmission provider's directives for reactive support and

thereby provide a tool on which transmission providers can lean to preserve the integrity of the transmission grid. R.91:96-97 [Bethel.Affidavit.¶¶45-46].

Given that transmission providers are the true cost-causers and beneficiaries, generators properly are entitled to collect rates for providing reactive service power within the deadband. And FERC cannot "choose not to allocate costs to those who *cause* the costs to be incurred and reap the resulting benefits." *El Paso Electric Co. v. FERC*, 76 F.4th 352, 362 (5th Cir. 2023) (quotations omitted); *see also Consol. Edison Co. of N.Y., Inc. v. FERC*, 45 F.4th 265, 282 (D.C. Cir. 2022) (vacating portion of FERC order that exempted even "*de minimis*" beneficiaries from cost allocation); *see infra* § II.A.3.

FERC's further assertion that generators provide reactive power merely to support their sale of real power also was unsupported. *See Order 904* at P 149; *Rehearing Order* at P 135. For example, FERC ignored evidence that the mandated deadband does not accurately represent how generators maintain their reactive power production to support the sale of real power. The deadband creates a portion of reactive power, known as "headroom," which a generator cannot sell and that instead is used to provide support to the transmission provider to maintain the reliability of the transmission grid. R.130:6-7; R.91:87-89 [Bethel.Affidavit.¶¶22-24]. Generators would not maintain this "headroom" *but for* the deadband reactive power requirements mandated by FERC. *See* R.130:6-7;

R.91:87-89 [Bethel.Affidavit.¶¶22-24]. FERC also failed to address evidence that, at times, generators sell real power without even involving reactive power (*i.e.*, when a transmission provider does not require reactive support), and that generators likewise at times provide reactive support without selling real power, R.91:21-22; R.91:97-98 [Bethel.Affidavit.¶48]. Most glaringly, FERC ignored its own precedent in *Order 827* which allows the use of capacitor banks to meet reactive power support requirements even though capacitor banks only provide reactive support and do not provide real power whatsoever. *Order 827* at P 35; R.130:35-36; R.91:37-38.

With *Order 904*, FERC failed substantively to grapple with these comments and its own prior findings, which challenge "a fundamental premise underlying the proposed agency decision." *Chamber of Commerce*, 85 F.4th at 774; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must "display awareness that it is changing position"); *Jupiter Energy Corp. v. FERC*, 407 F.3d 346, 350 (5th Cir. 2005) (FERC "must supply a reasoned analysis for any departure from other agency decisions." (quotation omitted)); *Acadian*, 878 F.2d at 870 ("[I]f an agency glosses over or swerves from prior precedent without discussion it may cross the line from the tolerably terse to the intolerably mute."); *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 858 (D.C. Cir. 2019) (if FERC departs

from prior precedent, it must "acknowledge that it is doing so" (alteration omitted)).[6]

Even if generators are "obligated" to provide reactive power to support the grid, FERC still cannot deny them, as public utilities under the FPA, the ability to recover their costs for providing that required service. *See infra* § II.A; *see, e.g.*, *Ameren Servs. Co. v. FERC*, 880 F.3d 571, 580-82 (2018) (rejecting FERC argument that utilities who "bear responsibility for most of the capital costs" should not be compensated for them, holding "a regulated industry is entitled to a return that is sufficient to ensure that *new* capital can be attracted").

FERC's illogical position is made clear by analogy. FERC routinely has allowed utilities to recover the cost incurred for all types of reliability products and services. R.36:6,9. For example, "good utility practice" and NERC Reliability Standards require transmission providers to perform vegetation management. NERC Reliability Standard FAC-003-4 (Transmission Vegetation Management). But FERC allows transmission providers to recover their costs related to that

---

[6] FERC's primary response was summarily to dismiss these points as "collateral attacks" on prior Commission orders, including *Order 2003*. *E.g.*, *Order 904* at PP 67, 101; *Rehearing Order* at P 68. But the collateral attack doctrine only prevents parties from circumventing the statute of limitations for challenging FERC orders by challenging those orders in proceedings that only clarify or enforce them. *See S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 46 (D.C. Cir. 2005). It does not apply where, like here, parties challenged the merits of a new proposal directly before FERC that "revise[s]" a "prior order." *Id.* at 44; *see El Paso*, 832 F.3d at 504.

obligation. *Rules Concerning Certification of the Electric Reliability Organization; and Procedures for the Establishment, Approval, and Enforcement of Electric Reliability Standards*, Order 672, 114 FERC ¶ 61,104 at P 259 (2006).

Similarly, FERC has allowed utilities that operate generation, transmission, or distribution facilities to collect compensation for reactive power they provide to the grid through their transmission wire reactive-power assets and transformers. R.91:99-100 [Bethel.Affidavit.¶51]. If independent generators are not paid for reactive power service, by FERC's reasoning in *Order 904*, "transmission owners also should not be paid for the reactive power they are obligated to provide to offset the reactive power their transmission lines and transformers inject to the grid," that are part of the FERC-approved transmission rate base. R.91:99-100 [Bethel.Affidavit.¶51]. In response to this point, FERC conclusively stated, without any explanation, that "reactive power supply from transmission facilities is distinct from reactive power supply from generating facilities." *Order 904* at P 150. But reactive power service is technically the same regardless of who produces it. There is no meaningful difference between reactive power from independent generators and transmission-owner-generators and reactive power from independent generators and reactive assets located on the transmission grid. R.85:38-39 [Knight.Affidavit.¶8]; R.91.63; R.130:57; *see infra* § II.B.1; *Gulf S. Pipeline Co., LP v. FERC*, 955 F.3d 1001, 1012 (D.C. Cir. 2020) (stressing

"FERC's statutory duty . . . to provide some reasonable justification for any adverse treatment relative to similarly situated competitors"). And yet FERC did not disturb transmission providers' ability to continue recovering their costs of these reactive assets located on the transmission grid they collect through transmission rate bases. FERC's reasoning was arbitrary and capricious.

### C. FERC's Finding Of Administrative Burden To Displace Current Rates Is Arbitrary And Capricious.

FERC further asserted that adjudicating cost-of-service reactive power rates based on the AEP Methodology was "administratively burdensome." *Order 904* at PP 27, 35; *Rehearing Order* at P 22. But FERC never explained how an internal administrative workload could render unjust, unreasonable, or unlawful a decades-long rate framework for compensating a necessary reliability service. *See El Paso*, 832 F.3d at 503 (When FERC "fails to substantiate the application of its policy" with reference to "the development of specific facts or by making a reasoned explanation," the court "may conclude that FERC's actions are arbitrary and capricious.").

Moreover, any administrative burden is of FERC's own making. For years, wind or solar generation owners have submitted applications to FERC to receive compensation for reactive power capacity of their generating facilities at a rate based on the AEP Methodology. But despite repeated industry requests, FERC declined to actually issue guidance on how the AEP Methodology should apply to

those new generation technologies. R.36:2-5; R.91:48-53. By contrast, FERC provided guidance long ago for *traditional* generators, allowing those cases to resolve efficiently. R.91:49. The Reactive Service Providers even provided FERC with a blueprint for how to streamline its rate acceptance process for reactive power compensation. R.36:5-6. But FERC ignored it. The difficulties FERC now cites therefore stem from its failure to update its own guidance—not from any flaw in compensating generators for providing a required reliability service.

## II. FERC Failed To Demonstrate That Eliminating Compensation For Reactive Power Within The Deadband Is Just And Reasonable.

### A. FERC's Zero Dollar Replacement Rate Is Arbitrary And Capricious And Denies Certain Generators The Ability To Recover Their Costs.

Under the FPA, a public utility – which includes independent generation companies – has the right to collect a rate (*i.e.*, charge) for services they provide, such as the sale of electricity. 16 U.S.C. § 824d; *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002); *see Rehearing Order* at P 1 n.3 (recognizing generating facilities as public utilities under the FPA). It is foundational to utility ratemaking that utilities need not provide their services for free – especially critical services like reactive power. Indeed, "it is the rule that rates are to yield a reasonable rate of return upon the value of the property used, at the time of its being used, to render the service." *Midwestern Gas Transmission Co. v. FPC*, 292 F.2d 119, 121 (5th Cir. 1961). So, to determine whether a FERC order sets a just and reasonable

rate under the FPA, courts consider the "total effect" of the order and "whether or not the *end result* of that order constitutes a reasonable balancing, based on factual findings, of the investor interest in maintaining financial integrity and access to capital markets and the consumer interest in being charged non-exploitative rates." *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1177-78 (D.C. Cir. 1987) (emphasis added).

Here, a review of the "total effect" of FERC's orders and their consequences reveals an imbalanced end result where transmission providers and their customer who require reactive power will get it for free, but the generators who invest the necessary capital to produce the service no longer can collect a rate for providing it. *See id*. at 1176. In other words, FERC's orders – which will strip generators of approximately $700 million in annual reactive power revenues – deny generators a "reasonable rate of return on the value of their property used, at the time of its being used," to produce reactive power. *Midwestern Gas*, 292 F.2d at 121; *FPC v. United Gas Pipe Line Co.*, 386 U.S. 237, 243 (1967) ("One of [the Commission's] statutory duties is to determine just and reasonable rates which will be sufficient to permit the company to recover its costs of service and a reasonable return on its investment."). Generators essentially would be required to produce reactive power "as a nonprofit business," which FERC cannot do. *Ameren*, 880 F.3d at 581; *see also Smyth v. Ames*, 169 U.S. 466, 523 (1898) ("Under pretense of regulating fares

and freights, the state cannot require" public utilities "to carry persons or property without reward."). And its reasoning in *Order 904* failed to consider "important aspect[s] of the problem[s]" raised by the Reactive Service Providers in multiple ways. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

*1. FERC provided no viable revenue or cost recovery substitutes.*

Despite arbitrarily asserting that generators incur no or at most "de minimis" costs to provide reactive power within the deadband, FERC nevertheless suggested that generators could recoup those supposedly non-existent costs through "other revenue streams," such as re-negotiating PPAs or increasing rates in capacity or energy markets. *Order 904* at P 141; *see also Rehearing Order* at P 126.

But FERC's assumption was pure speculation divorced from the substantial record evidence demonstrating that none of these purported alternative cost-recovery mechanisms are viable. R.36:30-34; R.91:56-62; R.130:58-62; R.129:55-61. Far from establishing that generators *could* recoup their reactive power costs in other ways, FERC admitted only that they "*may* be able to recover the costs." *Order 904* at P 10 (emphasis added). To the contrary, the Reactive Service Providers and other parties explained that restructuring PPAs to make-up for these costs was virtually impossible given that generators already negotiated long-term PPAs with the understanding that reactive power compensation would be available

through Schedule 2 of an OATT, and power purchasers would not voluntarily re-open binding PPAs to let generators raise prices to cover foregone reactive power revenue. R.85:7; R.91:59-60,161-62 [Loehr.Affidavit.¶¶7-9]; R.130:59. That is exactly how the D.C. Circuit saw it in *Capital Power*, where "FERC itself acknowledge[d] that generators 'may not be successful' in renegotiating existing contracts . . . which seems likely because many of their customers are affiliates of vertically integrated utilities that have monopsony power in the market." 156 F.4th at 653 (quoting FERC's response brief); *see also Wisconsin v. FERC*, 104 F.3d 462, 647 (D.C. Cir. 1997) (noting a ten-year-long PPA). FERC failed meaningfully to consider this practical reality here too. Indeed, the Reactive Service Providers stated that the PPAs are FERC-jurisdictional, and FERC should exercise its FPA authority to re-open PPAs if a power purchaser does not agree to do so, but FERC did not do so. *See* R.91:57-59; R.130:59.

FERC also did not explain how generators could make up their revenue shortfall through increased capacity or energy sales in organized ISO and RTO markets. Instead, FERC stated that "no commenter ha[d] demonstrated why these joint costs could not be recovered via energy sales." *Order 904* at P 143; *see also Rehearing Order* at P 44 n.120. But it was FERC's burden under Section 206 of the FPA – not that of commenters – to demonstrate a viable means for public utilities to recover their costs. *See Emera*, 854 F.3d at 25. In any event, increasing

capacity or energy sales would do nothing to alleviate the "financial harm on generators stuck in long-term contracts at current prices." *Capital Power*, 156 F.4th at 653. Even for generators not locked in PPAs, FERC admitted that "existing capacity market rules" in RTOs/ISOs prevent independent generators from increasing their capacity and energy prices to account for removed reactive power revenue. *Order 904* at P 142; *see* R.130:60. While FERC merely invited RTOs/ISOs to update those rules to allow generators to collect higher capacity and energy rates, FERC did not require them to do so. *Order 904* at P 146; *Rehearing Order* at P 128. The notion that RTOs and ISOs would voluntarily revise their market rules to ensure adequate compensation for reactive power is wishful thinking. R.85:61-62 [Borgatti.Affidavit.14:8-15:7]; R.91:56-60; R.130:60-61. Even the New York ISO agreed "[t]here is no assurance that [it] would practicably be able to secure the necessary super-majority in its stakeholder Management Committee" to modify its market rules. R.128:16-17. But regardless of whether RTOs and ISOs can or will adjust, at the time FERC entered Order 904, it had no way to know if they would do so. Because FERC failed meaningfully to grapple with these "valid concern[s]," its orders were arbitrary and capricious. *See TransCanada Power Mktg., Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015).

The same is true of FERC's suggestion that allowing reactive power compensation *outside* of the deadband could help offset the loss of reactive power

compensation within the deadband. *See Rehearing Order* at P 135; *Order 904* at P 8. As the Reactive Service Providers explained, there are no engineering or operational differences between reactive power within and outside deadband, because generators use the same equipment, and transmission providers and their customers benefit the same. R.91:65-66,123-24 [Bethel.Affidavit.¶¶107-09]; R.130:62-67. And, contrary to FERC's assertion, evidence showed that generators do *not* in fact always receive revenue when reactive service is required outside of the deadband. R.91:65-66. Indeed, evidence was provided showing that it is rare that a transmission provider will call on a generator to provide extra reactive support outside of the deadband. R.91:65-66 & n.112; R.91:97-98 [Bethel.Affidavit.¶48]. FERC's holding therefore ran "counter to the evidence before the agency." *Env't Def. Fund v. FERC*, 2 F.4th 953, 967 (D.C. Cir. 2021).

*2. FERC improperly disregarded the financial harm of eliminating reactive power compensation.*

While FERC speculated that independent generators *might* be able to recover some of their costs of providing deadband-level reactive power through capacity and energy markets or by re-opening PPAs, it failed to properly weigh the severe financial harm to generators if those other mechanisms do not pan out and generators are forced to swallow the costs themselves. *See Jersey Cent.*, 810 F.2d at 1177-78.

As the Reactive Service Providers explained, predictable cash flow for reactive power is a core assumption in the financial models that generators and their investors rely upon when deciding to fund new projects and determine if they can meet debt service obligations. R.91:161-62 [Loehr.Affidavit.¶¶5,8-9]; R.130.45-46. Indeed, "a regulated industry is entitled to a return that is sufficient to ensure that *new* capital can be attracted." *Ameren*, 880 F.3d at 581. Removing this compensation, however, will make generators less profitable and less attractive for investors to whom "it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business." *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944); *see also Ameren*, 880 F.3d at 581 ("FERC must explain how investors [can] be expected to underwrite the prospect of potentially large non-profit appendages with no compensatory incremental return."). But FERC did "little to address the generators' concerns" that FERC's orders would "force them to operate at a loss" and suffer "financial harm," and therefore failed to establish the reasonableness of the "zero dollar" replacement rate. *See Capital Power*, 156 F.4th at 653.

Compounding the issue was FERC's refusal to at least afford legacy treatment to generators with existing agreements and rate schedules where those generators for decades have relied on hundreds of millions of dollars in annual reactive power compensation. *Order 904* at P 227; *see Encino Motorcars, LLC v.*

*Navarro*, 579 U.S. 211, 212 (2016) ("[A]n agency must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (quotations omitted)); *Capital Power*, 156 F.4th at 651-53 (finding FERC inadequately considered generators' reliance interests in reactive power compensation for "significant tariff changes").

The Reactive Service Providers provided countless examples of when FERC grandfathered utilities who had made reliance-backed investment decisions based on prior FERC policies, including *Order 2003* concerning reactive power compensation. R.91:69-76; R.129:62-64; R.130:72-73. Even FERC acknowledged "[i]t is common for the Commission to allow grandfathering . . . when making sweeping industry changes . . . in view of the economic impact." *Order 904* at P 227 n.633 (quoting *Sw. Power Pool, Inc.*, 167 FERC ¶ 61,275 at P 19 (2019)). But while FERC attempted to distinguish those prior cases as not involving findings that the existing rate was unjust and unreasonable, *id.*, FERC simply was incorrect, as commentors pointed out. R.130:72-73; R.129:64. On rehearing, FERC had little response, except to regurgitate its other conclusory findings about the impact of removing reactive power compensation. *Rehearing Order* at PP 173-75. But FERC missed the broader point: "the harm to the generators stems from the loss of all reactive-power *revenue,*" and "there is reason

to think that such revenues have been significant." *Capital Power*, 156 F.4th at 653.

*3. FERC's findings violate cost causation principles.*

Inherent in the FPA's just and reasonable rate requirement is the foundational principle of cost-causation, which requires costs "to be allocated to those who cause the costs to be incurred and reap the resulting benefits." *El Paso*, 76 F.4th at 357 (quoting *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007)). This means "[p]roperly designed rates should produce revenues from each class of customers which match, as closely as practicable, the costs to serve each class or individual customer." *Gulf S. Pipeline Co.*, 955 F.3d at 1009. The cost causation principle is meant to combat "'[f]ree ridership,' where 'an entity is not required to pay for a benefit it receives,'" because "if compliance with the cost causation were not mandated, FERC would be unable to . . . 'ensure that rates . . . are just and reasonable.'" *El Paso*, 76 F.4th at 357-58 (quoting *Transmission Planning and Cost Allocation by Transmission Owning and Operating Pub. Utils.*, Order 1000, 136 FERC ¶ 61,051 at PP 535, 573 (2011)).

*Order 904* flunks this "basic tenet" of ratemaking." *Id*. at 357 (citation omitted); *see also Ill. Commerce Comm'n v. FERC,* 576 F.3d 470, 476-477 (7th Cir. 2009) ("To the extent that a utility benefits from the costs of new facilities, it

may be said to have 'caused' a part of those costs to be incurred[.]"). As FERC recognized before it reversed course with *Order 904*, transmission providers – not the generators – are the cost causers and beneficiaries of reactive power, which transmission providers need to provide reliable electricity to *their* customers. *See supra* § I.B.; R.91:62-63; R.130.49-54; *Order 888* at 21,579 (finding "ancillary services," including reactive power "are needed to provide basic transmission service to a customer" and to "maintain the integrity of the transmission system during a transaction"); *Order 661* at P 28 (finding "*Transmission Providers* have responsibility for ensuring the reliable operation of *their* systems" and determining reactive power needs (emphasis added)); *Order 827* at P 6 (finding "transmission providers need generators to either supply or consume reactive power").

Yet *Order 904* would allow exactly what the FPA mandates that FERC prevent: requiring public utilities (independent generators) to absorb the full costs of providing a service (reactive power) while subsidizing the cost-causing beneficiaries (transmission providers and their customers) who require that service but will get it for free. *See El Paso*, 76 F.4th at 361 ("[T]o ensure that rates are 'just,' the [cost causation] principle prevents 'subsidization by ensuring that costs and benefits correspond to each other." (citation omitted)); *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 268 (D.C. Cir. 2014) ("[T]he cost causation principle itself manifests a kind of equity.").

FERC did not dispute that the provision of reactive power within the deadband "provides reliability benefits," but paradoxically said it was "not persuaded" that its order violated cost causation because "providing reactive power within the standard power factor range enables generating facilities to reliably deliver real power to the transmission system," meaning "these costs are 'caused' by the operating requirements of the generating facilities." *Order 904* at PP 55, 148-49. But FERC provided no evidence of any nexus between a generator's "operating requirements" and FERC's deadband requirements. R.130:53. To the contrary, FERC ignored that "because reactive power cannot be transmitted for significant distances, *the local transmission provider* has to supply reactive power from generation sources." *Order 888* at 21,587 (emphasis added). That is why FERC previously authorized transmission providers "to treat reactive-power production as an ancillary *transmission* cost" and why *FERC* "required generators to calibrate their equipment so that their reactive-power capacity fell within" the deadband. *Capital Power*, 156 F.4th at 648 (citing *Order 888* at 21,581-82, 21,586-88 & *Order 2003* at P 542).

If reactive power service is a necessary transmission cost, and if FERC requires generators to provide that service as a condition for interconnection so the transmission grid can function, then any "approved rates [must] reflect to some degree [those] costs actually caused by the customer [(transmission providers)]

who must pay them." *El Paso*, 76 F.4th at 357 (quoting *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992)). But FERC's orders did not impose any such requirement, so they "cannot be considered 'just and reasonable' and [they] violate the [FPA's] cost-causation requirement as a matter of law." *Id.* at 363 (citation omitted).

### B. A Zero Dollar Replacement Rate Is Discriminatory And Preferential And Effects An Unconstitutional Taking.

In the FERC proceeding, the Reactive Service Providers and other parties repeatedly expressed their concern that compelling generators to supply free reactive power would violate FPA requirements barring undue discrimination and preference and violate the Takings Clause of the U.S. Constitution. R.91:63-65; R.129:5-7,69-72; R.130:54-58,61-62; R.131:6-7. But FERC summarily dismissed these concerns, thus failing to meet its burden under the FPA and APA. *See* 16 U.S.C. § 824e(a); *Ala. Elec. Co-op., Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982) ("FERC's responsibility under the Federal Power Act does not end with a determination that a proposed rate is reasonable, for it may be unlawful on other grounds."); *Ameren*, 880 F.3d at 582 (vacating FERC orders that failed to address petitioners' "serious statutory and constitutional concerns").

#### *1. FERC's orders allow undue discrimination and preference.*

The FPA requires FERC to ensure that any change in an existing rate or practice is not unduly discriminatory or preferential. *See* 16 U.S.C. §§ 824d(b),

824e(a); *Ameren*, 880 F.3d at 578 ("Discrimination is, of course, prohibited by the [FPA]."). FERC therefore has "the responsibility to consider . . . the anticompetitive effects of regulated aspects of interstate utility operations" in exercising its authority under the FPA. *Gulf States Util. Co. v. FERC*, 411 U.S. 747, 758-59 (1973); *see also Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1515 (D.C. Cir. 1984) ("Under the [FPA], a rate design must be non-discriminatory and non-preferential as well as being just and reasonable."). *Order 904* fails that statutory mandate.

Courts long have recognized the importance of "prevent[ing] the utilities that own the grid from offering more favorable transmission terms to their own affiliates and thereby extending their monopoly power to other areas of the industry." *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty., Wash.*, 554 U.S. 527, 536 (2008); *see also Xcel Energy Servs. v. FERC*, 41 F.4th 548, 561 (D.C. Cir. 2022) ("[U]tilities that . . . control transmission facilities naturally wish to maximize profit and so can be expected to act in their own interest to maintain their monopoly." (internal quotations omitted)); *Am. Clean Power*, 54 F.4th at 728 ("'[T]transmission owners . . . own[ing] integrated generation facilities . . . present[s] a competitive motive' [for] discrimin[ation]." (quoting *Ameren*, 880 F.3d at 578)).

Here, numerous parties explained to FERC that disallowing independent generators from recovering their costs for providing obligatory reactive power within the deadband would unduly discriminate against them and in favor of monopoly transmission providers that also produce reactive power from their own or affiliated generation facilities and can still recover those costs through retail rates. R.85:26-27; R.91:63-65; R.129:69-72; R.130:54-58; R.131:6-7. While FERC claimed there is no "guarantee" that transmission providers can recover such costs through retail rates, *Order 904* at P 151 & n.443, that misses the point: transmission providers still have at least the opportunity to seek recovery of their costs, where independent generators do not.

*Order 904* permits vertically integrated utilities an opportunity to recover their reactive power costs from ratepayers, but denies independent generators the ability to do so, instead forcing independents to consider speculative alternative cost recovery mechanisms. *See supra* § II.A.1. That affords a competitive advantage to transmission provider-owned generators who can offer lower prices for power given their other means of recovering costs (with a reasonable rate of return on top). *See Rehearing Order* at P 132 (FERC admitting transmission-affiliated generators "may have the opportunity to recover certain costs through retail rates"); *Xcel*, 41 F.4th at 559-60 (noting that although a rate "looks like a non-discriminatory proposal on the surface," if "in practice its design inherently

favor[s]" incumbent utilities over "third-party generation," it is "undue discrimination").

*American Clean Power Association* is instructive. 54 F.4th at 726-28. There, the D.C. Circuit found FERC "gave short shrift to the Petitioner's concern that transmission owners might discriminate in favor of generators they own" when choosing how to fund infrastructure upgrades, despite evidence showing that a majority of transmission owners in the MISO region own generators and "that many transmission owners have an incentive to discriminate between their own generators and would-be competitor generators." *Id*. But "FERC was obligated to respond to that evidence" with "more than a conclusory explanation," and the court held FERC "acted arbitrarily and capriciously by failing to meaningfully" do so. *Id*. at 728. Notably, thereafter, FERC preliminarily found that the rate scheme was in fact discriminatory and asked MISO and other RTOs to show cause why their OATT should not be revised to remove the discriminatory rate scheme. *Midcontinent Indep. Sys. Operator, Inc.*, 187 FERC ¶ 61,170 at PP 1-2 (2024).

Similarly here, parties presented ample evidence that eliminating generators' ability to collect compensation for providing deadband-level reactive power "posed a discrimination risk." *See e.g.*, R.85:26-27,56-60 [Borgatti.Affidavit.9-13]; R.91:63-65. And just like in *American Clean Power*, FERC responded that *commentors* had not provided enough evidence of potential discrimination without

meaningfully explaining why this was so and despite *FERC's* burden to show that its alternative rate (no reactive power compensation) was just and reasonable. *Order 904* at P 151; *Am. Clean Power*, 54 F.4th at 728. Specifically, FERC asserted that "commenters provide no support" that transmission providers will be able to recover their costs through retail rates and that independent generators "may be able to recover the costs for reactive power within the deadband in other ways." *Order 904* at 151. But, again, this improperly placed the burden on commentors instead of FERC. *See Gulf S. Pipeline Co.*, 955 F.3d at 1012. And the speculative argument "completely disregard[ed] the core of" independent generators' discrimination theory "based on a misconception of rudimentary economics." *Dynegy*, 633 F.3d at 1127.

Either all generators should be compensated for reactive power costs, or no one should—otherwise, the system for cost recovery is discriminatory and anticompetitive. FERC's "conclusory" explanations to the contrary do not suffice under the FPA and APA. *See Am. Clean Power*, 54 F.4th at 728.

Likewise, the Reactive Service Providers explained that transmission providers have reactive assets located on the transmission grid that perform the same function as generation. R.91:42-43,65-66. Indeed, in one year alone, MISO approved $146 million in reactive power assets to be added to the transmission rate base for transmission owners. R.91:42,65-66. And that is just *one* RTO and only

*one* year of reported investment. Yet, FERC chose not to discontinue *that* revenue stream. This is *per se* discrimination.

2. *FERC's orders result in unconstitutional takings.*

"The guiding principle" of ratemaking is that "[i]f the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307-08 (1989); *see also Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n*, 262 U.S. 679, 690 (1923) ("Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory" and "deprive[ ] the public utility company of its property."); *see supra* § II.A.1 (discussing similar principles under the FPA).

Here, mandating the provision of reactive service while depriving generators of their ability to recover their costs of providing the service exacts this very sort of unconstitutional taking. R.85:22-24; R.91:54; R.129:10-11; R.130:61-62. Based on decades of FERC precedent, the Reactive Service Providers and others have had reasonable, investment-backed expectations of receiving hundreds of millions of dollars in annual compensation to cover their costs of providing deadband-level reactive power service. R.91:161-62 [Loehr.Affidavit.¶¶5-9]; R.129:4; 130:30-42; *Capital Power*, 156 F.4th at 651 (noting "MISO has been compensating generators

for deadband-level reactive-power production since the mid-2000s"). FERC's orders, however, would strip away that compensation while still forcing generators to supply the service in order to connect to the grid. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 364-365 (2015) ("[A] governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking.").

In response, FERC just repeated its same *ipse dixit* pronouncements that generators incur at most *de minimis* costs in producing reactive power beyond production of real power; that generators still would "have the opportunity" to recover their costs "through other means"; and that "provision of sufficient reactive power is an obligation of a generator interconnected to the system." *Order 904* at PP 56, 57; *Rehearing Order* at P 45. These assertions are arbitrary in their own right, as already discussed, but they also do nothing to remedy the constitutional defects in FERC's orders. That property owners may retain a "contingent" prospect for recovering the value of their property does not remedy a takings clause violation. *Horne*, 576 U.S. at 363. Nor does a supposed "obligation" of the property owner to provide a service justify the denial of compensation for that service. *See Smyth*, 169 U.S. at 546 ("The corporation may not be required to use its property for the benefit of the public without receiving just compensation for the services rendered by it.").

FERC's failure meaningfully to address these constitutional concerns further renders its orders arbitrary, capricious, and contrary to law.

## III. Vacatur Is Appropriate.

This Court should vacate FERC's underlying orders because FERC failed to provide adequate evidence or explanation to meet either step of its FPA Section 206 "dual burden." *See Emera*, 854 F.3d at 25; 5 U.S.C. § 706(2)(A); *Fla. Gas Transmission Co. v. FERC*, 876 F.2d 42, 45 (5th Cir. 1989) (vacating FERC order unsubstantiated by reasoned explanation and specific facts). In determining if vacatur is proper, the Court evaluates "(1) the seriousness of the deficiencies of the action, that is, how likely [it is] the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *Texas v. EPA*, 132 F.4th 808, 862 (5th Cir. 2025).

Here, FERC ignored relevant evidence refuting its assertions that generators incur at most *de-minimis* costs to produce deadband-level reactive power; that providing reactive power is a generator's obligation per "good utility practice"; and that the current rate regime created an administrative burden. FERC also ignored critical concerns about cost recovery, financial harm and cost causation principles, and it did not meaningfully address serious potential for undue discrimination and preference and unconstitutional takings.

These defects cannot be resolved upon remand because they are "critical substantive failings" at the heart of FERC's analysis. *See Texas v. United States*, 126 F.4th 392, 419 (5th Cir. 2025). Nor would vacatur be disruptive, as it would do "nothing but re-establish the status quo absent the unlawful agency action." *Texas*, 132 F.4th at 863.

## CONCLUSION

For all the foregoing reasons, the Court should grant the petitions for review and vacate the challenged FERC orders.

Respectfully submitted,

By: /s/ *Steven P. Hollman*
Steven P. Hollman
Abraham J. Shanedling
Bruce A. Grabow
Jennifer Brough
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006
(202) 747-1941
shollman@sheppard.com
ashanedling@sheppard.com
bgrabow@sheppard.com
jbrough@sheppard.com

*Counsel for Petitioners Leeward Renewable Energy, LLC, RWE Clean Energy, LLC, DESRI Holdings, L.P., Invenergy Wind Development North America LLC, Invenergy Solar Development North America LLC, Invenergy Nelson LLC, Lightsource Renewable Energy Operations, LLC, and NextEra Energy Resources, LLC*

February 19, 2026

**CERTIFICATE OF SERVICE**

I certify that on February 19, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send notification of such to the attorneys of record.

*/s/ Steven P. Hollman*
Steven P. Hollman

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B), and the Court's Briefing Notice in this case, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,348 words. *See* Dkts. 120,129.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Steven P. Hollman*
Steven P. Hollman

Dated: February 19, 2026