**Nos. 25-60055, 25-60149, 25-60329 & 25-60453**

# In the United States Court of Appeals for the Fifth Circuit

VISTRA CORPORATION, ET AL.,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

*(caption continued on inside cover)*

*On Petitions for Review of Orders of the Federal Energy Regulatory Commission*

## JOINT BRIEF OF THE VISTRA, PSEG, AND ALPHA GENERATION PETITIONERS

KANNON K. SHANMUGAM
MASHA G. HANSFORD
JAMES DURLING
NATHAN W. RAAB
JACOB R. SCHULZ
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*mhansford@paulweiss.com*

CHRISTOPHER ODELL
ARNOLD & PORTER KAYE SCHOLER, LLP
*700 Louisiana Street, Suite 4000*
*Houston, TX 77002*
*(713) 576-2400*
*christopher.odell@arnoldporter.com*

JAMES E. TYSSE
STEPHEN J. HUG
KRISTEN E. LOVELAND
MARGARET O. RUSCONI
MATTHEW S. NOXSEL
AKIN GUMP STRAUSS HAUER & FELD LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 756-8000*
*jtysse@akingump.com*

No. 25-60055

VISTRA CORPORATION; DYNEGY MARKETING AND TRADE, L.L.C.; LS POWER DEVELOPMENT, L.L.C.; ALPHA GENERATION, L.L.C.; ELECTRIC POWER SUPPLY ASSOCIATION; NEW ENGLAND POWER GENERATORS ASSOCIATION, INCORPORATED; NATIONAL GRID RENEWABLES DEVELOPMENT, L.L.C.; INDEPENDENT POWER PRODUCERS OF NEW YORK, INCORPORATED; THE PJM POWER PROVIDERS GROUP; LEEWARD RENEWABLE ENERGY, L.L.C.; RWE CLEAN ENERGY, L.L.C.; DESRI HOLDINGS, L.P.; INVENERGY WIND DEVELOPMENT NORTH AMERICA, L.L.C.; INVENERGY SOLAR DEVELOPMENT NORTH AMERICA, L.L.C.; LIGHTSOURCE RENEWABLE ENERGY OPERATIONS, L.L.C.; NEXTERA ENERGY RESOURCES, L.L.C.,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

*consolidated with*

No. 25-60149

INVENERGY NELSON, L.L.C.,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

*consolidated with*

No. 25-60329

LEEWARD RENEWABLE ENERGY, L.L.C.; RWE CLEAN ENERGY, L.L.C.; DESRI HOLDINGS, L.P.; INVENERGY WIND DEVELOPMENT NORTH AMERICA, L.L.C.; INVENERGY SOLAR DEVELOPMENT NORTH AMERICA, L.L.C.; LIGHTSOURCE RENEWABLE ENERGY OPERATIONS, L.L.C.; NEXTERA ENERGY RESOURCES, L.L.C.; VISTRA CORPORATION; DYNEGY MARKETING AND TRADE, L.L.C.; LS POWER DEVELOPMENT, L.L.C.; ALPHA GENERATION, L.L.C.; ELECTRIC POWER SUPPLY ASSOCIATION; NEW ENGLAND POWER GENERATORS ASSOCIATION, INCORPORATED; GERONIMO POWER, L.L.C.; INDEPENDENT POWER PRODUCERS OF NEW YORK, INCORPORATED; THE PJM POWER PROVIDERS GROUP,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

*consolidated with*

No. 25-60453

PUBLIC SERVICE ELECTRIC & GAS COMPANY; PSEG POWER, L.L.C.; PSEG ENERGY RESOURCES & TRADE, L.L.C.,

*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

**CERTIFICATE OF INTERESTED PERSONS**

Nos. 25-60055, 25-60149, 25-60329, 25-60453

VISTRA CORPORATION, ET AL.,
PETITIONERS

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

A. Vistra Petitioners

1. Parties:

Vistra Corporation
Dynegy Marketing and Trade, L.L.C.
LS Power Development, L.L.C.
Alpha Generation, L.L.C.
Electric Power Supply Association
New England Power Generators Association, Inc.
Geronimo Power, L.L.C.
*(f/k/a/ National Grid Renewables Development, L.L.C.)*
Independent Power Producers of New York, Inc.
PJM Power Providers Group

2. Attorneys:

James E. Tysse
Stephen J. Hug
Kristen E. Loveland
Margaret O. Rusconi
Matthew S. Noxsel
Akin Gump Strauss Hauer & Feld LLP
*2001 K Street, N.W.*
*Washington, DC 20006*

B. PSEG Petitioners

1. Parties:

Public Service Electric & Gas Company
PSEG Energy Resources & Trade, L.L.C.
PSEG Power, L.L.C.

2. Attorneys:

Kannon K. Shanmugam
Masha G. Hansford
James Durling
Nathan W. Raab
Jacob R. Schulz
Paul, Weiss, Rifkind,
Wharton & Garrison LLP
*2001 K Street, N.W.*
*Washington, DC 20006*

C. Alpha Generation Petitioner

1. Party:

Alpha Generation, L.L.C.

2. Attorney:

Christopher Odell
Arnold & Porter
Kaye Scholer, LLP
*700 Louisiana Street,*
*Suite 4000*
*Houston, TX 77002*

D. Leeward Petitioners

1. Parties:

Leeward Renewable Energy, L.L.C.
RWE Clean Energy, L.L.C.
RWE Clean Energy, L.L.C.
DESRI Holdings, L.P.
Invenergy Wind Development North America, L.L.C.
Lightsource Renewable Energy Operations, L.L.C.
NextEra Energy Resources, L.L.C
Invenergy Nelson, L.L.C.

2. Attorneys:

Steven P. Hollman
Bruce A. Grabow
Jennifer Brough
Abraham J. Shanedling
Sheppard, Mullin,
Richter & Hamilton, LLP
*2099 Pennsylvania Avenue,*
*Suite 100*
*Washington, DC 20006*

E. Respondent

1. Party:

Federal Energy Regulatory Commission

2. Attorneys:

Susanna Y. Chu
Beth Guralnick Pacella
Robert Harris Solomon
*Federal Energy Regulatory Commission*
*888 First Street, N.E.*
*Washington, DC 20426*

F. Intervenors

1. Parties:

PJM Interconnection, L.L.C.
Illinois Office of the Attorney General
Maryland Office of People's Counsel
New Jersey Division of Rate Counsel
Monitoring Analytics, L.L.C.
Old Dominion Electric Cooperative
Virginia Electric & Power Company
*(d/b/a Dominion Energy Virginia)*
Northern Virginia Electric Cooperative
MISO Transmission Owners

2. Attorneys:

Ryan James Collins
Wendy N. Reed
Wright & Talisman, P.C.
*1200 G Street, N.W.,*
*Suite 600*
*Washington, DC 20005*

Sarah A. Hunger
Illinois Office of the Attorney General
Solicitor General's Office
*115 South LaSalle Street, 23rd Floor*
*Chicago, IL 60603*

Stephen Pearson
Spiegel & McDiarmid, L.L.P.
*1818 N Street, N.W.*
*Washington, DC 20036*

Jeffrey Mayes
Monitoring Analytics, L.L.C.
*2621 Van Buren Avenue,*
*Suite 160*
*Eagleville, PA 19087*

Matthew Rudolphi
Thompson Coburn, L.L.P.
*55 East Monroe Street, 37th Floor*
*Chicago, IL 60603*

Stephen John Snyder
Womble Bond Dickinson (US), L.L.P.
*2001 K Street, N.W.,*
*Suite 400 South*
*Washington, D.C. 20006*

Cheri Yochelson
Dominion Energy, Incorporated
*120 Tredegar Street, Room Rs-5*
*Richmond, VA 23219*

Debra Roby
Alan Robbins
Washington Energy Law, L.L.P.
*900 17th Street, N.W.*
*Washington, DC 20006*
*Suite 500-A*

G. Corporate Disclosure Statement of Vistra, PSEG, and Alpha Generation Petitioners

Petitioner Vistra Corporation ("Vistra") is publicly traded on the New York Stock Exchange, and the Vanguard Group, Inc. holds 10 percent or more of Vistra's stock. Petitioner Dynegy Marketing and Trade, LLC is an indirect, wholly owned subsidiary of Vistra.

Petitioner Electric Power Supply Association and petitioner Independent Power Producers of New York, Inc., trade associations, are not public companies, have no parent corporations, and no publicly held corporation owns 10 percent or more of their stock.

Petitioner Geronimo Power, LLC is owned indirectly by Brookfield Asset Management Ltd. and Brookfield Corporation. Brookfield Corporation is a publicly held corporation that owns 10 percent or more of Brookfield Management Ltd.'s stock. No publicly held company owns 10% or more of Brookfield Corporation's stock.

Petitioner LS Power Development, L.L.C. is not a public company, has no parent corporations, and no publicly held corporation owns 10 percent or more of its stock.

Petitioners Public Service Electric & Gas Company, PSEG Power LLC, and PSEG Energy Resources & Trade LLC are wholly owned subsidiaries of Public Service Enterprise Group, Inc. No publicly held company owns 10% or more of Public Service Enterprise Group, Inc.'s stock.

Petitioner Alpha Generation, L.L.C. is a wholly owned direct subsidiary of Alpha Generation Intermediate Holdings, LLC. No

publicly held company owns 10% or more of Alpha Generation Intermediate Holdings, LLC's stock.

/s/ Masha G. Hansford
MASHA G. HANSFORD

*Attorney of Record for PSEG Petitioners*

/s/ James E. Tysse
JAMES E. TYSSE

*Attorney of Record for Vistra Petitioners*

/s/ Christopher Odell
CHRISTOPHER ODELL

*Attorney of Record for Alpha Generation Petitioner*

February 19, 2026

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners respectfully submit that oral argument would be useful to the disposition of this appeal because it presents exceptionally important issues regarding the interpretation and application of the Federal Power Act and the Administrative Procedure Act.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................i
STATEMENT REGARDING ORAL ARGUMENT ..............................viii
TABLE OF AUTHORITIES................................................................xi
STATEMENT OF JURISDICTION......................................................1
STATEMENT OF THE ISSUES............................................................2
STATUTES INVOLVED........................................................................2
STATEMENT OF THE CASE ..............................................................2
A. Statutory Background..................................................5
B. Factual And Regulatory Background ............................6
C. Proceedings Below ......................................................12
D. *Capital Power v. FERC* ................................................18
SUMMARY OF ARGUMENT..............................................................19
STANDARD OF REVIEW....................................................................23
ARGUMENT ........................................................................................23
I. ORDER NO. 904 FAILS TO SATISFY SECTION 206 OF THE FEDERAL POWER ACT .......................................23
A. Under Section 206, FERC Cannot Require Generators To Give Away Reactive Power For Free........................................................................24
B. FERC Did Not Adequately Determine That Existing Rates For Reactive Power Were Unjust And Unreasonable......................................................27
C. FERC's Zero-Dollar Replacement Rate For Reactive Power Is Contrary To The Federal Power Act And Arbitrary And Capricious...................32
II. ORDER NO. 904 CONFLICTS WITH THE COST-CAUSATION PRINCIPLE ..................................................47
A. FERC Exceeded Its Statutory Authority By Departing From The Cost-Causation Principle ..........47

B. FERC Engaged In Arbitrary And Capricious Decisionmaking By Failing To Address The Cost-Causation Principle .......... 53

III. FERC IGNORED RELIANCE INTERESTS IN ADOPTING ORDER NO. 904 .......... 59

IV. VACATUR IS THE APPROPRIATE REMEDY .......... 69

CONCLUSION .......... 70

ADDENDUM

16 U.S.C. § 824d .......... Add. 1

16 U.S.C. § 824e .......... Add. 6

## TABLE OF AUTHORITIES

**<u>CASES</u>:**

*American Clean Power Ass'n v. FERC*,
54 F.4th 722 (D.C. Cir. 2022) .......... 6

*Ameren Servs. Co. v. FERC*,
880 F.3d 571 (D.C. Cir. 2018) .......... 24, 26

*American Whitewater v. FERC*,
125 F.4th 1139 (D.C. Cir. 2025) .......... 1

*Antero Res. Corp. v. FERC,*
156 F.4th 654 (2025) .......... 56

*Arkansas Louisiana Gas Co. v. Hall*,
453 U.S. 571 (1981) .......... 28, 32

*Bluefield Waterworks & Improvement Co. v. Public Service Comm'n of W. Va.*,
262 U.S. 679 (1923) .......... 24, 40, 41

*BNP Paribas Energy Trading GP v. FERC*,
743 F.3d 264 (D.C. Cir. 2014) .......... 48, 56

*BP West Coast Prods., LLC v. FERC*,
374 F.3d 1263 (D.C. Cir. 2004) .......... 27

*Capital Power Corp. v. FERC*,
156 F.4th 644 (D.C. Cir. 2025) .......... *passim*

*Central Hudson Gas & Elec. Corp. v. FERC*,
138 F.4th 531 (D.C. Cir. 2025) .......... 5

*Chicago, Milwaukee & St. Paul Ry. Co. v. Public Util. Comm'n of Idaho*,
274 U.S. 344 (1927) .......... 27, 55

*Cities of Batavia v. FERC*,
672 F.2d 64 (D.C. Cir. 1982) .......... 45

*City of Centralia v. FERC*,
213 F.3d 742 (D.C. Cir. 2000) .......... 42

*City of Girard v. FERC*,
790 F.2d 919 (D.C. Cir. 1986) .......... 32

*City of Winnfield v. FERC*,
744 F.2d 871 (D.C. Cir. 1984) .......... 6

*Clarke v. CFTC,*
74 F.4th 627 (5th Cir. 2023) .......... 66

*Colorado Interstate Gas Co. v. Federal Power Comm'n*,
324 U.S. 581 (1945) .......... 36

*Covington & L. Turnpike Road Co. v. Sandford*,
164 U.S. 578 (1896) .......... 25

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
45 F.4th 846 (5th Cir. 2022) .......... 69

*DHS v. Regents of the Univ. of California*,
591 U.S. 1 (2020) .......... 60, 61, 64, 66

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 1

*Dynegy Midwest Generation, Inc. v. FERC*,
633 F.3d 1122 (D.C. Cir. 2011) .......... 7, 10, 31

*El Paso Elec. Co. v. FERC (El Paso I)*,
832 F.3d 495 (5th Cir. 2016) .......... *passim*

*El Paso Elec. Co. v. FERC (El Paso II)*,
76 F.4th 352 (5th Cir. 2023) .......... *passim*

*Emera Maine v. FERC*,
854 F.3d 9 (D.C. Cir. 2017) .......... 6, 23, 28, 29

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 60, 61, 63, 69

*Gas Transmission Northwest, L.L.C. v. FERC*,
157 F.4th 674 (5th Cir. 2025) .......... 23

*Horne v. Department of Agric.*,
576 U.S. 350 (2015) .......... 25

*Jersey Cent. Power & Light Co. v. FERC*,
810 F.2d 1168 (D.C. Cir. 1987) .......... 28

*Louisiana Pub. Serv. Comm'n v. FERC*,
771 F.3d 903 (5th Cir. 2014) .......... 31

*Michigan Pub. Power Agency v. FERC*,
963 F.2d 1574 (D.C. Cir. 1992) .......... 43

*Midwestern Gas Transmission Co. v. Federal Power Comm'n*,
292 F.2d 119 (5th Cir. 1961) .......... 24, 25, 34

*Morgan Stanley Cap. Grp. Inc. v. Public Util. Dist. No. 1 of Snohomish Cnty.*,
554 U.S. 527 (2008) .......... 5, 7, 29, 30

*Northern Pacific Ry. Co. v. North Dakota ex rel. McCue*,
236 U.S. 585 (1915) .......... 26, 27, 40

*NRG Power Marketing, LLC v. FERC*,
862 F.3d 108 (D.C. Cir. 2017) .......... 28

*NSTAR Elec. & Gas Corp. v. FERC*,
481 F.3d 794 (D.C. Cir. 2007) .......... 32

*Smith v. Hood*,
900 F.3d 180 (5th Cir. 2018) .......... 5

*Southwestern Elec. Power Co. v. FERC*,
810 F.2d 289 (D.C. Cir. 1987) .......... 31

*State of Mont. v. Clark*,
749 F.2d 740 (D.C. Cir. 1984) .......... 45

*State of Wisconsin v. FERC*,
104 F.3d 462 (D.C. Cir. 1997) .......... 43

*Texas Med. Assn. v. U.S. Dep't of Health & Human Servs.*,
110 F.4th 762 (5th Cir. 2024) .......... 69

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) .......... 60, 61, 66

*Village of Morrisville v. FERC*,
136 F.4th 1117 (D.C. Cir. 2025) .......... 23

*Williams Gas Processing-Gulf Coast Co., LP v. FERC*,
475 F.3d 319 (D.C. Cir. 2006) .......... 46, 59, 66

*WorldCom, Inc. v. FCC*,
246 F.3d 690 (D.C. Cir. 2001) .......... 65

**<u>AGENCY DECISIONS</u>:**

*Ameren Illinois Co.*,
185 FERC ¶ 61,124 (2023) .......... 36, 56

*American Elec. Power Serv. Corp.*,
81 FERC ¶ 61,129 (1997) .......... 44

*American Elec. Power Serv. Corp.*,
88 FERC ¶ 61,141 (1999) .......... 9, 44

*Bishop Hill Energy LLC*,
185 FERC ¶ 61,056 (2023) .......... 35

*Bluegrass Generation Co., L.L.C.*,
118 FERC ¶ 61,214 (2007) .......... 10, 11, 25
121 FERC ¶ 61,018 (2007) .......... 10, 35

*Compensation for Reactive Power Within the Standard Power Factor Range*,
Order No. 904, 189 FERC ¶ 61,034 (2024) .......... *passim*
Rehearing Order, 191 FERC ¶ 61,188 (2025) .......... *passim*

*Duke Energy Fayette, LLC*,
104 FERC ¶ 61,090 (2003) .......... 38

*Dynegy Midwest Generation, Inc.*,
116 FERC ¶ 63,052 (2006) .................... 34
121 FERC ¶ 61,025 (2007) .................... *passim*
125 FERC ¶ 61,280 (2008) .................... 33, 35, 38

*Entergy Servs., Inc.*,
143 FERC ¶ 61,120 (2013) .................... 36, 56

*Interconnection for Wind Energy*, Order No. 661,
111 FERC ¶ 61,353 (2005) .................... 41

*Maine Pub. Util. Comm'n*,
126 FERC ¶ 61,090 (2009) .................... 43

*Midcontinent Indep. Sys. Operator, Inc.*,
182 FERC ¶ 61,033 (2023) .................... 18, 65
184 FERC ¶ 61,022 (2023) .................... 18

*Midwest ISO Transmission Owners*,
122 FERC ¶ 61,305 (2008) .................... 31

NERC Reliability Standard FAC-0003-4 (Transmission Vegetation Management); *Rules Concerning Certification of the Electric Reliability Organization, and Procedures for the Establishment, Approval, and Enforcement of Electric Reliability Standards*, Order No. 672, 114 FERC ¶ 61,104 (2006) .................... 40

*New York Transco LLC*,
190 FERC ¶ 61,150 (2025) .................... 40

*Northern States Power Co. (Minnesota & Wisconsin)*,
59 FERC ¶ 63,003 (1992) .................... 7
64 FERC ¶ 61,324 (1993) .................... 7

*Reactive Power Capability Compensation*,
177 FERC ¶ 61,118 (2021) .................... 9, 12

*Rules Concerning Certification of the Electric Reliability Organization, and Procedures for the Establishment, Approval, and Enforcement of Electric Reliability Standards*, Order No. 672, 114 FERC ¶ 61,104 (2006) ..................... 40

*Southwest Power Pool, Inc.*, 119 FERC ¶ 61,199 (2007) ..................... 59

*Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 (2003) ..................... *passim*

*Virginia Elec. & Power Co.*,
114 FERC ¶ 61,318 (2006) ..................... 33
162 FERC ¶ 61,029 (2018) ..................... 30

**<u>STATUTES</u>:**

5 U.S.C.
§ 706(a)(A) ..................... 23

16 U.S.C.
§ 824d ..................... 5
§ 824d(a) ..................... 5
§ 824d(c) ..................... 5
§ 824d(d) ..................... 5
§ 824e ..................... 28
§ 824e(a) ..................... 6, 23, 24
§ 825l(b) ..................... 1

28 U.S.C.
§ 2112(a) ..................... 1

**<u>OTHER AUTHORITIES</u>:**

*Capacity Reservation Open Access Transmission Tariffs,* Notice of Proposed Rulemaking, 61 Fed. Reg. 21,847 (May 10, 1996) ..................... 36

Fed. R. App. P. 28(i) ..................... 4

FERC Staff Report, *Payment for Reactive Power* (Docket No. AD14-7, Apr. 22, 2014) ............................................................ *passim*

*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, 61 Fed. Reg. 21,540 (May 10, 1996) ............................ *passim*

Restatement (Second) of Torts § 432(2) ........................................................................................ 55

*Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003-A, 69 Fed. Reg. 15,932 (Mar. 26, 2004) ........................................................................ *passim*

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 16 U.S.C. § 825l(b) and 28 U.S.C. § 2112(a). The Federal Energy Regulatory Commission (FERC) issued the order under review on October 17, 2024, *Compensation for Reactive Power Within the Standard Power Factor Range*, 189 FERC ¶ 61,034 (Order No. 904 or Order), and an order denying rehearing on June 6, 2025, *Order Addressing Arguments Raised on Rehearing*, 191 FERC ¶ 61,188 (Rehearing Order). Petitioners timely filed their petitions within sixty days of the order denying rehearing. *See* 16 U.S.C. § 825l(b); *American Whitewater v. FERC*, 125 F.4th 1139, 1151-1152 (D.C. Cir. 2025); R.134 at 1; *Public Service Electric & Gas Co. v. FERC*, Dkt. 2, No. 25-1165 (D.C. Cir. filed Aug. 4, 2025).[1]

Petitioners have standing to sue because, by prohibiting compensation for reactive power that petitioners would otherwise receive, FERC's order deprives them of tens of millions of dollars in annual revenue. That is a direct, pecuniary injury that vacatur of the order would redress. *See Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 113-115 (2025).

[1] Documents listed in FERC's certified index to the record, excluding Order No. 904 and FERC's Rehearing Order, are cited by index number and internal page number. Order No. 904 and FERC's Rehearing Order are cited by paragraph ("P") in the FERC Reporter.

## STATEMENT OF THE ISSUES

1. Whether FERC exceeded its statutory authority or acted arbitrarily and capriciously because, in adopting Order No. 904, it compelled generators to give away reactive power for free and failed to satisfy its dual burden under Section 206 of the Federal Power Act.

2. Whether FERC exceeded its statutory authority or acted arbitrarily and capriciously because Order No. 904 violates the cost-causation principle.

3. Whether FERC acted arbitrarily and capriciously by adopting Order No. 904 without considering relevant reliance interests.

## STATUTES INVOLVED

Relevant statutory provisions are set forth in an addendum to this brief.

## STATEMENT OF THE CASE

This case concerns an attempt by FERC to compel American electricity generators to produce hundreds of millions of dollars in electricity each year for free. That requirement exceeds FERC's authority under the Federal Power Act and is arbitrary and capricious under the Administrative Procedure Act. This Court should accordingly vacate the FERC order under review.

Power plants generate two kinds of electricity: "real" or "active" power, which produces usable electricity, and "reactive" power, which

stabilizes voltage levels across the electric grid and thus ensures reliable grid operation despite fluctuations in demand. For decades, FERC has treated generators' production of reactive power as a valuable service, separate and apart from their production of real power. In fact, FERC *requires* generators to provide reactive power service within a preset range—called the "deadband" or "standard power factor range"—as a condition of connecting to the electrical grid.

FERC had long authorized generators to be paid for the reactive power service they provided. But in the order under review—Order No. 904—FERC abruptly eliminated that longstanding scheme, banning compensation for reactive power across the country, including where it had been freely negotiated. FERC continued, however, to require generators to provide reactive power service whenever they sold real power as a condition of interconnection. Order No. 904 will end hundreds of millions a year in reactive power compensation for generators nationwide.

Order No. 904 is unlawful for three principal reasons. *First*, FERC lacked authority under Section 206 of the Federal Power Act to set a $0 rate for reactive power—that is, to make generators give reactive power away for free. Relatedly, FERC failed to establish, as the Federal Power Act required, that existing rates for reactive power were "unjust" and

"unreasonable" and that its $0 replacement rate was "just" and "reasonable."

*Second*, FERC violated the cost-causation principle. The cost-causation principle requires those who benefit from specific electrical services to pay for them. FERC's decision to make reactive power free cannot be reconciled with that principle: it allows transmission customers, the entities that need and benefit from reactive power service, to free-ride on generators' reactive power production. FERC's analysis of the cost-causation problems with Order No. 904 was erroneous as a matter of law, as well as arbitrary and capricious.

*Third*, FERC did not meaningfully consider generators' reliance interests in their existing payments for reactive power. For decades, generators entered multi-year contracts and made long-term investment decisions in reliance on FERC's rules for reactive power payments. Yet FERC said remarkably little about those paradigmatic reliance interests, and what it did say was unpersuasive. For the reasons the D.C. Circuit gave in vacating a related FERC order, those defects make FERC's order arbitrary and capricious. *Capital Power Corp. v. FERC*, 156 F.4th 644, 647 (D.C. Cir. 2025).[2]

[2] Petitioners join in full the arguments raised in the separate brief by the Leeward petitioners. *See* Fed. R. App. P. 28(i). Those arguments are

### A. Statutory Background

The Federal Power Act authorizes FERC to regulate electricity sales in interstate commerce, including the rates at which electric power is sold. *Morgan Stanley Cap. Grp. Inc. v. Public Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 531 (2008). Modeled on the Interstate Commerce Act, the Federal Power Act "requires regulated utilities to file compilations of their rate schedules, or 'tariffs,' with the Commission, and to provide service to electricity purchasers on the terms and prices there set forth." *Id.* The Act also "permits utilities to set rates with individual electricity purchasers through" freely negotiated "bilateral contracts," called power purchase agreements. *Id.*; *see* 16 U.S.C. § 824d(c)-(d).

The Federal Power Act provides two pathways for establishing and modifying "rates and charges" within FERC's jurisdiction. 16 U.S.C. § 824d. First, utilities can "unilaterally file" their preferred rate pursuant to Section 205. *Central Hudson Gas & Elec. Corp. v. FERC*, 138 F.4th 531, 534 (D.C. Cir. 2025). "FERC must approve the proposed rates so long as they are 'just and reasonable.'" *Id.* (quoting 16 U.S.C. § 824d(a)). Section 205 "is intended for the benefit of the utility . . . as a means

"equally applicable" to all petitioners. *Smith v. Hood*, 900 F.3d 180, 184 n.4 (5th Cir. 2018) (citation omitted).

of enabling it to increase its rates[.]" *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984).

Second, Section 206 of the Federal Power Act permits FERC to modify approved rates prospectively. "Section 206's procedures are entirely different and stricter than those of [S]ection 205." *Emera Maine v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017) (citation omitted). While a utility seeking to change a rate under Section 205 need only demonstrate that the proposed rate is just and reasonable, FERC must meet a "dual burden" when it seeks to modify a rate under Section 206. *Id.* at 25. FERC must (1) demonstrate that the existing rate is "unjust, unreasonable, unduly discriminatory, or preferential," and then (2) "determine a 'just and reasonable' replacement rate." *American Clean Power Ass'n v. FERC*, 54 F.4th 722, 724 (D.C. Cir. 2022) (quoting 16 U.S.C. § 824e(a)).

**B. Factual And Regulatory Background**

1. "When a power plant generates electricity, it emits two kinds of power: active or 'real' power, which produces usable energy, and reactive power[.]" *Capital Power*, 156 F.4th at 647. Reactive power, the portion of power that establishes and maintains electric and magnetic fields in alternating current (AC) equipment, "is a critical component of operating an [AC] electricity system." FERC Staff Report, *Payment for Reactive Power* 4 (Docket No. AD14-7, Apr. 22, 2014),

tinyurl.com/2014FERCReport (2014 Staff Report). Those responsible for transmitting electricity use reactive power "to maintain adequate voltages to transmit real power, and to prevent damage such as overheating of generators and motors." *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1124 (D.C. Cir. 2011). They require a steady flow of reactive power so that the electrical grid operates reliably and efficiently. *See Capital Power*, 156 F.4th at 648.

Although crucial to the nationwide power grid, reactive power "cannot be efficiently transferred long distances on transmission lines." 2014 Staff Report at 5. To ensure that real power flows reliably across the grid, generators must inject reactive power into (or absorb reactive power from) the grid at various points. *See, e.g.*, *Northern States Power Co. (Minnesota & Wisconsin)*, 59 FERC ¶ 63,003 at 65,040 (1992), *aff'd in part, vacated in part*, 64 FERC ¶ 61,324 (1993). When the supply of reactive power is inadequate at a particular location, "voltage collapse and blackouts" can result. *Dynegy*, 633 F.3d at 1124.

2. The electrical grid in the United States is largely managed by regional "grid operators" called independent system operators (ISOs) or regional transmission organizations (RTOs), which are "not-for-profit entities that operate transmission facilities in a nondiscriminatory manner." *Morgan Stanley*, 554 U.S. at 536-537. RTOs and ISOs serve users

of electrical transmission infrastructure—"transmission customers"—which are typically utility companies that own the transmission wires and use the grid to deliver energy to end-users like homes and businesses. To ensure that real power can be transmitted across the grid, FERC has long held that grid operators (including ISOs and RTOs) must provide reactive power service.

Thirty years ago, FERC issued the landmark Order No. 888. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, 61 Fed. Reg. 21,540 (May 10, 1996) (Order No. 888). Order No. 888 "unbundled" electricity services, separating transmission from power generation and requiring separate rates for generation service, transmission service, and ancillary services. *Id.* One of those ancillary services was reactive power service. FERC explained that "[b]ecause reactive power cannot be transmitted for significant distances, the local [grid operator] has to supply reactive power from generation sources." *Id.* at 21,587.

FERC did not, however, expect grid operators to supply reactive power service for free. Instead, it required transmission customers to "purchase [reactive power] services from" their grid operator(s). Order No. 888, 61 Fed. Reg. at 21,590. To obtain the reactive power to meet their obligations, grid operators were required to either "install facilities

. . . as part of the transmission system" (the costs of which become part of transmission rates), or "use generating facilities to supply reactive power" (the costs of which would be paid by fees collected by grid operators and passed along to generators). *Id.* at 21,581. In either case, transmission customers paid the costs. *See id.*; *Dynegy Midwest Generation, Inc.*, 121 FERC ¶ 61,025 at PP 2, 82 (2007).

Soon after, FERC approved a specific allocation method (called the AEP methodology) to help establish the costs of providing reactive power service. *American Elec. Power Serv. Corp.*, 88 FERC ¶ 61,141 (1999). The AEP methodology identified four components of generation plants that contributed to the production of reactive power: (1) the generator and its exciter (a device that uses DC electrical power to create a magnetic field in order to produce AC electrical power); (2) accessory electric equipment that supported the operation of the generator-exciter; (3) the generator step-up transformer; and (4) the remaining investment required to provide real power and operate the exciter. *Reactive Power Capability Compensation*, 177 FERC ¶ 61,118 at P 9 (2021). Because those plant parts also contributed to the production of real power, the AEP methodology acted as "an allocation factor to sort the annual revenue requirements of the[] components between real and reactive power

production." *Bluegrass Generation Co., L.L.C.*, 118 FERC ¶ 61,214 at P 3 (2007), *order on reh'g*, 121 FERC ¶ 61,018 at P 12 (2007).

3. In 2003, FERC for the first time imposed an obligation on generators—rather than just grid operators—to supply reactive power within a standard power factor range (or deadband).[3] *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 at PP 5, 542, 741 (2003) (Order No. 2003), *order on reh'g*, Order No. 2003-A, 69 Fed. Reg. 15,932 (Mar. 26, 2004) (Order No. 2003-A). Imposing that obligation was necessary because, at the time, vertically integrated utilities were increasingly spinning off their generating facilities to independent third parties.

FERC vacillated on whether and how generators would be compensated for their reactive power service. FERC originally contemplated that generators would be compensated just as grid operators had been under Order No. 888. Then, in Order No. 2003, FERC initially determined (without further explanation) that a generator "should not be compensated for reactive power when operating its [g]enerating [f]acility

[3] The deadband is between a 0.95 leading and 0.95 lagging power factor. A 0.95 "leading" power factor "reflect[s] the real/reactive ratio when the generator is consuming reactive power," while a 0.95 "lagging" power factor "reflect[s] the real/reactive ratio when the generator is supplying reactive power[.]" *Dynegy*, 633 F.3d at 1124 n.1. A ratio of 1 means that the generator is neither consuming nor supplying reactive power. *See* 2014 Staff Report, App. 1, at 1.

within the established power factor range, since it is only meeting its obligation." 104 FERC ¶ 61,103 at P 546. On rehearing, FERC reconsidered that determination in part, concluding in Order No. 2003-A that independent generators were owed compensation for reactive power within the standard range if vertically integrated utilities were paid for the same. Order No. 2003-A, 69 Fed. Reg. 15,932 at P 416. That rule is known as the "comparability principle." In response, most grid operators permitted generators within their regions to be paid for reactive power service.[4]

For the next two decades, FERC applied the AEP methodology in hundreds of proceedings to establish individual reactive rate schedules for the reactive power service provided by generators within certain grid operator regions, including PJM Interconnection (PJM) and the Midcontinent Independent System Operator (MISO). *See Compensation for Reactive Power Within the Standard Power Factor Range*, Order No. 904, 189 FERC ¶ 61,034 at P 13 (2024) (Order No. 904 or Order); *see, e.g.*, *Bluegrass Generation Co.*, 118 FERC ¶ 61,214. Those orders emphasized the importance of reactive power and the propriety of collecting the costs

[4] Some grid operators, such as California ISO, do not compensate generators within their regions for reactive power service within the deadband. To petitioners' knowledge, no generator supplying reactive power has ever challenged that arrangement in court.

of that power from transmission customers. *E.g.*, *Dynegy*, 121 FERC ¶ 61,025 at P 82 (2007). In other regions—such as New York Independent System Operator (NYISO) and ISO New England (ISO-NE)—FERC approved proposals to compensate resources using flat rates tied to capability. Order at P 13. As a result of those approvals, generators have received billions of dollars in reactive power compensation, including approximately $700 million in 2023 alone. *See* R.129 at 4 n.12 (citing Order No. 904 at P 24 n.59).

### C. Proceedings Below

1. In 2021, FERC issued a notice seeking comment on "reactive power capability compensation and market design." 177 FERC ¶ 61,118 at P 1. FERC had grown concerned that the AEP methodology had become outdated given changes in the types of generators seeking reactive power compensation. *Id.* at P 2. When the AEP methodology was adopted, most generators seeking reactive power compensation had been "synchronous" generators using traditional energy sources, such as coal and gas. *Id.* In the years since, an increasing number of generators used "asynchronous" alternative energy sources, such as wind and solar. *Id.* Given that evolution, FERC sought to examine whether the AEP methodology required "revisions" to "ensure that payments for reactive power

capability accurately reflect the costs associated with reactive power capability." *Id.* at P 19.

But what followed went far beyond mere revisions to the AEP methodology. Rather than adopt an amended methodology to allocate reactive power costs more precisely, FERC eliminated reactive power compensation altogether. FERC determined that allowing grid operators to charge customers for reactive power within the standard power factor range was unjust and unreasonable, and that the just and reasonable rate for reactive power service was $0. Order at PP 20, 58.

Moreover, rather than directly revising individual rate schedules filed under Section 205 of the Federal Power Act, FERC modified its standard tariffs (*i.e.*, model rate schedules and connection agreements) applicable to *grid operators* to "prohibit the inclusion in transmission rates of charges associated with reactive power in the standard power factor range." Order at P 60. In that way, FERC modified what grid operators could charge to transmission customers, without formally "adjusting, overturning, or reducing to zero any generating facility's rate for reactive power within the standard power factor range." Order at P 61. The result was that generators' reactive power rates would remain on file, even though generators would "no longer be[] entitled to

compensation for the provision of reactive power within the standard power factor range." *Id.*

FERC gave several justifications for its approach. At the outset, FERC concluded that there were little to no distinct costs attributable to reactive power. Order at P 51. Despite allowing providers for decades to allocate costs between real and reactive power using the AEP methodology—and despite having approved hundreds of millions of dollars annually in cost-based rates under that methodology, Order at P 24 n.59—FERC decided that fixed costs could *never* be attributed to reactive power, Order at P 90. FERC reasoned that "real and reactive power are provided as joint products with joint costs," and "any allocation of joint fixed costs between real and reactive power could be viewed as inherently arbitrary." *Id.* Otherwise, FERC claimed that there was "no incremental investment, or fixed costs," and that any variable costs were "*de minimis*." Order at P 51.

In addition, FERC took the view that reactive power production within the deadband should not be compensated because it was an "obligation of . . . good utility practice." Order at PP 8, 89. It followed, FERC said, that "standalone compensation for the provision of reactive power within the standard power factor range [did] not result in just and reasonable transmission rates." Order at P 102.

FERC also acknowledged its obligation to ensure that its order was consistent with the cost-causation principle—the foundational principle of utility regulation that those who benefit from a service must pay for it. Order at PP 148-149; *see El Paso Elec. Co. v. FERC (El Paso II)*, 76 F.4th 352, 357-358 (5th Cir. 2023) (describing the principle). But it rejected arguments that allowing transmission customers to benefit from reactive power without paying for it violated that principle. Separate compensation for providing reactive power was not necessary, FERC reasoned, because "real and reactive power are provided as joint products." Order at P 148. FERC also "disagree[d]" with claims "that transmission customers [we]re the sole beneficiaries and cost-causers" of reactive power service, asserting that reactive power costs were "'caused' by the operating requirements of . . . generating facilities to deliver real power." Order at P 149.

Finally, in just a few sentences, FERC tried to explain what had changed such that a service whose costs and compensability the agency had recognized in hundreds of proceedings suddenly deserved zero compensation. FERC noted that "[s]ome vertically integrated utilities have divested their generation," "[c]ompetitive markets [for reactive power]" with "market-based rates" had emerged, and "[n]ew technologies" had developed for which prior methods of calculating reactive power costs "do[]

not squarely apply." Order at P 23. FERC did not explain why those developments meant that any compensation for reactive power was now unjust and unreasonable for a particular generator (let alone for all generators).

FERC also spent just a few paragraphs addressing generators' reliance interests. In FERC's view, generators should not have relied on the agency's longstanding and consistent recognition of reactive power costs because "generating facilities ha[d] not had an inherent right to separate compensation for reactive power capability within the standard power factor range since Order Nos. 2003 and 2003-A." Order at P 226. FERC additionally emphasized that it had "rejected reliance arguments" in several related agency cases, including when the regional grid operator MISO had sought to end payments for reactive power in its region. Order at P 145.

2. FERC subsequently issued an order denying rehearing that reached the "same result" as Order No. 904. *Order Addressing Arguments Raised on Rehearing*, 191 FERC ¶ 61,188 at P 3 (June 6, 2025) (Rehearing Order). FERC doubled down on its determination that reactive power compensation was unjust and unreasonable, and that compensation at $0 was just and reasonable, on the grounds that the costs associated with providing reactive power were at best *de minimis*; providing

reactive power was an obligation of good utility practice; and any reactive power costs "may" be recovered through energy and capacity markets. *Id.* at PP 18-21, 36.

In response to objections that FERC could not now conclude the allocation of fixed costs between real and reactive power was impossible given its long practice of approving those very allocations, FERC insisted that its "prior acceptance or approval of compensation for reactive power service d[id] not prevent it from revising its policies." Rehearing Order at P 24. It reasoned that there was "no allocator" by which to attribute the joint costs for real and reactive power, *id.*, even though the AEP methodology had served as such an allocator since 1999. It further noted that real power rates were now determined by markets, though it did not explain why that meant costs for reactive power could not be allocated. *Id.* FERC also repeated that "providing reactive power service within the standard power factor range is an obligation of the generating facility" and "consistent with good utility practice." *Id.* at P 101. As before, however, it did not explain why the generator was therefore required to provide reactive power service for free.

Finally, FERC again dismissed generators' reliance interests. FERC admitted that Order No. 904 represented a "departure from longstanding policy." Rehearing Order at P 153. FERC nonetheless

maintained that Order Nos. 2003 and 2003-A had long ago put generators "on notice that [reactive power] payments could end[.]" *Id.* at P 158 & n.473. FERC also reiterated that it had rejected parallel reliance arguments in its case involving MISO. *Id.*

### D. *Capital Power v. FERC*

This appeal is not the only recent challenge to the abrupt elimination of reactive power compensation. In 2022, the grid operator MISO sought to stop compensating generators for reactive power service within the MISO region. *Capital Power*, 156 F.4th at 649. FERC approved the MISO proposal over the protests of generators, who argued (among other things) that eliminating reactive power compensation would upset investment-backed reliance interests. *See id.* (citing *Midcontinent Indep. Sys. Operator, Inc. (MISO)*, 182 FERC ¶ 61,033 (2023), *modified on reh'g*, 184 FERC ¶ 61,022 (2023)). In adopting Order 904, the order at issue here, FERC repeatedly invoked its reasoning in approving the MISO proposal. *See* p. 16, *supra*.

Generators filed a petition for review from the MISO order. *See Capital Power*, 156 F.4th at 649. The D.C. Circuit vacated and remanded in a unanimous opinion written by Judge Katsas. The court reasoned that "FERC did not adequately consider the generators' reliance

interests" given "MISO's longstanding practice of allowing generators to recover cost-based compensation for reactive power." *Id.* at 650.

## SUMMARY OF ARGUMENT

Order No. 904 exceeds FERC's authority under the Federal Power Act, which does not authorize FERC to compel generators to provide reactive power—a discrete and valuable service—for free. And FERC's reasoning in support of Order No. 904 was arbitrary and capricious under the Administrative Procedure Act. This Court should therefore hold Order No. 904 unlawful and vacate it.

I. Order No. 904 violates Section 206 of the Federal Power Act, which requires FERC to show both that existing rates for reactive power are "unjust and unreasonable" and that FERC's $0 replacement rate is "just and reasonable."

A. Nothing in Section 206 authorizes FERC to compel generators to provide electrical power, including reactive power, without compensation. Instead, Section 206's dual burden protects generators' right to charge a price for reactive power service that lets them earn a reasonable return on the value of the property they use to produce reactive power. Because Order No. 904 bars generators from earning *any* return on property insofar as it is used to produce reactive power, the order exceeds FERC's authority under Section 206.

B. Beyond that fundamental deficiency, FERC did not adequately establish that the reactive power rates Order No. 904 replaced were "unjust" or "unreasonable." On the contrary, when it adopted Order No. 904, FERC did not assess *any* of the existing rates for reactive power, much less find that those rates fell outside the zone of reasonableness for reactive power payments. Compounding the error, FERC purported to supplant existing rates for reactive power established through settlements that explicitly invoked the longstanding *Mobile-Sierra* presumption, which provides that freely negotiated rates should not be modified absent a showing of compelling public interest.

C. Even setting aside the problem that the $0 rate exceeds FERC's statutory authority, FERC also failed to establish that $0 is a "just and reasonable" rate for reactive power service. FERC asserted that generators could produce reactive power without incurring any fixed or variable costs, but that assertion was inadequately explained and belied by uncontradicted record evidence. Likewise, while FERC asserted that generators did not need to be compensated for reactive power because providing reactive power service was merely a "requirement of good utility practice," it did not (and could not) articulate how that justification helped FERC satisfy its legal burden. FERC's remaining attempts to

explain why generators could not justly and reasonably expect payment for reactive power service were similarly deficient.

II. Order No. 904 also runs afoul of the cost-causation principle, the foundational rule of utility regulation that those who benefit from a service like reactive power must pay for it. This Court's precedents establish that agency actions that contravene the cost-causation principle violate the Federal Power Act as a matter of law, and an agency action that fails adequately to explain compliance with the cost-causation principle is arbitrary and capricious under the Administrative Procedure Act. Order No. 904 falls into both traps.

A. Order No. 904 exceeds FERC's authority as a matter of law because it grossly departs from the cost-causation principle. Under that principle, FERC must match burden with benefit; if generators are required to provide reactive power service for the benefit of transmission customers, transmission customers must pay their fair share. Order No. 904 does not honor that requirement: it requires generators to provide reactive power service for the benefit of transmission customers, while transmission customers pay nothing for the reactive power they need. Requiring generators to cross-subsidize transmission customers in this manner conflicts with the Federal Power Act.

B. At a minimum, Order No. 904's cursory analysis of cost causation renders it arbitrary and capricious. When parties raised the cost-causation problems with Order No. 904, FERC principally responded that real and reactive power are joint products with joint costs. But that is a non sequitur: the cost-causation principle applies equally to joint products. Nor did FERC adequately explain its (erroneous) view that real and reactive power are always produced jointly. Likewise, FERC's hypothesis that generators "cause" the grid's reactive power needs cannot plausibly be understood in a manner that justifies Order No. 904.

III. Finally, FERC's adoption of Order No. 904 was arbitrary and capricious because FERC failed meaningfully to consider generators' reliance interests in their reactive power payments. As recently as 2023, generators earned approximately $700 million per year from producing reactive power, and they have relied upon that revenue stream in negotiating long-term contracts and making investment decisions. Yet FERC all but ignored those reliance interests. The D.C. Circuit recently vacated a close relative of Order No. 904 as arbitrary and capricious for overlooking similar reliance interests. *Capital Power Corp. v. FERC*, 156 F.4th 644, 647 (D.C. Cir. 2025). This Court should do the same.

IV. As the default remedy in cases under the Administrative Procedure Act, vacatur is the appropriate remedy here.

## STANDARD OF REVIEW

This Court reviews FERC orders under the Administrative Procedure Act "to ensure that they are not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Gas Transmission Northwest, L.L.C. v. FERC*, 157 F.4th 674, 700 (5th Cir. 2025) (quoting 5 U.S.C. § 706(a)(A)). It reviews questions of law de novo. *See, e.g.*, *Village of Morrisville v. FERC*, 136 F.4th 1117, 1125 (D.C. Cir. 2025). Although the Court affords deference to FERC's factual findings and policy decisions, it "do[es] not owe FERC deference if it has not substantiated the application of [a proposed] policy, either through the development of specific facts or by making a reasoned explanation." *El Paso Elec. Co. v. FERC (El Paso I)*, 832 F.3d 495, 503 (5th Cir. 2016) (citation omitted).

## ARGUMENT

### I. ORDER NO. 904 FAILS TO SATISFY SECTION 206 OF THE FEDERAL POWER ACT

Section 206 of the Federal Power Act "imposes a 'dual burden' on FERC" to show both that the existing rates on file are "unjust and unreasonable" and that its proposed replacement rate is "just and reasonable." *Emera Maine*, 854 F.3d at 25; *see* 16 U.S.C. § 824e(a). This dual burden protects public utilities by setting a high legal standard for changes to existing power rates.

FERC fell short of that standard here. In setting its new $0 rate for reactive power, FERC fundamentally erred by claiming the authority to make generators give away reactive power for free. Compounding that error, FERC failed to make either showing required by Section 206: it neither established that the long-extant compensation mechanism was unjust and unreasonable, nor justified its newfound view that a $0 rate is just and reasonable.

### A. Under Section 206, FERC Cannot Require Generators To Give Away Reactive Power For Free

1. FERC cannot force a generator to run "as a nonprofit business." *Ameren Servs. Co. v. FERC*, 880 F.3d 571, 581 (D.C. Cir. 2018). Instead, the Federal Power Act codifies a generator's right to be compensated for its services. *See* 16 U.S.C. § 824e(a). Under the Act, FERC must allow a generator to receive "a reasonable rate of return upon the value of the property used, at the time of its being used," to render a service. *Midwestern Gas Transmission Co. v. Federal Power Comm'n*, 292 F.2d 119, 121 (5th Cir. 1961). Rates that do not meet that standard are necessarily "unjust, unreasonable and confiscatory." *Bluefield Waterworks & Improvement Co. v. Public Service Comm'n of W. Va.*, 262 U.S. 679, 690 (1923).

Those statutory requirements have constitutional underpinnings. "[C]onstitutional provisions forbidding the deprivation of property

without due process of law" dictate that "the [government] cannot require" public utilities to "carry persons and property without reward" "[u]nder the pretense of regulating fares and freights." *Covington & L. Turnpike Road Co. v. Sandford*, 164 U.S. 578, 592-593 (1896). Thus, the Constitution itself requires that FERC properly ensure that generators earn a reasonable rate of return for the use of their property. *See id.*; *cf. Horne v. Department of Agric.*, 576 U.S. 350, 364-365 (2015) (explaining that "a governmental mandate to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce" can constitute a "per se taking" requiring just compensation).

2. Order No. 904 violates those requirements and thus exceeds FERC's authority under Section 206. As FERC has previously explained, generators do not create reactive power from nothing. Rather, they must use their property, including their generators, exciters, transformers, and accessory electric equipment, to produce it. *Bluegrass Generation Co.*, 118 FERC ¶ 61,214 at P 3. In exchange, generators are entitled to earn "a reasonable rate of return upon the value" of that property. *Midwestern Gas*, 292 F.2d at 121.

Consistent with that understanding, FERC has for decades treated the generation of reactive power as a service distinct from the generation of real power, deeming it both inherently valuable and separately

compensable. *See, e.g.*, Order No. 888, 61 Fed. Reg. at 21,581-82 (requiring "that reactive supply and voltage control service be offered as a discrete service, and to the extent feasible, charged for on the basis of the amount required"). And in the wake of Order No. 888, generators have received billions of dollars for the reactive power they have provided—with FERC's approval. *See* Order at P 24 n.59.

Yet Order No. 904 does not allow generators to receive compensation for their provision of reactive power. Instead, it requires them to give away the reactive power they produce for free, "as essentially non-profit" stewards of the grid's reactive power needs. *Ameren*, 880 F.3d at 573. The Federal Power Act does not authorize FERC to make such demands on generators.

The fact that generators can still earn a return by using their generating equipment to produce real power does not alter the analysis. As the Supreme Court explained long ago, the government may not "set apart a commodity . . . and impose upon it any rate it pleases, provided only that return from the [regulated entity's] entire . . . business is adequate." *Northern Pacific Ry. Co. v. North Dakota ex rel. McCue*, 236 U.S. 585, 559-600 (1915). Thus, for instance, the government cannot compel a railroad to carry one "class of traffic . . . without reasonable reward" merely because the railroad as a whole turns a profit. *Id.* at 601;

*accord Chicago, Milwaukee & St. Paul Ry. Co. v. Public Util. Comm'n of Idaho*, 274 U.S. 344, 350-351 (1927) (holding that state regulators could not require a railroad to haul logs "without compensation that [was] reasonable and just" even if it received "adequate revenues" from hauling logs and lumber "taken together"). So too for reactive power: FERC cannot compel generators to produce reactive power "without reasonable reward" because it lets them seek compensation for the other items they sell. *Northern Pacific*, 236 U.S. at 601. Put differently, FERC cannot offset an unjust and unreasonable reactive power rate based on the prospect of higher rates for real power. *Cf. BP West Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1307-1308 (D.C. Cir. 2004) (per curiam) (rejecting effort to "offset[] undercharges and overcharges" over time under a law that requires "just and reasonable" rates).

### B. FERC Did Not Adequately Determine That Existing Rates For Reactive Power Were Unjust And Unreasonable

Beyond FERC's fundamental lack of authority to issue an order eliminating compensation for a required service, Order No. 904 fails to satisfy the first prerequisite for rate-setting under Section 206: it does not adequately determine that generators' existing FERC-approved rates for reactive power are unjust and unreasonable.

1. Because hundreds of generators have filed "just and reasonable" reactive power rate schedules over the years under Section 205, "a finding that an existing rate is unjust and unreasonable is the 'condition precedent' to FERC's exercise of its [S]ection 206 authority to change that rate." *Emera Maine*, 854 F.3d at 25; *see* 16 U.S.C. § 824e. Until FERC satisfies that condition precedent, a generator is free to—indeed, required to—charge only its filed rate. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981).

Importantly, FERC may not simply assume that only its preferred rate is just and reasonable. Rather, the Federal Power Act contemplates a "zone of reasonableness" that includes "a broad range of potentially lawful [rates]." *Emera Maine*, 854 F.3d at 26. That range is "bounded at one end by the investor interest against confiscation and at the other by the consumer interest against exorbitant rates." *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1177 (D.C. Cir. 1987) (citation omitted). Section 206 thus "requires FERC to demonstrate that the existing rates are 'entirely outside the zone of reasonableness' before FERC imposes a new rate without the consent of the utility[.]" *NRG Power Marketing, LLC v. FERC*, 862 F.3d 108, 114 n.2 (D.C. Cir. 2017).

2. Here, FERC did nothing to assess whether any "existing rate[s]" were "unjust and unreasonable" before acting under Section

206—meaning that FERC failed to satisfy the key "condition precedent" for its Section 206 powers to establish a replacement rate. *Emera Maine*, 854 F.3d at 25. For example, FERC did not examine any of the hundreds of rate schedules on file in the PJM and MISO regions to determine whether they fell within the zone of reasonableness. Nor did FERC conduct a market-and-technology-specific analysis or explain why one was inappropriate. Nor did it examine the individual rates that were established in the NYISO and ISO-NE regions—which, unlike other transmission regions, compensated generators for reactive power service at flat rates based on a resource's capability to provide the service. Instead, it essentially assumed that its preferred $0 rate for reactive power service was the only just and reasonable rate. That assumption was fundamentally inconsistent with FERC's limited authority under Section 206.

Compounding the problem, FERC deemed non-zero rates for reactive power to be unjust and unreasonable even when they were freely negotiated between parties with equal bargaining power—a result flatly inconsistent with Supreme Court precedent. As the Court has explained, "in wholesale markets, the party charging the rate and the party charged are often sophisticated businesses enjoying presumptively equal bargaining power, who could be expected to negotiate a 'just and reasonable' rate as between the two of them." *Morgan Stanley*, 554 U.S. at 545 (brackets

omitted). Under that principle, known as the *Mobile-Sierra* doctrine, FERC "must presume that the rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law." *Id.* at 530. FERC can modify that rate only if it demonstrates that the rate "seriously harms the consuming public." *Id.* at 545-546. FERC did not even attempt to make that showing in Order No. 904, even though FERC had previously acknowledged that some generators' filed rates were subject to the requirements of the *Mobile-Sierra* presumption. *See, e.g.*, *Virginia Elec. & Power Co.*, 162 FERC ¶ 61,029 at P 19 (2018).

3. Without denying that it must ordinarily show that existing rates are unjust and unreasonable, FERC attempted to sidestep its burden by claiming that it was not literally "adjusting, overturning, or reducing to zero any generating facility's rate for reactive power within the standard power factor range." Order at P 61. Rather, FERC claimed, "[t]he final rule addresses *only* the justness and reasonableness of transmission rates" that *grid operators* charge to *transmission customers* under the standard grid operator tariffs. *Id.* (emphasis added). Because FERC revised the tariffs only "to prohibit the inclusion in transmission rates of charges associated with reactive power in the standard power factor range," Order at P 60, FERC denied that it was changing rates—

even though the conceded result was that generators will "no longer be[] entitled to compensation for the provision of reactive power within the standard power factor range," Order at P 61.

FERC's attempt to zero-out filed rates without meeting its Section 206 obligation itself rendered its action arbitrary and capricious. For one thing, it was an unexplained departure from FERC's previous position that transmission customers "remain obligated" to provide compensation "pursuant to the generators' filed rate schedules unless and until these rate schedules are successfully challenged under [S]ection 206." *Midwest ISO Transmission Owners*, 122 FERC ¶ 61,305 at 62,769 (2008), *aff'd in part, vacated in part by Dynegy*, 633 F.3d 1122; *see* Br. of Respondent, *Dynegy Midwest Generation, Inc. et al. v. FERC*, Nos. 09-1306 & 09-1308, 2010 WL 4569087, at *43 (D.C. Cir. Oct. 7, 2010) (taking the same position). Such an abrupt about-face without adequate justification renders a FERC order unlawful. *See Southwestern Elec. Power Co. v. FERC,* 810 F.2d 289, 290 (D.C. Cir. 1987).

For another, the departure from normal procedures rendered the order unlawful as a circumvention of Section 206. Under this Court's precedent, "the rate filed by the wholesale seller of electricity or fixed by FERC is the only lawful charge and deviation from it is not permitted upon any pretext." *Louisiana Pub. Serv. Comm'n v. FERC*, 771 F.3d 903,

910 (5th Cir. 2014) (citation omitted); *see also Arkansas Louisiana Gas Co.*, 453 U.S. at 577. In Order No. 904, however, FERC left rates on file and attempted to eliminate compensation through the expedient of forcing grid operators to "revise their [tariffs] to eliminate compensation for the provision of reactive power." Order at P 61 n.158. If that were sufficient, FERC would never have to meet its Section 206 burden of showing existing rates were unjust and unreasonable; it could simply modify grid operators' tariffs to eliminate entire classes of compensation without finding existing rates unjust and unreasonable under Section 206's first step. Eliminating reactive power while leaving "zombie" rate schedules on file contravenes the foundational goal of "rate predictability" that undergirds the "filing requirements" in the Federal Power Act. *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007). FERC's end-run thus violates the Act for that additional reason. *See City of Girard v. FERC*, 790 F.2d 919, 922 (D.C. Cir. 1986).

### C. FERC's Zero-Dollar Replacement Rate For Reactive Power Is Contrary To The Federal Power Act And Arbitrary And Capricious

Beyond sidestepping its burden to show that existing filed rates were unjust and unreasonable, FERC separately failed to establish that the $0 replacement rate it imposed was just and reasonable. As a matter of law, FERC's $0 replacement rate was not just and reasonable for the

reasons given above. *See* pp. 24-27. But even setting that aside, the reasons FERC gave for adopting its $0 replacement rate were inadequate under the Administrative Procedure Act. *First*, FERC arbitrarily and capriciously ignored the fixed and variable costs associated with providing reactive power service. *Second*, FERC abused its discretion in asserting that, because the provision of reactive power was an obligation of good utility practice, generators could be compelled to provide it for free. *Third*, FERC's remaining justifications for its order lacked a reasonable basis in law and fact.

1. FERC's first and most fundamental failure was its choice to ignore the costs of providing reactive power service. As petitioners explained below, producing reactive power carries fixed and variable costs for generators. FERC did not adequately respond to petitioners' arguments on this point, and what it did say does not hold up.

a. As FERC has long recognized, generators incur "fixed costs associated with providing reactive power service." *Dynegy Midwest Generation, Inc.*, 125 FERC ¶ 61,280 at P 11 (2008). That is because, for any generating facility, a "portion of plant investment [is] attributable to reactive power production." *See Virginia Elec. & Power Co.*, 114 FERC ¶ 61,318 at P 3 (2006); *see* pp. 9-10, *supra*. Plants producing reactive power are entitled to earn "a reasonable rate of return" from that

property to the extent that it is devoted to the production of reactive power. *Midwestern Gas*, 292 F.2d at 121.

Indeed, the costs of the equipment that generators devote (in part) to reactive power production can be quite substantial, as FERC itself has recognized in the past. For example, FERC has approved tens of millions of dollars in compensation for the "total plant cost of reactive power producing facilities" for a series of generators. *Dynegy Midwest Generation, Inc.*, 116 FERC ¶ 63,052 at PP 78, 85 (2006) (initial decision by administrative law judge finding total plant cost was $20,325,562), *order on initial decision*, 121 FERC ¶ 61,025 at PP 37-38 (2007) (affirming in relevant part). FERC has also accepted grid operators' implementation of cost-based rates for the "fixed capital costs associated with the installation and maintenance of the capability of providing reactive power." R.22 at 4 (ISO-NE Comments); *see also* R.101 at 3-4 (NYISO Comments) (similar).

In adopting Order No. 904, however, FERC disregarded those costs without adequate explanation. FERC's principal ground for dismissing them was that "real and reactive power are provided as joint products with joint costs." Order at P 90. Thus, in FERC's view, "any allocation of joint fixed costs between real and reactive power could be viewed as inherently arbitrary." *Id.* But that is wrong: FERC is obliged to allocate

costs to ensure the costs and benefits of reactive power actually "correspond to each other," as a "just and reasonable" rate requires. *El Paso II*, 76 F.4th at 361. Its failure to do so was incorrect as a matter of law and is a sufficient reason for reversal. *See* pp. 47-53, *infra* (discussing cost causation).

Further, FERC did not reconcile its contention that "any allocation of joint fixed costs between real and reactive power" was "arbitrary" with its longstanding acceptance of the AEP methodology. As noted, for over two decades, FERC has allocated joint costs under the AEP methodology based on a "reactive power allocator" determined by comparing a generator's reactive power capability to its apparent power capability. *See Bishop Hill Energy LLC*, 185 FERC ¶ 61,056 at P 19 (2023). And it has consistently found allocation under that methodology to be "just and reasonable." *See, e.g.*, *Dynegy*, 125 FERC ¶ 61,280 at P 11; *Bluegrass Generation Co., L.L.C.*, 121 FERC ¶ 61,018 at P 12 (2007). To the extent FERC has changed its mind about the justness and reasonableness of the AEP methodology, it was incumbent upon FERC to revise or even develop a new methodology—not to eliminate compensation for reactive power altogether.

What is more, reactive power is far from the only jointly sourced product for which FERC allows compensation. FERC has repeatedly

found it just and reasonable to allocate "costs [that] support multiple . . . utility functions." *Ameren Illinois Co.*, 185 FERC ¶ 61,124 at P 24 (2023); *see also*, *e.g.*, *Entergy Servs., Inc.*, 143 FERC ¶ 61,120 at P 14 (2013). For instance, transmission-owning utilities use the same assets both to serve their native load obligations (*i.e.*, the customers whom the utility must serve by virtue of their obligations as a utility) and to provide point-to-point transmission service to additional third-party customers. *See, e.g.*, *Capacity Reservation Open Access Transmission Tariffs,* Notice of Proposed Rulemaking, 61 Fed. Reg. 21,847, 21,848 (May 10, 1996). Yet FERC has never suggested a utility must provide one of those services for free. Indeed, FERC points to no other instance where it has denied cost recovery for joint costs.

Finally, FERC suggested that it is categorically more difficult to allocate the joint costs of reactive and real power. Rehearing Order at P 24. But allocating costs has never had a "claim to an exact science," particularly where "several classes of services have a common use of the same property." *Colorado Interstate Gas Co. v. Federal Power Comm'n*, 324 U.S. 581, 589 (1945). Such difficulties do not license FERC simply to throw up its hands.

b. FERC also took the position that producing reactive power imposes no meaningful incremental costs beyond the cost of producing

real power. That conclusion was likewise arbitrary and capricious and not based on substantial evidence.

The record showed that generators must use larger and more capable generation equipment to produce reactive power within the deadband compared to what they would need if they produced real power alone. *See* R.91 Attach. A ¶ 102 (Affidavit of Dennis W. Bethel, P.E.). For solar-powered plants, that has meant installing larger inverters that add hundreds of thousands of dollars in incremental costs. R.85 Attach. A ¶ 11 (Affidavit of Sherman Knight) (Knight Aff.).

Indeed, FERC staff have recognized the point as to at least some of the generators covered by the order. FERC staff previously acknowledged that asynchronous solar- and wind-powered generators have required additional power electronics designed to mimic the reactive power characteristics of a synchronous generator. *See* 2014 Staff Report, App. 1, at 7. A 2014 FERC staff report found that the cost of additional reactive power equipment for wind generators ranged from 3.18% to 4% of their capital costs, while the costs of adding reactive power capability to solar photovoltaic generators ranged from 2% to 20% of a project's total costs. *Id.* App. 2, at 2-3.

Those equipment needs are not the only incremental costs. Producing reactive power within the deadband can cost generators hundreds of

thousands of dollars a year in heating losses. *See, e.g.*, *Dynegy*, 125 FERC ¶ 61,280 at P 37; *Duke Energy Fayette, LLC*, 104 FERC ¶ 61,090 at PP 8, 17 (2003). Generators may also lose the opportunity to produce additional amounts of real power when they must instead produce reactive power within the deadband. *See* 2014 Staff Report, App. 3, at 1. In one record example, a generator's real power capability dropped from 437.6 MW to approximately 415 MW and 425 MW at power factors of 0.95 lagging and 0.95 leading—meaning that producing reactive power within the deadband caused the generator to sacrifice up to 5% of its potential real power output. Knight Aff. ¶¶ 12, 13.

FERC's responses failed meaningfully to engage with the above evidence. Responding to evidence that the price of upsizing equipment to produce reactive in addition to real power could amount to "millions of dollars" and that generators could lose significant opportunities to sell additional amounts of real power, FERC offered only a non sequitur: those costs did not count "because providing reactive power service within the standard power factor range is an obligation of the generating facility as an interconnection customer, and is consistent with good utility practice." Rehearing Order at PP 99, 101. That rationale is deficient on its own terms, as explained in the next subsection. More importantly

for present purposes, it has nothing to do with whether upsizing costs generators money.

In addressing heating losses caused by reactive power production, FERC also maintained that there was no evidence that they caused anything more than a "*de minimis* increase in variable costs." Rehearing Order at P 100. But as noted, FERC had previously approved recoveries for heating losses in the hundreds of thousands of dollars per year. And while FERC suggested that newer asynchronous generators did not require the same "costly additional equipment" to produce reactive power as older asynchronous generators did, Rehearing Order at P 101 n.289, it did nothing to account for generators that still rely on older equipment to produce reactive power. Instead, it applied the same blanket rule to all generators across the entire national electrical grid. That was not reasoned decisionmaking.

2. FERC's next justification for its $0 reactive power rate was its contention that providing reactive power within the deadband was "a requirement of . . . good utility practice." *E.g.*, Rehearing Order at P 99. Good utility practice, however, is not the barometer for whether a rate is "just and reasonable." Rather, as explained above, whether a rate is "just and reasonable" turns on whether it is "sufficient to yield a reasonable return on the value of the property . . . used to render the service."

*Bluefield Waterworks*, 262 U.S. at 690. And for good reason: as the Supreme Court has explained, a regulated entity "cannot be required" to provide a service "gratuitously" just because a regulator "assert[s] that the public interest" (understood as good utility practice or otherwise) "demand[s]" it. *Northern Pacific*, 236 U.S. at 595.

Otherwise, FERC could force any number of services to be offered for free. For example, regular maintenance of transmission lines is also a requirement of good utility practice, but that does not make it just and reasonable to prohibit utilities from incorporating maintenance costs into the rates they charge consumers. *See, e.g., New York Transco LLC*, 190 FERC ¶ 61,150 at P 22 (2025). So too, utilities must clear vegetation from their lines as a requirement of good utility practice, but that does not make it just and reasonable to force them to foot the bill for tree-trimming expenses without any chance of a return. *See* NERC Reliability Standard FAC-0003-4 (Transmission Vegetation Management); *Rules Concerning Certification of the Electric Reliability Organization, and Procedures for the Establishment, Approval, and Enforcement of Electric Reliability Standards*, Order No. 672, 114 FERC ¶ 61,104 at P 259 (2006). In those cases, as with the production of reactive power, participants in the electric sector invest funds to provide a necessary service to meet

their obligations and are entitled to a "reasonable return" on that investment. *Bluefield Waterworks*, 262 U.S. at 690.

3. Finally, FERC proffered a grab-bag of additional justifications for its decision to require generators to give away reactive power. None can salvage FERC's order.

a. At times, FERC justified its $0 rate by claiming that a generator merely "provides reactive power within the standard range for its own benefit and as a necessary condition of interconnection—so that it can reliably inject its real power into the grid." Rehearing Order at P 38. But that is incorrect: if maintaining reactive power levels within the deadband were only "for [a generator's] own benefit," FERC would hardly need to make it a generator's "obligation" as a "condition of interconnection." *Id.*; Order at P 89. In reality, generators must inject reactive power at various points of interconnection across the transmission system to ensure real power flows reliably for everyone. *See* Order No. 888, at 198. Indeed, "without . . . extra reactive power, transmission customers would not be able to use the transmission system." *Dynegy*, 121 FERC ¶ 61,025 at P 82.

FERC's decision to exempt wind generators from providing reactive power within the deadband until 2016 proves the point. *See Interconnection for Wind Energy*, Order No. 661, 111 FERC ¶ 61,353, at P 50 (2005).

Such an exemption would have been pointless if it was already "necessary" for generators to supply reactive power for their "own benefit." *See* Rehearing Order at P 58 (acknowledging that wind generators had relied for years on "reactive power on the grid coming from other sources"). Instead, as FERC concedes, the mandate to supply reactive power is for the good of the grid—*i.e.*, "based on system needs," not those of individual generators. *Id.*

b. FERC further claimed that generators can try to recover their reactive power costs by increasing their prices for real power in energy or capacity markets. *See* Order at P 28. That solution does not wash. For one, it violates the cost-causation principle: because reactive power consumers (*i.e.*, transmission customers) benefit from generators' provision of reactive power, reactive power consumers—not real power consumers—must pay the costs of reactive power. *See* pp. 47-53, *infra*. It is also entirely speculative. FERC did not find that generators *would* recover their reactive power costs in energy or capacity markets, only that they *might*. *See* Order at P 151 (suggesting generators "may" be able to recover costs). "[S]heer speculation" by FERC is not "substantial evidence." *City of Centralia v. FERC*, 213 F.3d 742, 749 (D.C. Cir. 2000).

FERC's conjecture also "runs contrary to" the evidence before it. *El Paso II*, 76 F.4th at 364. As a general rule, energy and capacity markets

are not designed to recover the costs of reactive power. *See, e.g.*, R.85 Attach. B at 14:9-15:7 (affidavit of Michael Borgatti) (Borgatti Aff.); PJM Operating Agreement, Schedule 2; *Maine Pub. Util. Comm'n*, 126 FERC ¶ 61,090 at P 41 (2009). Thus, as petitioners explained before FERC, "capacity and energy markets do not provide an alternative means of compensation for reactive service." Borgatti Aff. 13:5-6. At a minimum, FERC again failed adequately to address petitioners' argument on this score.

Even if reactive power costs were recoverable in energy and capacity markets, many generators would be unable to take advantage. For the foreseeable future, they are locked into settled bilateral power purchase agreements with agreed-upon prices that generally do not account for reactive power compensation. Indeed, such agreements are often negotiated as a means of binding parties to terms and conditions for a decade or more, to facilitate certainty for both generators and purchasers. *See, e.g., Capital Power*, 156 F.4th at 653; *Michigan Pub. Power Agency v. FERC*, 963 F.2d 1574, 1576 (D.C. Cir. 1992); *State of Wisconsin v. FERC*, 104 F.3d 462, 467 (D.C. Cir. 1997). Nor has FERC explained how reactive power costs will be collected under purchase power agreements that do not currently provide compensation for ancillary services such as reactive power. *See* Rehearing Order at P 130. While FERC speculates

that those agreements may "include 'Change in Law' provisions that broadly account for new laws and regulations," *id.*, there is typically no requirement that a counterparty accept a cost increase because of a change in law. *See, e.g.*, *Capital Power*, 156 F.4th at 653 ("FERC itself acknowledges that generators 'may not be successful' in renegotiating existing contracts" in MISO region.).

c. Changing gears, FERC identified certain developments in electricity markets and technologies since 2003 that it claims justify changing its approach. Order at P 23. But none of those developments justifies a $0 rate of compensation for reactive power. For instance, FERC notes that vertically integrated utilities have increasingly divested their generation assets, such that a greater fraction of generators now charge for real power at market-based rates. *Id.* Changes in how *real* power is priced, however, do not demonstrate that previously accepted *reactive* power rates fall outside the zone of reasonableness, much less that they must be zeroed out. In any case, the AEP methodology has been applied since its inception to companies, including AEP itself, that were authorized to make power sales at "market-based rates." *American Elec. Power Serv. Corp.*, 81 FERC ¶ 61,129 (1997); *see American Elec. Power Serv. Corp.*, 88 FERC ¶ 61,141 (1999).

FERC further observed that "[n]ew technologies have developed that provide reactive power through different means," making the AEP methodology more difficult to apply. Order at P 23. But FERC has not demonstrated that those new technologies have replaced every piece of older equipment at every generator. And it certainly has not explained why a methodology that has become more difficult to apply automatically justifies a rate that provides generators no return whatsoever.

d. Finally, FERC dismissed some of the arguments above as "a collateral attack on Order No. 2003." Order at P 101. But petitioners do not attack Order No. 2003, collaterally or otherwise. They challenge the substantive validity of a new FERC rule—Order No. 904. And when a "petitioner challenges the substantive validity of a rule, failure to exercise a prior opportunity to challenge the regulation"—assuming one existed—"ordinarily will not preclude review." *State of Mont. v. Clark*, 749 F.2d 740, 744 n.8 (D.C. Cir. 1984); *see also Cities of Batavia v. FERC*, 672 F.2d 64, 72 n.15 (D.C. Cir. 1982) (parties may raise previously litigated issues that are "inextricably linked to a subsequent agency opinion on another aspect of the same case").

In any event, Order No. 904—which *forbids* generators from receiving payment for reactive power—reflects a marked change from Order Nos. 2003 and 2003-A, which allowed (indeed, *required*) identical

payments in certain circumstances. Because Order No. 904 "substantively alter[s]" rather than "simply clarifie[s] and implement[s]" those orders, a challenge to Order No. 904 is not a collateral attack on either of them. *El Paso I*, 832 F.3d at 509. Further, because petitioners challenge FERC's "specific reasoning"—for instance, its failure to adequately explain its finding that $0 was the only just and reasonable rate for reactive power—their challenges "could succeed regardless of Order No. 2003's validity" and are thus not a collateral attack. *Capital Power*, 156 F.4th at 650.

4. Although each of FERC's rationales was erroneous, this Court should vacate Order No. 904 if it finds that any were invalid. "When an agency relies on multiple grounds for its decision, some of which are invalid," courts may uphold the agency action only "where one is valid and the agency would clearly have acted on that ground even if the other were unavailable." *Williams Gas Processing-Gulf Coast Co., LP v. FERC*, 475 F.3d 319, 330 (D.C. Cir. 2006) (citation modified). That is not the case here: Order No. 904 "rest[s] at least in part" on each of the errors enumerated above. *See id.* Accordingly, if *any* of FERC's reasons for finding $0 to be a just and reasonable rate for reactive power is contrary to the Federal Power Act or arbitrary and capricious, Order No. 904 must be vacated. *Id.*

## II. ORDER NO. 904 CONFLICTS WITH THE COST-CAUSATION PRINCIPLE

FERC also exceeded its statutory authority because Order No. 904 violates the Federal Power Act's cost-causation principle. The cost-causation principle is the well-settled rule that those who benefit from a service must pay for it. Order No. 904 fails as a matter of law because it violates that principle. At a minimum, the agency's cursory analysis of cost causation rendered its decision arbitrary and capricious under the Administrative Procedure Act. Those defects independently require vacatur of the order.

### A. FERC Exceeded Its Statutory Authority By Departing From The Cost-Causation Principle

1. A "foundational" principle of utility regulation—which also follows from Section 206's reference to "just and reasonable" rates—is that those who benefit from a service must pay for it. *El Paso I*, 832 F.3d at 505. Under that "cost-causation principle," costs "are to be allocated to those who cause the costs to be incurred and reap the resulting benefits." *El Paso II*, 76 F.4th at 357 (citation omitted). Thus, FERC may not "allocat[e] costs to those who reap little to no benefit." *Id.* at 362. Nor may it decline to "allocate costs to those who cause the costs to be incurred and reap the resulting benefits." *Id.* (citation and emphasis

omitted). Allocating costs in violation of the cost-causation principle amounts to "approv[ing] unjust and unreasonable rates." *Id.*

The cost-causation principle often comes into play in cases that involve "joint costs"—*i.e.*, where multiple entities collectively cause specific costs and enjoy the resulting benefits. In those cases, the cost-causation principle dictates that "burden" must be "matched with benefit": the joint costs must be allocated fairly, so that all who benefit from a project or service pay for it. *El Paso II*, 76 F.4th at 357 (citation omitted). Thus, for instance, FERC "may not single out [one] party for the full cost of a project, or even most of it, when the benefits of the project are diffuse." *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 268 (D.C. Cir. 2014). So too, where transmission infrastructure—a classic joint cost—is concerned, the "cost of transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits." *El Paso II*, 76 F.4th at 357 (citation omitted).

The cost-causation principle serves two core purposes. *First*, it seeks to ensure that rates are "just" by requiring "that costs and benefits correspond to each other." *El Paso II*, 76 F.4th at 361 (citations omitted). In other words, the principle reflects "a kind of equity" by "making sure that burden is matched with benefit." *Id.* (citation omitted). *Second*, the

principle helps to ensure that rates are "reasonable" by encouraging "more efficient and cost-effective" service delivery. *Id.* (citation omitted). As FERC itself has recognized, the cost-causation principle encourages efficient practices by preventing "free ridership"—where utilities use services for which they do not pay. *Id.* at 357-358, 361 (citation omitted). Limiting free ridership in turn promotes investment. *Id.* at 365. After all, "a rational economic actor" will not "elect to pay for some good or service that [it] can get for nothing." *Id.* at 364. The incentive to invest arises only when each utility must pay its fair share.

To be sure, the cost-causation principle does not require FERC to "utilize a particular formula or "allocate costs with exacting precision," particularly where "unintended, residual beneficiaries" of a service are concerned. *El Paso II*, 76 F.4th at 357, 361 (emphasis omitted). But the agency cannot depart "wholesale" from the principle of cost causation. *Id.* at 363 (citation omitted). Nor can it "sacrifice" the principle to benefit "specifically and intentionally designated" beneficiaries, no matter how compelling the "competing interests" may seem. *Id.* at 361, 363.

2. Order No. 904 wholly departs from the cost-causation principle and thus violates the Federal Power Act.

As explained above, transmission customers "cause" generators to provide reactive power service and "reap the resulting benefits." *El Paso*

*II*, 76 F.4th at 357 (citation omitted). Consistent with its longstanding policy, FERC has required generators to provide reactive power service within the deadband "for the benefit of transmission customers." *Dynegy*, 121 FERC ¶ 61,025 at P 82; *see* Order at P 179; pp. 6-10, *supra*. And FERC imposes that requirement because transmission customers need reactive power to enable the reliable transmission of real power: reactive power is used to "control system voltage within appropriate ranges" and thereby ensure that the grid efficiently transmits electricity. Order at P 3; *see, e.g.*, *Capital Power*, 156 F.4th at 648.

Under Order No. 904, however, transmission customers pay nothing for the reactive power they demand. Instead, precisely because reactive power is so essential, Order No. 904 takes the view that generators must provide it as "an obligation of good utility practice"—in other words, that transmission customers need not pay a dollar for the reactive power service they need. Order at PP 8, 89. FERC's view appears to be that, when a service is sufficiently important, a generator is required to provide it as a public service without compensation. That is a gross departure from the cost-causation principle and from the principles of fairness it embodies: FERC errs as a matter of law when it "choose[s] not to allocate costs to those who cause the costs to be incurred and reap the resulting benefits," even when those costs are incurred to provide important

utility services. *El Paso II*, 76 F.4th at 362 (citation and emphasis omitted).

Amplifying the problem, Order No. 904 facilitates the very free ridership that the cost-causation principle is meant to limit, letting transmission customers (and grid operators) take advantage of investments made by generators instead of requiring them to invest in or pay for the reactive power service they need. As FERC recognizes, grid operators can install transmission equipment to provide reactive support, the cost of which would be passed on to transmission customers. Order at P 4. But Order No. 904 gives grid operators no incentive to do so. Instead, the order requires generators to use *their* equipment and materials to produce reactive power on grid operators' behalf and for transmission customers' benefit. Generators then have the option (FERC says) of recouping their costs from *other* customers—namely, those who participate in capacity or real power markets—who neither directly cause nor benefit from generators' reactive power production. Order at P 141. The fact that transmission customers "maintain the ability to free ride" in this manner—shifting costs either to generators or to consumers of services *other than* reactive power service—confirms that Order No. 904 violates the cost-causation principle "as a matter of law." *El Paso II*, 76 F.4th at 364 n.7.

In those respects, Order No. 904 bears a striking resemblance to FERC's orders in *El Paso I* and *El Paso II*, which similarly departed from the cost-causation principle and which this Court vacated for that reason. *See El Paso II*, 76 F.4th at 356. At issue in those cases was FERC's effort to regulate investment in new transmission infrastructure across a particular planning region, which stretched from New Mexico to California. *Id.* at 358. FERC directed grid operators to make transmission investments that took into account the "transmission needs" of every utility in the region but required only a subset of those utilities—the "jurisdictional utilities" that fell within FERC's statutory jurisdiction—to pay for them. *Id.* In *El Paso I*, this Court vacated FERC's order under the cost-causation principle and remanded for further factfinding, explaining that FERC had not "provide[d] a reasoned explanation" as to how its orders comported with the cost-causation principle, including by avoiding the free-ridership problem. 832 F.3d at 505.

After FERC issued a new order responding to the Court's concerns, the Court again vacated, finding that the orders failed as a matter of law because they were "incompatible with the [Federal Power Act's] mandate for just and reasonable rates and with [the] application of the cost causation principle." *El Paso II*, 76 F.4th at 366. The Court also determined that FERC's explanation of how its orders comported with the cost-

causation principle remained "inadequate and unreasonable." *Id.* In particular, the Court reasoned that FERC's approach to costs was unlawful because it let the non-jurisdictional utilities free ride on transmission investments made "specifically and intentionally" for their benefit. *Id.* at 362-363.

Like the orders in *El Paso I* and *El Paso II*, Order No. 904 "specifically and intentionally" requires generators to serve transmission customers' "transmission needs." *See El Paso II*, 76 F.4th at 358, 362. To reiterate, generators provide reactive power because transmission customers need it to transmit electricity successfully. *See* pp. 6-10, *supra.* But like the orders in *El Paso I* and *El Paso II*, Order No. 904 does not require transmission customers to "help[] pay" for that service. *See El Paso II*, 76 F.4th at 362. Instead, like the non-jurisdictional utilities in *El Paso I* and *El Paso II*, transmission customers can receive it for free. *Id.* As a result, like the orders in *El Paso I* and *El Paso II*, Order No. 904 conflicts with the Federal Power Act's cost-causation requirement and cannot be considered "just and reasonable" as a matter of law.

### B. FERC Engaged In Arbitrary And Capricious Decisionmaking By Failing To Address The Cost-Causation Principle

In the alternative, FERC did not adequately explain its cost-causation analysis when it adopted Order No. 904. FERC gave two primary

reasons for its conclusion that Order No. 904 did not conflict with the cost-causation principle: that "real and reactive power are provided as joint products," Order at P 148, and that generators themselves "[c]ause[]" the costs associated with reactive power provision, Order at P 149; *see also* Rehearing Order at PP 97, 136-138. Neither reason withstands even cursory scrutiny, for reasons similar to those given above. *See* pp. 34-36. This Court should therefore vacate FERC's order as arbitrary and capricious.

1. FERC principally took the position that "real and reactive power are provided as joint products, with joint costs, and are produced using the same equipment," at least within the standard power factor range. Order at P 148. "[T]herefore," it reasoned, "a separate cost compensation mechanism for the provision of reactive power within the standard power factor range is not necessary." *Id.* But the cost-causation principle applies even when a utility produces joint products with joint costs: indeed, that is one of its core applications. And in any event, FERC ignored evidence that generators do not necessarily produce real and reactive power jointly.

a. At the outset, the cost-causation principle applies regardless of whether generators provide real and reactive power as joint products with joint costs. The cost-causation principle ensures that "burden is

matched with benefit." *El Paso II*, 76 F.4th at 357 (citation omitted). That principle continues to apply when a burden or benefit is joint, as a common-sense example illustrates. Imagine that a railroad carries two passengers. The railroad's costs of transporting the passengers are essentially joint; each passenger travels in the same train over the same track. Yet it would be patently unjust and unreasonable for the railroad to allocate all of those joint costs to one passenger, letting the other ride for free. And the reason is cost causation. Because the free-riding passenger causes the joint costs just as much as the paying passenger, and "reap[s]" the "benefit[s]" of the railroad's shared infrastructure, she must cover her fair share of that infrastructure's joint costs. *Id.* at 362. Put differently, because the two passengers jointly cause the railroad's costs, they must jointly pay for them. *Cf. Chicago, Milwaukee & St. Paul*, 274 U.S. at 350-351 (similar, for joint carriage of logs and lumber); *see generally* Restatement (Second) of Torts § 432(2) & illus. 3 (adopting a similar rule for causation in tort).

FERC seemingly believed that cost allocation was unnecessary because it viewed such allocation as "inherently arbitrary" (even though it has long allocated the joint costs of reactive power). Order at P 90; *see* pp. 8-10, *supra.* But the point of the cost-causation principle is that, when multiple parties benefit from a joint cost, allocation of that joint

cost is not arbitrary. To the contrary, both fairness and economic efficiency require allocations that match "burden" with "benefit." *El Paso II*, 76 F.4th at 357 (citation omitted). Setting burden equal to benefit may not always be reduceable to one "particular formula." *Id.* But that hardly licenses an agency to abandon the task entirely.

Consistent with that reality, courts regularly apply the cost-causation principle to joint products with joint costs. In *BNP Paribas*, for example, the D.C. Circuit applied the cost-causation principle to a pipeline's charges for "base gas" under the National Gas Act—a statute that closely parallels the Federal Power Act—even though the base gas "serve[d] the . . . deliverability needs" of each of the pipeline's customers jointly as part of an "integrated" system. 743 F.3d at 268-270; *see also El Paso II*, 76 F.4th at 357, 361 (citing *Paribas*). Likewise, in *Antero Resources Corporation v. FERC*, the D.C. Circuit applied the principle to an expansion of pipeline capacity in an "integrated pipeline system where all gas [was] commingled and transported through a single network"—*i.e.*, a system that served several different customers at joint cost. 156 F.4th 654, 661 (2025); *see also Ameren Illinois Co.*, 185 FERC ¶ 61,124 at P 24; *Entergy Servs.*, 143 FERC ¶ 61,120 at P 14 (requiring allocation of joint costs as a matter of FERC precedent).

This Court's decision in *El Paso II* crystallizes the point. The central problem with FERC's reasoning that this Court identified was that jurisdictional and non-jurisdictional utilities benefited jointly from the same infrastructure: because the planning region was "heavily-integrated," "significant projects" would "benefit both jurisdictional and non-jurisdictional utilities" simultaneously. 76 F.4th at 365 (citation omitted). This Court held that FERC was required to apply the cost-causation principle, reasoning that the agency could not "ignore the benefits" that those projects would provide for "free-riding non-jurisdictional utilities," even if those benefits accrued jointly with benefits to the jurisdictional utilities. *Id.* at 366. The same holds true here. Even if real and reactive power are produced jointly while providing separate benefits to multiple beneficiaries, FERC cannot "ignore the benefits" of reactive power in setting real and reactive power rates. *Id.*

b. Additionally, as explained above, FERC failed to grapple with contrary evidence in the record before concluding that "real and reactive power are provided as joint products, with joint costs . . . using the same equipment." Order at P 148. Of course, generators incur *some* of their reactive power costs jointly with their costs for producing real power. But evidence in the administrative record also establishes that generators' reactive power costs are *not* all joint. *See* pp. 36-38, *supra*.

FERC did not meaningfully explain why this evidence does not warrant credence, making its conclusion that "real and reactive power" are "provided as joint products, with joint costs . . . using the same equipment" arbitrary and capricious. Order at P 148; *see* pp. 38-39, *supra*.

2. FERC also suggested that the costs of providing reactive power are "'caused' by the operating requirements of . . . generating facilities" because "providing reactive power within the standard power factor range enables generating facilities to reliably deliver real power to the transmission system." Order at P 149. But that suggestion misapprehends what FERC's order does. It is true that generators need some reactive power to "reliably inject [their] real power into the grid." Rehearing Order at P 38. As previously explained, however, the order does more than require generators to provide reactive power for that purpose. *See* pp. 41-42. Instead, it requires generators to provide reactive power so that the grid as a whole remains stable, and thus enables "transmission customers . . . to use the transmission system." *Dynegy*, 121 FERC ¶ 61,025 at P 82. As FERC explained in the order, "generating facilities must either produce or absorb reactive power for the *transmission system*"—taken as a whole—"to maintain voltage levels required to reliably supply real power from generation to load." Order at P 3

(emphasis added); *see, e.g.*, *Southwest Power Pool, Inc.*, 119 FERC ¶ 61,199 at P 28 (2007) (similar); *see also* pp. 6-7, *supra*.

Put another way, under Order No. 904, generators must meet the reactive power needs of *others* transmitting real power to customers over the grid (at least to the extent of the deadband). That is why FERC had to impose an *obligation* rather than make it a voluntary choice. *See* pp. 6-10, *supra*. But FERC never explained why the "burden[s]" of producing reactive power should not be shared with the transmission customers who clearly derive "benefits" from the production of reactive power. *See El Paso II*, 76 F.4th at 357.

3. At a minimum, and as explained above, this Court should vacate if it finds that either of FERC's cost-causation rationales were invalid. *See* p. 46. FERC nowhere made "clear[]" that it viewed those rationales as independent grounds for adopting Order No. 904. *See Williams Gas Processing-Gulf Coast*, 475 F.3d at 330. Accordingly, although each of FERC's rationales was inconsistent with the cost-causation principle, this Court should vacate the order if it finds that either was.

## III. FERC IGNORED RELIANCE INTERESTS IN ADOPTING ORDER NO. 904

Finally, Order No. 904 is arbitrary and capricious because it ignores petitioners' reliance interests. For over twenty years, FERC treated reactive power as a distinct product for which generators could be

separately compensated. *See* Order No. 2003-A, 69 Fed. Reg. 15,932 at P 416. Petitioners received compensation and made critical business decisions in reliance on that longstanding regime. In eliminating compensation for reactive power nationwide, Order No. 904 upended the structure of American power markets and disrupted the investment-backed expectations of generators across the country. Yet the agency said almost nothing about generators' reliance interests in their reactive power payments, and what it did say was both legally deficient and analytically incomplete. Those flaws independently justify vacatur.

1. It is black-letter administrative law that, "[w]hen an agency changes course," it must "take[] into account" any "serious reliance interests" created by its prior policy. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (citations omitted); *see*, *e.g.*, *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021). An agency acts arbitrarily and capriciously when it shifts its position without adequately considering those interests. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). And in considering those interests, the agency must provide "reasoned analysis" for changing course. *Biden*, 10 F.4th at 555; *accord Capital Power*, 156 F.4th at 650.

Reliance interests arise in various circumstances, including where regulated parties make "investment decisions predicated on" an agency's

existing policies, *Capital Power*, 156 F.4th at 652, or "negotiate[] and structure[]" long-term contracts against the backdrop of current law, *Encino Motorcars*, 579 U.S. at 222. An agency must determine whether those potential reliance interests are "significant," and "weigh [them] against competing policy concerns." *Regents*, 591 U.S. at 33. An agency's blanket assertion that it conducted the requisite analysis is not enough: "Stating that [reliance] was considered . . . is not a substitute for considering it." *Biden*, 10 F.4th at 556 (citation omitted).

The D.C. Circuit's decision in *Capital Power* illustrates how those principles apply in practice. There, a grid operator (MISO) sought to eliminate reactive power compensation for generators within its territory, which consists of much of the South and Midwest. 156 F.4th at 644. FERC approved the change with an order quite similar to Order No. 904, ending cost-based compensation for reactive power in one segment of the national energy market. But the D.C. Circuit vacated FERC's decision as arbitrary and capricious. *Id.* at 651. "[G]enerators," as the court explained, had "relied on the availability of" reactive power revenues "when entering loans and negotiating long-term power-purchase agreements with wholesale customers." *Id.* As a result, ending compensation for reactive power threatened to "jeopardize" the generators' "ability to service debt and render their current . . . contracts unprofitable." *Id.*

And FERC had "failed to adequately explain why these reliance interests were either inconsequential or outweighed by countervailing considerations." *Id.*

2. Here, as in *Capital Power*, FERC did not "adequately explain" why generators' reliance interests in continued reactive power payments "were either inconsequential or outweighed by countervailing considerations." 156 F.4th at 651.

Generators and their investors have significant reliance interests in their reactive power payments, as the evidence presented below makes clear. FERC established its current framework for the provision and compensation of reactive power more than twenty years ago. *See* Order No. 2003, 104 FERC ¶ 61,103. That framework gave generators an entitlement to reactive power payments under a "comparability standard": if grid operators paid their own affiliates for reactive power, they were obliged to provide reactive power payments to every generator whom they served. *Capital Power*, 156 F.4th at 649. Because many American grid operators *did* pay their own affiliates for reactive power, the upshot of FERC's comparability standard was that reactive power payments were required in many parts of the country. *See, e.g.*, *id.* (describing how FERC "ordered" MISO to "provide . . . compensation for all generators' reactive power" in 2004).

Since then, regulated parties have relied on the reactive power payments provided by FERC's 2003 regulatory regime, "negotiat[ing]" contracts with them in mind and making "investment decisions predicated on" their existence. *Encino Motorcars*, 579 U.S. at 222; *see Capital Power*, 156 F.4th at 651-652. In particular, as petitioners explained below, many generators have entered into long-term "power purchase agreements" that presuppose continued revenue from reactive power: for example, one generator owner negotiated long-term contracts with an "offset" for reactive power payments. R.88 at 2-4; *accord* R.85 at 17-18 (similar comments by the Electric Power Supply Association, a trade association representing generators). Generators will "undercollect" under such agreements if "reactive power compensation is eliminated," effectively forcing generators to provide their services at a price lower than what they originally agreed upon. R.88 at 2-4. And as for investments, many investors have "financed the development and acquisition of utility-scale energy generation resources and portfolios based, in part, on the expectation that these resources would be eligible for and continue to receive reactive revenues." Borgatti Aff. 4:14-17 (describing investments in the PJM area). Sudden changes to FERC's reactive power compensation framework may "result in violations" of those investments' "contractual

financing obligations" and "increase the[ir] risk of financial distress." *Id.* at 4:17-20.

Yet FERC failed to give those reliance interests meaningful consideration. For example, FERC did not make factual findings as to whether changing its reactive power rules midstream would disserve generators with existing "contractual obligations," leaving those generators "stuck in long-term contracts at current prices." *Capital Power*, 156 F.4th at 653. Nor did it analyze whether ending reactive power payments could lead generators to run afoul of their contracts with investors, despite record evidence that this course of action could "result in violations of contractual financing obligations." Borgatti Aff. 4:17-20. In other words, despite FERC's obligation to address "generators' concerns" that ending reactive power compensation would be unfair in light of their "immediate debt and power-sale obligations," FERC did not do so. *Capital Power*, 156 F.4th at 653 (emphasis omitted). Likewise, despite the requirements of *Regents*, the agency entirely failed to "weigh" those reliance interests "against competing policy concerns." *Regents*, 591 U.S. at 333. Instead, as it did in the order at issue in *Capital Power*, FERC "failed to reasonably explain why the generators' short-term financial concerns were unfounded, immaterial, or outweighed by countervailing policy concerns." 156 F.4th at 653.

On this score, it is particularly revealing that FERC relied on its prior order concerning MISO—the same order the D.C. Circuit vacated for inadequate consideration of the reliance interests related to power purchase agreements. In Order No. 904, FERC repeatedly cited the MISO order when dismissing petitioners' reliance interests. *See, e.g.*, Order at PP 11, 145, 170 (citing *MISO*, 182 FERC ¶ 61,033). But in *Capital Power*, the D.C. Circuit rejected the MISO order's reliance analysis. 156 F.4th at 653. It was equally arbitrary and capricious for FERC to rely on that "defective reasoning" here. *WorldCom, Inc. v. FCC*, 246 F.3d 690, 696 (D.C. Cir. 2001).

3. Nothing in Order No. 904 gave adequate consideration to generators' reliance interests. FERC's principal rationale—that generators did not have legitimate reliance interests because they have always known that reactive power payments lie within FERC's discretion—is foreclosed by binding precedent. And its remaining responses lack merit as well.

a. FERC's principal response to generators' reliance interests was to deny they even existed. According to FERC, "because market rules can change," "no generating facility could have reasonably relied on an inherent right to separate compensation for reactive power capability." Order at P 145; *accord* Order at PP 180, 226, Rehearing Order at P

158. But that reasoning is "squarely foreclosed" by the Supreme Court's and this Court's precedents, which make clear that regulated entities can develop significant reliance interests even where an agency retains the discretion to change its mind. *Biden*, 10 F.4th at 553.

In *Regents*, for example, the Supreme Court found that undocumented immigrants held cognizable reliance interests in President Obama's Deferred Action for Childhood Arrivals program even though that program was entirely discretionary. 591 U.S. at 30-31; *see Biden*, 10 F.4th at 553 (interpreting *Regents*). Likewise, in *Clarke v. CFTC*, this Court found that a prediction market held "significant reliance interests" in a no-action letter that an agency could "modify, suspend, terminate, or otherwise restrict . . . in its discretion." 74 F.4th 627, 634, 641 (5th Cir. 2023). Persuasive authority is of a piece: in *Capital Power*, the D.C. Circuit found that generators had reliance interests in receiving payment for reactive power itself. 156 F.4th at 651.

Because Order No. 904 rests on a fundamentally mistaken premise—and FERC did not make clear that it would have independently reached the same conclusion without that premise—this Court should vacate the order. *See, e.g.*, *Williams Gas Processing-Gulf Coast*, 475 F.3d at 330.

b. To the extent FERC otherwise considered generator's reliance interests, its responses fare no better. In another part of Order No. 904, FERC purported to reject generators' reliance interests on the theory that "the provision of reactive power within the standard power factor range requires no incremental investment or fixed costs and at most *de minimis* incremental variable costs." Order at P 183. But as already explained, that is incorrect; the provision of reactive power within the standard power factor range *does* require incremental investment. *See* pp. 36-38, *supra*. FERC's rationale also misses the point. As explained in *Capital Power*, "the harm to generators stems from the loss of all reactive power revenue," not just from the failure of generators to receive compensation for specific costs. 156 F.4th at 653 (emphasis omitted). One generation owner, for example, has entered into long-term power purchase agreements that specifically include "an offset for . . . reactive power compensation." R.88 at 2. Without reactive power compensation, the generation owner will lose that revenue and receive nothing in return. That is an unfair result, and one that has nothing to do with the costs of reactive power production. *Id.*

FERC also suggested that the "record lacks any concrete evidence showing whether, and to what extent, generating facilities factored reactive power revenues into their [power purchase agreements]." Order at

P 226. But again, that ignores the evidence discussed above, *see* pp. 63-64, and it was legally incorrect in any event. FERC—not the generators—"bore the burden of proving that it was reasonable" to eliminate all compensation for reactive power on a condensed timeline. *Capital Power*, 156 F.4th at 652. And FERC "never carried its initial burden of showing that it would be reasonable to end compensation for reactive power" on such a timeline, "despite existing contracts and investment decisions predicated on its availability." *Id.* That omission is striking, given that generators enter into power purchase contracts with a lifespan of ten years or more. *See, e.g.*, *id.* at 649; R.88 at 2; R.85 at 17; p. 43, *supra*.

Finally on this point, although FERC gave certain regional transmission organizations the opportunity to adopt longer implementation periods with FERC approval, that possibility does not demonstrate that FERC adequately considered generators' reliance interests either. Order at P 224. By its terms, FERC's grace period for grid operators was neither sufficient nor meant to address generators' reliance interests; rather, it addressed "concerns raised by commentators" regarding the RTOs' "energy and capacity market rules." *Id.* That discussion reinforces that FERC failed to recognize that generators had reliance interests in this case.

In light of the serious reliance interests at stake, FERC's "conclusory" discussion of generators' interests in their existing reactive power payments "do[es] not suffice to explain its decision." *Encino Motorcars*, 579 U.S. at 224. This Court should therefore vacate Order No. 904 as arbitrary and capricious.

## IV. VACATUR IS THE APPROPRIATE REMEDY

Given its numerous defects, Order No. 904 should be vacated. As this Court has explained, the "default rule" in cases under the Administrative Procedure Act "is that vacatur is the appropriate remedy." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022); *see also El Paso I,* 832 F.3d at 510. Vacatur here would not have "disruptive consequences." *Texas Med. Assn. v. U.S. Dep't of Health & Human Servs.*, 110 F.4th 762, 779 (5th Cir. 2024) (citation omitted). Rather, it would "preserve[]" the pre-order "status quo." *Id.* Accordingly, this Court should follow its usual practice and vacate Order No. 904.

## CONCLUSION

FERC Order No. 904 should be vacated.

Respectfully submitted,

/s/ Masha G. Hansford
KANNON K. SHANMUGAM
MASHA G. HANSFORD
JAMES DURLING
NATHAN W. RAAB
JACOB R. SCHULZ
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*mhansford@paulweiss.com*

*Counsel for PSEG Petitioners*

/s/ James E. Tysse
JAMES E. TYSSE
STEPHEN J. HUG
KRISTEN E. LOVELAND
MARGARET O. RUSCONI
MATTHEW S. NOXSEL
AKIN GUMP STRAUSS
HAUER & FELD LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 756-8000*
*jtysse@akingump.com*

*Counsel for Vistra Petitioners*

/s/ Christopher Odell
CHRISTOPHER ODELL
ARNOLD & PORTER
KAYE SCHOLER, LLP
*700 Louisiana Street,*
*Suite 4000*
*Houston, TX 77002*
*(713) 576-2400*
*christopher.odell@arnoldporter.com*

*Counsel for Alpha Generation Petitioner*

February 19, 2026

# ADDENDUM

## TABLE OF CONTENTS

16 U.S.C. § 824d .......................................................................... Add. 1

16 U.S.C. § 824e .......................................................................... Add. 6

**United States Code**
**Title 16. Conservation**
**Chapter 12. Federal Regulation and Development of Power**
**Subchapter II. Regulation of Electric Utility Companies Engaged in Interstate Commerce**

## 16 U.S.C. § 824d

§ 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

Effective: October 23, 2018

(a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

(b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any

manner affect or relate to such rates, charges, classifications, and services.

(d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public

utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine--

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are--

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment

clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to--

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

(g) Inaction of Commissioners

(1) In general

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum--

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825l(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

(2) Appeal

If, pursuant to this subsection, a person seeks a rehearing under section 825l(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825l(b) of this title.

## 16 U.S.C. § 824e

§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

Effective: August 8, 2005

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this

section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: Provided, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: Provided, That refunds, in whole or in part, may be

ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.

(d) Investigation of costs

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

(e) Short-term sales

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall

be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to--

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, James E. Tysse, a member of the Bar of this Court and counsel for Vistra petitioners, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), Fifth Circuit Rule 32.3, the Court's August 25, 2025 Order, Dkt. 129, and the Court's February 19, 2026 Order, Dkt. 217, that the attached Joint Brief of Petitioners is proportionately spaced, has a typeface of 14 points or more, and contains 14,972 words.

/s/ James E. Tysse
JAMES E. TYSSE

February 19, 2026